IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civ. No. 18-00145 JMS-RT |
| Plaintiff, | ORDER (1) GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 48; (2) GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM, ECF NO. 52; AND (3) GRANTING THIRD-PARTY DEFENDANTS' MOTION TO DISMISS INDIVIDUAL CAPACITY CLAIMS, ECF NO. 55 |
| vs. | |
| SANDWICH ISLES COMMUNICATIONS, INC., ET AL., | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS AND THIRD-PARTY CLAIMS. | |

**ORDER (1) GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, ECF NO. 48; (2) GRANTING PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIM, ECF NO. 52; AND (3) GRANTING THIRD-PARTY DEFENDANTS' MOTION TO DISMISS INDIVIDUAL CAPACITY CLAIMS, ECF NO. 55**

## I. INTRODUCTION

The court addresses three motions in this suit brought by Plaintiff United States of America ("Plaintiff" or "United States") arising from the alleged breach of certain promissory notes by Defendant Sandwich Isles Communications, Inc. ("Sandwich Isles" or "SIC").

First, the United States seeks summary judgment on Count One of its Complaint, arguing that it is undisputed that Sandwich Isles has breached loan contracts—owing the United States well over $129 million—by defaulting on loans made to Sandwich Isles by the Rural Telephone Bank ("RTB"), predecessor to the Rural Utilities Service ("RUS"), which is an agency of the U.S. Department of Agriculture ("USDA").  *See* ECF No. 48.[1]  The United States also moved for summary judgment on Count Two, seeking to foreclose immediately on the loans and to sell all property pledged as collateral, but it is no longer pursuing such relief at this stage of the proceedings.

Second, the United States—as counterclaim-Defendants the USDA; the Federal Communications Commission ("FCC"); Ajit Pai ("Pai"), Lisa Hone ("Hone"), Sharon Gillett ("Gillett"), and Carol Mattey ("Mattey") in their official capacities as current or former FCC officials; and Kenneth Johnson ("Johnson"), in his official capacity as head of the RUS (collectively, the "Official Capacity Counter-Defendants" or simply the "United States")—moves to dismiss the counterclaim brought against them by Sandwich Isles and "additional counterclaimants" Iini Patelesio and Kaleo Cullen.  *See* ECF No. 52.

---

[1] Plaintiff's Motion for Partial Summary Judgment does not address the other Counts of the Complaint, alleging (1) violations of the Federal Priority Statute, 31 U.S.C. § 3713, for preferential transfers to others while Sandwich Isles was "insolvent;" (2) violations of provisions of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304, for post-insolvency fraudulent transfers; and (3) beaches of fiduciary duty.  *See generally* ECF No. 1 at ¶¶ 174 to 279.

Third, Pai, Hone, Gillett, Mattey, and Johnson, in their *individual* capacities (collectively the "Individual Capacity Third-Party Defendants"), separately move to dismiss all third-party claims against them.  *See* ECF No. 55.

Having considered the extensive written briefing, and oral arguments of counsel at the April 29, 2019 hearing, the court rules as follows:

Plaintiff's Motion for Partial Summary Judgment, ECF No. 48, is GRANTED in part.  It is granted as to Count One because the record establishes that Sandwich Isles has breached the promissory notes at issue and is in default.  It is denied without prejudice as to Count Two because of an existing bankruptcy stay and, in any event, procedural and substantive requirements remain before the sale of all collateral can occur (as conceded by Plaintiff).

The United States' Motion to Dismiss Counterclaim of Sandwich Isles, Patelesio and Cullen, ECF No. 52, is GRANTED with leave to amend.  By August 19, 2019, Sandwich Isles may file an amended counterclaim—as to Count One of its Counterclaim only—that attempts to cure the defects identified in this Order.

Finally, the Individual Capacity Third-Party Defendants' Motion to Dismiss, ECF No. 55, is GRANTED with prejudice.  The claims against Pai, Hone, Gillett, Mattey, and Johnson, in their individual capacities, fail to state viable causes-of-action under *Bivens v. Six Unknown Agents of the Federal Bureau of*

*Narcotics*, 403 U.S. 388 (1971), and any such amendment would be futile under

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017).

## II. <u>BACKGROUND</u>

### A.    **Factual Background**

#### 1.    *Sandwich Isles*

Sandwich Isles was formed in the mid-1990s to provide

telecommunications services to native Hawaiians on Hawaiian home lands.  ECF

No. 26-1 ¶ 29 at PageID #590.  *See generally Nelson v. Hawaiian Homes Comm'n*,

127 Haw. 185, 187-89, 277 P.3d 279, 281-83 (2012) (explaining basic history of

the Hawaiian Homes Commission Act); *Arakaki v. Lingle*, 477 F.3d 1048, 1054-55

(9th Cir. 2007) (also setting forth history, and explaining that the State of Hawaii

Department of Hawaii Home Lands administers Hawaiian home lands for the

benefit of "native Hawaiians," defined by the Hawaiian Homes Commission Act as

"any descendant of not less than one-half part of the blood of the races inhabiting

the Hawaiian Islands previous to 1778").  Hawaiian home lands are primarily

located in rural or more remote areas, and "[b]ecause of the remote and non-

contiguous nature of the Home Lands, the cost to provide infrastructure to these

areas is very high."  ECF No. 26-1 ¶ 20 at PageID #587.

According to the Complaint, "at times relevant," Defendant Albert

S.N. Hee ("Hee") has been Sandwich Isles' president and secretary, and one of its

directors. ECF No. 1 ¶ 16 at PageID #5. Hee was president "until a date in 2013 after August 30, 2013." *Id.* ¶ 19. He remained secretary "until a date in 2013," and a director until July 13, 2015. *Id.* ¶¶ 19, 20. Sandwich Isles' current president and secretary is Defendant Janeen-Ann Olds ("Olds"), having become president "on a date in 2013 after August 30, 2013." *Id.* ¶¶ 13, 14 at PageID #4, 5.

Sandwich Isles is a wholly-owned subsidiary of Defendant Waimana Enterprises, Inc. ("Waimana"), which is a Hawaii corporation. *Id.* ¶¶ 33, 107 at PageID #7, 17. Before December 2012, Hee was the sole owner of Waimana. *Id.* ¶ 111 at PageID #17. After December 2012, Hee owned 10% of Waimana, with the other 90% owned by trusts benefitting Hee's children. *Id.* ¶ 112 at PageID #18. The directors of Waimana "at various times relevant" to this case, have been Hee, his wife, and their children. *Id.* ¶ 108 at PageID #17. In addition to Sandwich Isles, Waimana wholly owns as subsidiaries Defendants ClearCom, Inc. and Ho'opa'a Insurance Corp. *Id.* ¶¶ 113, 114 at PageID #18. Defendants Paniolo Cable Company, LLC and Pa Makani LLC are owned indirectly by trusts benefitting Hee's children. *Id.* ¶¶ 115, 116.

When the Complaint was filed on April 20, 2018, Hee was incarcerated at a Federal Correctional Institution located in Terre Haute, Indiana. *Id.* ¶ 18 at PageID #5. As set forth in a Judgment entered on January 7, 2016, Hee was convicted and sentenced to 46 months imprisonment on various tax-related

charges, stemming from a grand jury indictment first returned on September 17, 2014. *See United States v. Albert S.N. Hee*, Crim. No. 14-00826 SOM (D. Haw.) (ECF Nos. 1, 242).[2] His conviction was affirmed on March 14, 2017. *See United States v. Hee*, 681 F. App'x 650 (9th Cir. Mar. 14, 2017) (mem.).

"The evidence at trial established that Hee had characterized millions of dollars in personal expenses as business expenses incurred by [Waimana]." *Hee v. United States*, 2018 WL 4609932, at *1 (D. Haw. Sept. 25, 2018) (denying § 2255 petition). Specifically,

> Trial evidence established that, between 2002 and 2012, Hee used Waimana to pay millions of dollars in personal expenses, including personal massages, college tuition for his children, living expenses for his children, and credit card charges such as those for family vacations to France, Switzerland, Tahiti, Disney World, and the Mauna Lani resort. Hee also had Waimana pay salaries and benefits to his wife and children, even while his children were full-time students doing no work for the company. And although Hee claimed that he purchased the Santa Clara house as an investment by Waimana, Hee's son and daughter lived in the house while attending college and rented out rooms to classmates without submitting the rent proceeds to Waimana. Waimana wrongfully deducted the expenses on corporate

---

[2] The court takes judicial notice of Hee's conviction, and of various court decisions and published administrative orders related to it and to Sandwich Isles, as discussed later in this Order. *See, e.g.*, *Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("[Courts] may take judicial notice of undisputed matters of public record . . ., including documents on file in federal or state courts.") (citations omitted). This includes "records and reports of administrative bodies." *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (citation omitted).

tax returns, and Hee failed to report the receipt of any rental income on his personal tax returns.  After an eleven-day trial, the jury returned a verdict of guilty beyond a reasonable doubt on all counts.

*Id.*

### 2.    *Loans from the RTB and Funding from the FCC's USF Program*

To partially finance construction and operation of Sandwich Isles' telecommunications services on Hawaiian home lands, Sandwich Isles and the United States entered into a series of loan agreements and corresponding promissory notes from September 1997 to April 2001.  ECF No. 1 ¶ 57 at PageID #10.  The three loans, totaling over $165 million, were made by the RTB pursuant to the Rural Electrification Act of 1936, as amended, 7 U.S.C. § 901 et seq.  *See* Kenneth Kuchno Decl. ¶¶ 5-6, ECF No. 50 at PageID #939.[3]  RTB was an agency of the USDA, but was dissolved in 2006, and was succeeded by the RUS, which is also an agency of the USDA.  *Id.* ¶ 19 at PageID #940.  As of January 1, 2013, Sandwich Isles was required to make monthly installment payments to the RUS of $1,086,758.01.  *Id.* ¶ 35 at PageID #942.

---

[3] The court overrules Sandwich Isles' objections to Kuchno's declaration, arguing that it is insufficient to authenticate the various financial records attached to the Complaint and to Kuchno's declaration.  *See* ECF No. 108 at Page ID #1326-27.  Kuchno declares under penalty of perjury that he is a current Deputy Assistant Administrator with the RUS, having worked there since 1980 and as Deputy Assistant Administrator since 2014.  ECF No. 50 ¶ 3.  In that capacity, he attests to having personal knowledge of facts, issues, and documents referred to in his declaration.  *Id.* ¶ 4.  His declaration is sufficient to authenticate the records, and Sandwich Isles offers nothing contrary to question their authenticity.

Meanwhile, Sandwich Isles was receiving subsidies from the FCC as part of the FCC's Universal Service Fund ("USF"). Indeed, to qualify for certain loan advances, the RUS required Sandwich Isles to provide "evidence that [it] has received approval to participate in the Universal Service Fund" so that the RUS could "determine that the revenues derived by [Sandwich Isles] from said Fund, along with the revenues derived by [Sandwich Isles] from all other sources, will be sufficient to enable [Sandwich Isles] to maintain" a certain level of financial health. ECF No. 1-1 ¶ 5 at Page ID #76.

> The USF is a funding stream the [FCC] uses to subsidize telecommunications and information services in rural and high-cost areas, as well as for schools, libraries, and low-income households. 47 U.S.C. § 254(b)(3), (h)(1)(B). The USF receives its funding from businesses in the telecommunications sector; some businesses are required by statute to contribute while others must contribute only when the [FCC] has, in its discretion, required them to do so. Specifically, the Act mandates contributions from "[e]very telecommunications carrier that provides interstate telecommunications services." *Id.* § 254(d). Moreover, under its permissive contribution authority, the [FCC] may demand USF contributions from "[a]ny other provider of interstate telecommunications . . . if the public interest so requires." *Id.*

*Vonage Holdings Corp. v. F.C.C.*, 489 F.3d 1232, 1236 (D.C. Cir. 2007).

As addressed later in this Order, the USF was established to fulfill certain principles, including that:

> Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

47 U.S.C. § 254(b)(3), and that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5).

In 2005, Sandwich Isles was receiving USF high-cost support in the amount of $14,000 per "loop" (or line) per year. ECF No. 26-1 ¶¶ 52 to 59 at PageID #597 to 601; *In re Sandwich Isles Commc'ns*, 20 FCC Rcd. 8999, 9006 n.53, 2005 WL 1147760 at **5 n.53 (May 16, 2005).

### 3. The 2011 Transformation Order, and 2013 Waiver Denial

In 2011, "the FCC 'comprehensively reformed' its existing regulatory system for telephone service." *In re FCC 11-161*, 753 F.3d 1015, 1035 (10th Cir. 2014). "On February 9, 2011, the FCC issued a Notice of Proposed Rulemaking (NPRM) 'proposing to fundamentally modernize the FCC's Universal Service Fund (USF or Fund) and intercarrier compensation (ICC) system.'" *Id.* at 1035-36 (citation and brackets omitted). As a result, on November 18, 2011, the FCC issued a comprehensive 975-page Report and Order (the "Transformation Order"),

that, among other matters, reformed the manner and amount of USF payouts made to rural carriers.  *See In re Connect America Fund*, 26 FCC Rcd. 17663, 2011 WL 5844975 (Nov. 18, 2011), *petitions for review denied*, *In re FCC 11-161*, 753 F.3d at 1033; *see also In re FCC 11-161*, 753 F.3d at 1070 (analyzing changes to USF subsidies).

The Transformation Order instituted a $250 per line per month cap on USF support, effective July 2014.  *See* 47 C.F.R. § 54.302(a).  This was a significant reduction from the $14,000 per line per year that Sandwich Isles had been receiving.  As summarized by the United States, "[t]he Transformation Order affected . . . *all* high-cost USF recipients by establishing, 'for the first time,' a 'budget for the high-cost programs within USF' to 'protect consumers and businesses that ultimately pay for USF through fees on their communications bills.'"  ECF No. 55-1 at PageID #1037 (quoting Transformation Order, 26 FCC Rcd. 17663, ¶ 18).

The FCC recognized that its reforms could impact particular recipients differently, so the Transformation Order established a "waiver mechanism under which a carrier can seek relief from some or all of our reforms if the carrier can demonstrate that the reduction in existing high-cost support would put consumers at risk of losing voice service. . . ."  *Id.* (quoting Transformation Order ¶¶ 32, 193, 539).  *See also In re FCC 11-161*, 753 F.3d at 1069 (explaining

that "the Order made clear that if 'any rate-of-return carrier can effectively demonstrate that it needs additional support to avoid constitutionally confiscatory rates, the FCC will consider a waiver request for additional support.'") (citing Transformation Order ¶ 294).

Sandwich Isles sought a waiver from the Transformation Order, and its $250 per line per month cap on USF subsidies, but the FCC denied its request on May 10, 2013. *See In re Connect America Fund*, 28 FCC Rcd. 6553, 2013 WL 1962345 (May 10, 2013). The FCC's denial concluded as follows:

> We conclude that Sandwich Isles has failed to show good cause for a waiver at this time. In particular, Sandwich Isles seeks a waiver that would allow it to retain a number of significant and wasteful expenses, totaling many millions of dollars, including significant payments to a number of affiliated and closely-related companies. Indeed, Sandwich Isles' corporate expenses are 623 percent greater than the average for companies of similar size with the highest corporate operations expenses. . . . Sandwich Isles may file a new petition for waiver in the future, once it is able to restructure its operations in an appropriate manner that allows it to reduce unreasonable expenses.

2013 WL 1962345, at **1. Sandwich Isles apparently did not appeal that denial.

And in a different decision in related proceedings, on December 5, 2016, the FCC issued an administrative Order concluding that "Sandwich Isles improperly received payments in the amount of $27,270,390 from the federal high-cost support mechanisms from 2002 to June 2015," and finding that "amount[s] to

be determined of the inflated management fees paid by Sandwich Isles to its parent company Waimana . . . were excessive." *In re Sandwich Isles Commc'ns*, 31 FCC Rcd. 12999, 2016 WL 7129743 at **1 (Dec. 5, 2016).  Among other things, the Order required Sandwich Isles to repay the $27 million that it improperly received, and it continued a suspension of further USF payments to Sandwich Isles that the FCC had implemented on July 28, 2015.  *Id.* at **10

      The FCC denied reconsideration of that Order on January 3, 2019. *See In re Sandwich Isles Commc'ns, Inc*., 2019 WL 105385 (F.C.C. 18-172 Jan. 3, 2019).  And, on May 17, 2019, the Court of Appeals for the District of Columbia dismissed as untimely Sandwich Isles' appeal of that reconsideration Order.  *See Sandwich Isles Commc'ns, Inc. v. FCC*, 2019 WL 2564087 (D.C. Cir. May 17, 2019).

### 4. *Sandwich Isles Stops Making Full Payments on the Loans*

      Meanwhile, in an April 25, 2013 letter from Hee to the Secretary of Agriculture, Sandwich Isles—given the FCC's adoption of the Transformation Order lowering USF payments (and apparently while its waiver petition was still pending)—notified the FCC that Sandwich Isles "is unable to continue making interest and principal payments on [its] RUS loans."  ECF No. 48-18 at PageID #892.  Rather, Hee stated that "beginning in May 2013, Sandwich Isles will be

reducing the amount of its debt payment made to RUS to match the amount the FCC has determined is reasonable and supportable." *Id.* at PageID #894.

On May 10, 2013, the RUS responded to the April 25, 2013 notification by declaring that Sandwich Isles' nonpayment of the full amounts owing was an "event of default," and that the RUS would be "accelerat[ing] the entire debt on the Loans" if full payment was not made. ECF No. 48-19 at PageID #895, 896. After apparent negotiations, by letter dated July 26, 2013, the USDA rejected a proposed restructuring plan from Sandwich Isles. ECF No. 48-21 at PageID #905. That letter indicated that, in order to cure the default, Sandwich Isles was required by August 26, 2013 to make payment in full of past due amounts. *Id.* at PageID #906.

Sandwich Isles did not make payment in full. Instead, it continued to make periodic partial payments until February 2018, when it made its last payment. Specifically, "[f]rom November 2013 through February 2018, [Sandwich Isles] has made payments on the RUS Loans ranging from approximately 4.6% to approximately 27.7% of the monthly installment payments that were due in 2013 prior to RUS's acceleration of the repayment of the RUS Loans." ECF No. 110 ¶ 18 at PageID #1368, 1369.

## B. Procedural Background

The United States, on behalf of the RUS, filed this suit on April 20, 2018. ECF No. 1. The Complaint contains six substantive counts:

- Count One (breach of contract against Sandwich Isles for failure to repay the RUS loans);

- Count Two (seeking foreclosure and sale of mortgaged property, against Sandwich Isles and several other Defendants who may have had interests in such property);[4]

- Count Three (violations of the Federal Priority Statute, 31 U.S.C. § 3713, against Hee, Olds, and Randall Ho "for approving payment of claims of others before causing the claims of the United States to be paid");

- Count Four (violations of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304, against Waimana, ClearCom, Ho'opa'a Insurance Co., Paniolo, Pa Makani LLC, Hee, Ho, and Olds, for "transfers made while [Sandwich Isles] was insolvent");

- Count Five (violations of the Federal Debt Collection Procedures Act, against Waimana, ClearCom, Paniolo, Hee, Ho, and Olds, for "[Sandwich Isles'] transfers or obligations for which [Sandwich Isles] did not receive reasonably equivalent value"); and

- Count Six (breach of fiduciary duty, against Hee and Olds).

On August 3, 2018, Sandwich Isles filed its answer, along with a counterclaim. ECF No. 26. The counterclaim joins as "additional

---

[4] Those Defendants are Hawaii National Bank, Maui Electric Co., Ltd., Hawaiian Electric Company, Inc., Central Pacific Bank, Kekauluohi, Inc., Dell Financial Services LLC, R.M. Towill Corporation, ClearCom, Inc., and Paniolo. ECF No. 1 at PageID #26.

Counterclaimants" Patelesio and Cullen (who were joined, perhaps improperly, pursuant to Federal Rules of Civil Procedure 13(h) and 20).  As discussed to follow, the counterclaim is made against the United States, and "additional counterclaim Defendants Kenneth Johnson, the FCC, Ajit Pai, Lisa Hone, Sharon Gillett,[5] and Carol Mattey."  ECF No. 26-1.  The counterclaim (more correctly characterized as a third-party counterclaim as to the individuals sued in their personal capacities) is described and analyzed later, when discussing the motions seeking its dismissal.

As described in the Introduction, the court now faces three substantive motions—(1) the United States' Motion for Partial Summary Judgment as to Counts One and Two of its Complaint, ECF No. 48, (2) the United States' Motion to Dismiss the counterclaim as to its official-capacity allegations, ECF No. 52, and (3) the Individual Capacity Third-Party Defendants' Motion to Dismiss the third-party counterclaim as to the individual-capacity allegations, ECF No. 55.  The court held a hearing on the motions on April 29, 2019.  ECF No. 140.

---

[5] The counterclaim describes Sharon "Gillette" as "the former Bureau Chief of the FCC's Wireline Competition Bureau."  ECF No. 26-1 at PageID #586.  The court, however, spells her name "Gillett," as used by government counsel representing the counterclaim Defendants in their individual capacities.

# III. **DISCUSSION**

A. **Motion One—the United States' Motion for Partial Summary Judgment on Counts One and Two of its Complaint, ECF No. 48**

*1. Standard of Review*

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56[(a)] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation marks omitted).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1184 (9th Cir. 2016).

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir. 1992)). And so a Plaintiff moving for summary judgment on an affirmative claim "must establish beyond peradventure *all* of the essential elements of the claim . . . to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Put another way, "[its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v.*

*United States,* 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary*

*Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99

F.R.D. 465, 488 (1984)).

**2.      As to Count One, Sandwich Isles has Defaulted on the Promissory Notes**

Sandwich Isles admits that it has not made full installment payments

on the RUS promissory notes since before April 2013.  ECF No. 48-2 ¶¶ 15, 19 at

PageID #830-31; ECF No. 110 ¶¶ 15, 19 at PageID #1367-69.  Rather, Sandwich

Isles made a partial payment on April 30, 2013, and continued to make partial

payments until February 2018, when it stopped making payments altogether.  ECF

No. 110 ¶¶ 16, 18 at PageID #1368-69.

Sandwich Isles also concedes that the RUS accelerated the remaining

balance on the loans according to the loans' terms, effective August 27, 2013, after

the RUS rejected a proposed restructuring plan on July 26, 2013.  *Id.* ¶ 17; ECF

No. 48-21 at PageID #903; Kuchno Decl. ¶ 45, ECF No 50 at PageID #943.  As

such, Sandwich Isles cannot contest that a failure to make full payments was an

"event of default," at least as the term is defined under the loan documents.  *See*

ECF No. 1-10 at PageID #148 (Art. III, § 1(a) of mortgage); ECF No. 1-1 at

PageID #69 (§ 5.1 of the Sept. 26, 1997 Loan Contract).

And Sandwich Isles acknowledges that it has not repaid the balances due on the RUS loans, which exceeded $129 million in July 2018 (with interest continuing to accrue).  ECF No. 110 ¶ 19 at PageID #1369; ECF No. 48-22 at PageID #909.

Despite those uncontested facts, Sandwich Isles argues that it has not breached the loan contracts (and is therefore not in default) because a purported "basic assumption" of the loans—that Sandwich Isles would continue to receive the same level of USF payments from the FCC to, in turn, make the loan payments to the RUS—changed when the FCC issued its Transformation Order in 2011, and then denied Sandwich Isle's application for a waiver from the Transformation Order in 2013.  In essence, Sandwich Isles contends that its obligation to make full loan payments to the RUS ended when the FCC lowered the amount of USF payments to Sandwich Isles.  *See* ECF No. 108 at PageID #1331 (opposition arguing that "[c]ontinuation of the universal service fund payments at the same level was a 'basic assumption on which the contract was made'" such that "SIC's obligation to perform the contract has been discharged") (quoting Restatement (Second) of Contracts § 261).  This argument fails, both factually and legally.

Nothing in the contractual language supports Sandwich Isles' position.  Sandwich Isles relies on the following provision (the "Revenue

Documentation Prerequisite") listed in "Schedule A" of the Sept. 26, 1997 loan

agreement:[6]

> (C) . . . [N]o advances of funds on account of the [loans]
> will be made unless and until those additional
> prerequisites to advances of funds have been met as set
> forth in Schedule A attached to and made a part of this
> agreement.
> . . . .
> 5. [Sandwich Isles provides] evidence that [Sandwich
> Isles] has received approval to participate in the
> Universal Service Fund to enable RUS to determine that
> the revenues derived by [Sandwich Isles] from said Fund,
> along with the revenues derived by [Sandwich Isles]
> from all other sources, will be sufficient to enable
> [Sandwich Isles] to maintain a TIER of 1.04.

ECF No. 1-1 at PageID #56, 76.[7]  And it cites to a declaration of Albert Hee as

extrinsic evidence of the parties' intent that the obligation to make full payments

on the RUS loans was contingent on sufficient USF payments continuing without

reduction.  *See* Hee Decl. ¶¶ 9-11, ECF No. 110-1 at PageID #1375-76.

But the terms of the Revenue Documentation Prerequisite are

unambiguous, and they say nothing about Sandwich Isles' obligations to make loan

---

[6] Some of the loan agreements do not have this Revenue Documentation Prerequisite. *See* ECF No. 1-2 at PageID #79-85 (Jan. 22, 1999 loan agreement with no such reference to USF payments); ECF No. 1-3 at Page ID #87-95 (Apr. 2, 2001 loan agreement with no such reference).

[7] "TIER" means "times interest earned ratio," and is a figure used by the RUS "to assess its borrowers' financial health."  Kuchno Decl. ¶¶ 30-31, ECF No. 50 at Page ID #941-942; ECF No. 125 at Page ID #1633.

payments.[8]  The absence of ambiguity in this provision renders extrinsic evidence of intent improper.  *See, e.g.*, *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765-66 (2018) (reasoning that courts may not consult extrinsic evidence "unless, 'after applying established rules of interpretation, [the provision] remains reasonably susceptible to at least two reasonable but conflicting meanings.'") (quoting 11 R. Lord, *Williston on Contracts* § 30.4, at 53-54 (4th ed. 2012)); *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) ("[W]hen the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself.") (citation omitted); *id.* ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation.") (citation omitted).

The clear terms required Sandwich Isles, as a condition precedent to receiving "advances of funds," to provide the RUS with evidence only that Sandwich Isles was "approv[ed] to *participate* in the [USF]"—and evidence of such participation that was in fact given to the RUS.  *See* ECF No. 50 ¶ 30, 32 at

---

[8] The court applies federal law in interpreting these federal contracts entered into pursuant to the Rural Electrification Act, as amended, 7 U.S.C. § 901 et seq.  *See, e.g.*, *United States v. Seckinger*, 397 U.S. 203, 209-10 (1970) (holding that federal law controls interpretation of a contract between United States and contractor, where the "contract was entered into pursuant to authority conferred by federal statute"); *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989) ("Federal law controls the interpretation of a contract entered pursuant to federal law when the United States is a party.") (citing *Seckinger*).

PageID #941-42.  This enabled the RUS to determine whether USF revenues "along with the revenues . . . from all other sources," would be sufficient for Sandwich Isles "to maintain a TIER of 1.04."  ECF No. 1-1 at PageID #76.  The RUS knew that Sandwich Isles would be participating in the USF (and required such participation) and would be receiving subsidies.  The provision, however, says nothing about limiting Sandwich Isles' duty to repay the loans based on receipt of any specific level of USF payments.  It says nothing about ending Sandwich Isles' repayment obligations if USF payments were reduced.  Indeed, it specifically contemplates that Sandwich Isles would be receiving revenues from other sources (besides USF payments) to maintain the specified measure of financial health.

Under the provision's plain language, if Sandwich Isles was unable to provide evidence that it was "approv[ed] to participate in the [USF]," then the RUS was not required to make further advances of funds.  *Id.*  Likewise, the provision could indicate that the RUS had no further obligation to advance funds if Sandwich Isles could not "maintain a TIER of 1.04."  *Id.*  But there is no language that even hints at terminating or reducing Sandwich Isles' separate obligation to make loan payments for previous advances.  There is no language excusing Sandwich Isles from full performance if USF payments are reduced or discontinued.  Similarly, nothing in that provision (or anywhere else in the loan contracts) precludes the

FCC (a non-party to the contracts) from changing the amount of USF payments to Sandwich Isles.[9]

And this reading—that the contracts say nothing limiting Sandwich Isles' loan payment obligations upon a regulatory change in the amount of USF payments—is fully supported by *United States v. Winstar Corporation*, 518 U.S. 839, 905-910 (1996), which interpreted the "basic assumption" provision of section 261 of the Restatement (Second) of Contracts, relied upon by Sandwich Isles. In particular, Sandwich Isles contends that, under section 261, its payment obligation was discharged (or there is at least a question of fact regarding its obligation) by the non-occurrence of a "basic assumption" of the contract. Section 261 provides:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

In interpreting section 261, *Winstar* reasoned that "[t]he premise of this requirement is that the parties will have bargained with respect to any risks that are both within their contemplation and central to the substance of the contract." 518

---

[9] There is no indication that RUS or the USDA has any control over the FCC or its decisions on the amount of USF payments made to carriers.

U.S. at 905. And "if the risk was foreseeable *there should have been provision for it in the contract*, and the absence of such a provision gives rise to the inference that the risk was assumed." *Id.* (quoting *Lloyd v. Murphy*, 153 P.2d 47, 50 (Cal. 1944) (Traynor J.) (internal brackets omitted) (emphasis added).

Here, if a "basic assumption of the contract" was—as Sandwich Isles contends—that USF payments would not be lowered by the FCC (or that a lowering of USF payments would discharge its obligation to make loan payments), then "there should have been provision for it in the contract." *Id.* As for USF payments to Sandwich Isles, "there is no doubt that some changes in the regulatory structure . . . were both foreseeable and likely when [Sandwich Isles] contracted with the Government," *id.* at 906—especially in this highly regulated telecommunications area—and yet there is no contractual language making such a regulatory change (or lack thereof) a prerequisite towards Sandwich Isles' payment obligation. This absence "gives rise to the inference that the risk was assumed [by Sandwich Isles]." *Id.* at 905. Indeed, *Winstar* reasoned under analogous circumstances that "it would be absurd to say that the nonoccurrence of a change in

///

///

///

the regulatory capital rules was a basic assumption upon which these contracts were made." *Id.* at 907 (citations omitted).[10]

Moreover, this conclusion—that a continuation of (non-reduced) USF payments was not a "basic assumption" of the loan contracts indicated in the Revenue Documentation Prerequisite—is further reinforced by the Tenth Circuit's decision in *In re FCC 11-161*, which upheld the Transformation Order. In particular, *In re FCC 11-161* rejected the argument that the Transformation Order unlawfully deprived rural carriers (such as Sandwich Isles) "of a reasonable opportunity to recover their prudently-incurred costs." 753 F.3d at 1069. In so doing, the Tenth Circuit concluded that the FCC was "both reasoned and reasonable" in finding that "carriers have no vested property interest in USF [payments]." *Id.* at 1070, 1071 (quoting Transformation Order ¶ 293). Specifically, it embraced the FCC's conclusions that:

> there was no statutory provision or Commission rule that
> provides companies with a vested right to continued
> receipt of support at current levels, and we are not aware
> of any other, independent source of law that gives
> particular companies an entitlement to ongoing USF
> support.

---

[10] *See also* Restatement (Second) Contracts § 261, cmt. b ("The continuation of existing market conditions and of the financial situation of the parties are ordinarily not such [basic] assumptions . . ."); *id.*, illustration 3 ("A and B make a contract under which B is to work for A for two years at a salary of $50,000 a year. At the end of one year, A discontinues his business because governmental regulations have made it unprofitable and fires B. A's duty to employ B is not discharged, and A is liable to B for breach of contract.").

*Id.* at 1070 (square brackets omitted). Finally, *In re FCC 11-161* found the FCC's analysis to be "entirely consistent with the overarching universal service principles outlined in 47 U.S.C. § 254(b), including the principle that 'there should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.'" *Id.* at 1071 (quoting 47 U.S.C. § 254(b)(5)).

Ultimately Sandwich Isles' argument thus amounts to an impermissible collateral attack on the Transformation Order and the Tenth Circuit's opinion upholding it—but this court is bound by those decisions. *See FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals. Litigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order.") (citations omitted); *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1113 (11th Cir. 2014) ("Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals.") (citation omitted). And "[w]here exclusive jurisdiction [over a challenge to an FCC order] is mandated by statute, a party cannot bypass the procedure by characterizing its position as a defense to an enforcement action." *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) (quoting *Sw. Bell*

*Tel. v. Ark. Pub. Serv.,* 738 F.2d 901, 906 (8th Cir. 1984), *vacated and remanded on other grounds,* 476 U.S. 1167 (1986)).

In sum, the United States is entitled to summary judgment on Count One. Sandwich Isles has defaulted on its loan obligations with the RUS; Sandwich Isles has breached the loan contracts.[11]

### 3. *The United States Now Concedes that it is Premature to Grant Summary Judgment on Count Two*

In addition to Count One, the United States originally also sought summary judgment as to Count Two, seeking to foreclose immediately and to sell all property pledged as collateral by Sandwich Isles to secure the loans. Circumstances, however, have changed after the motion was filed such that—whether or not the United States had fulfilled the necessary steps to sell such collateral at that time—the United States no longer seeks relief on Count Two at this stage.

_____

[11] In its supplemental memorandum, the United States takes the position that "the Court should issue a judgment on Count I's claim for breach of contract. The United States then will request that this judgment be made final under Fed. R. Civ. P. 54(b). . . ." ECF No. 139 at PageID #2029. It is unclear what the United States seeks by this request at this stage—by this Order, the court grants summary judgment on Count One in favor of the United States, but no actual "judgment" will issue (given other open claims, including Counts Three to Six, against other Defendants) unless and until a Rule 54(b) motion is actually filed and granted. The current motion is insufficient for such purposes; at minimum, it does not analyze all the factors under Rule 54(b) and does not provide notice to Defendants that such a partial final judgment is sought on Count One.

In particular, after the United States filed its motion, Defendant Paniolo was forced into bankruptcy by creditors. *See* Notice of Nov. 13, 2018 Involuntary Chapter 11 Petition of Paniolo, ECF No. 74. Accordingly, the action was stayed as to any claims against Paniolo, or against "any property of Paniolo or the Paniolo bankruptcy estate." *See* ECF No. 136 at PageID #1911.

Given that stay and other subsequent developments, the United States filed a supplemental memorandum stating in part that "a foreclosure sale of all Collateral pledged by [Sandwich Isles] in connection with the RUS loans currently is premature, and certain real property of [Sandwich Isles] could not currently be sold free and clear of all liens and encumbrances." ECF No. 139 at PageID #2021.[12] Accordingly, at the April 29, 2019 hearing on these motions, the United States asked the court to defer action on its motion as to Count Two.

The court agrees that it cannot grant the United States relief on Count Two at this stage. At minimum, even aside from the bankruptcy stay as to Paniolo, the United States recognizes that it has not fully perfected its interests in certain real property of Sandwich Isles. *See id.* at PageID #2029. However, rather than simply deferring the motion as to Count Two as the United States asks, the court

---

[12] It appears that Paniolo has interests in some of Sandwich Isles' pledged collateral, rendering the bankruptcy stay applicable to potential claims against that collateral.

will for administrative reasons DENY the motion as to Count Two *without*

prejudice.  At an appropriate time, the United State may re-file a complete motion

(that is, without incorporating any previous filings by reference) as to Count Two,

seeking to foreclose and sell collateral as it deems necessary, after all necessary

prerequisites are completed.

**B.      Motion Two—The Official Capacity Counter-Defendants' Motion to Dismiss Counterclaim of Sandwich Isles, Patelesio and Cullen, ECF No. 52**

Sandwich Isles and the "additional counterclaimants" Patelesio and

Cullen[13] allege four Counts in their 45-page Counterclaim.  The four Counts are:

Count One (violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et

seq.); Count Two (violation of the Telecommunication Act of 1934, as amended by

the Telecommunications Act of 1996); Count Three (violations of *Bivens v. Six*

*Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), as

to the Rural Consumer Counterclaimants); and Count Four (violations of *Bivens*, as

to Sandwich Isles).

The Counterclaim alleges in various ways that the counterclaim

Defendants took various actions relating to the RUS loans and USF subsidies "on

---

[13] Patelesio and Cullen are current native Hawaiian beneficiaries of the Hawaiian Homes Commission Act who allegedly would or may be deprived of telecommunication services if Sandwich Isles ceases to operate.  They are sometimes referred to as "the Rural Consumer Counterclaimants."  *See* ECF No. 26-1 at PageID #579.

the basis of [the Rural Consumer Counterclaimants'] race as native Hawaiians," ECF No. 26-1 ¶ 120 at Page ID #618; or on the basis that Sandwich Isles "is owned by Hawaiian Homes Commission Act beneficiaries and serves native Hawaiians. . . ." *Id.* ¶ 132 at Page ID #621. It alleges that "[s]tarting in 2010, USDA and FCC abruptly and arbitrarily embarked on a targeted campaign to reduce services to native Hawaiians, and ultimately cut such services altogether while destroying [Sandwich Isles].'" *Id.* ¶ 70 at PageID #604.

Although not clearly stated, the counterclaim appears to be brought against the FCC and government officials in *both* their official *and* individual capacities. The counterclaim Defendants have thus filed two motions to dismiss, based on the capacity on which they were sued. This section addresses Motion Two (brought by the United States) which is limited to challenging the Counterclaim's official-capacity allegations, including against the FCC itself. Motion Three, which is addressed later, is restricted to challenging the same Counterclaim (or, more precisely, third-party counterclaim) as to the individual-capacity allegations.

## 1. *Standards of Review*

### a. *Rule 12(b)(1)*

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss claims over which it lacks proper subject matter jurisdiction. The court may

determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) so long as "the jurisdictional issue is [not] inextricable from the merits of a case. . . ." *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008). The moving party "should prevail [on a motion to dismiss] only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Casumpang v. Int'l Longshoremen's & Warehousemen's Union*, 269 F.3d 1042, 1060 (9th Cir. 2001) (citation and quotation marks omitted); *Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001), *abrogated on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

> ### b. *Rule 12(b)(6)*

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss for "failure to state a claim upon which relief can be granted[.]" A Rule 12(b)(6) dismissal is proper when there is either a "'lack of a cognizable legal theory or the absence of sufficient facts alleged.'" *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

Although a plaintiff need not identify the legal theories that are the basis of a pleading, *see Johnson v. City of Shelby, Mississippi*, 135 S. Ct. 346, 346 (2014) (per curiam), a plaintiff must nonetheless allege "sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This tenet—that the court must accept as true all of the allegations contained in the complaint—"is inapplicable to legal conclusions." *Id.* Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively.").

Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). In other words, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. Factual allegations that only permit the court to infer "the mere possibility of misconduct" do not show that the pleader is entitled to relief as required by Rule 8. *Iqbal*, 556 U.S. at 679.

**2.      *The Counterclaim is Dismissed as against the Official Capacity Counter-Defendants for Lack of Subject-Matter Jurisdiction, or for Failure to State a Claim***

**a.      *Count One—Violation of the ECOA, 15 U.S.C. § 1691 et seq.***

Incorporating the Counterclaim's allegations regarding racial discrimination against native-Hawaiian owned Sandwich Isles, Count One of the Counterclaim alleges that the "USDA violated the Equal Credit Opportunity Act [("ECOA")], when it . . . refused to make the loan in the full amount it had previously been approved to [Sandwich Isles]."  ECF No. 26-1 ¶ 98 at PageID #613.[14]  It alleges that Sandwich Isles is an "applicant" under the ECOA because it

_____

[14] The ECOA provides in part that:

> It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)[.]"

15 U.S.C. § 1691(a), where,

> The term "creditor" means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

15 U.S.C. § 1691a(e), and where, in turn,

> The term "person" means a natural person, a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association.

15 U.S.C. § 1691a(f).

"applied to RUS for a restructured loan agreement." *Id.* ¶ 99. But "[i]nstead of signing the workout agreement containing the terms they represented they accepted, RUS filed this lawsuit, thus failing and refusing to offer a workout to [Sandwich Isles] as they have offered to numerous Caucasian-owned borrowers." *Id.* ¶ 102 at PageID #614.[15]

In this regard, elsewhere in the Counterclaim, Sandwich Isles alleges that "although [Sandwich Isles'] entire loan application had been approved, USDA refused to fund any further loans long before the entire loan had been funded." *Id.* ¶ 80 at PageID #609. It alleges that "USDA's refusal to fund the rest of the loan they had approved was a direct violation of federal law," *id.* ¶ 81, ostensibly based on alleged race discrimination because "[n]o Caucasian-owned [Rural Local Exchange Carrier] had ever been subjected to such a cut-off." *Id.*

The United States, however, argues that this ECOA claim is time-barred, at least to the extent it is based on any loan decisions by the RUS that were made before August 3, 2013—five years prior to the August 3, 2018 filing of the Counterclaim, where a five-year limitation period now applies under 15 U.S.C.

---

[15] To the extent these allegations might state a claim for breach of contract, this court would lack jurisdiction to consider that claim (especially where Sandwich Isles seeks damages of not less than $200 million, ECF No. 26-2 ¶ 136). *See, e.g.*, *M-S-R Pub. Power Agency v. Bonneville Power Admin.*, 297 F.3d 833, 840 (9th Cir. 2002) ("The Tucker Act confers exclusive jurisdiction on the Court of Federal Claims for contract claims against the government exceeding $10,000.") (citing 28 U.S.C. § 1491(a)(1) (other citation omitted)).

§ 1691e(f).[16]  This would clearly bar claims based on RUS loan decisions made in 1997, 1999 or 2001, and would also apparently include the RUS's "refus[al] to make the loan in the full amount it had previously approved" as alleged in Count One.  *See* ECF No. 26-1 ¶ 98 at PageID #613.

The Counterclaim marks 2010 as the key time when the alleged improper discrimination occurred, or at least began.  *See* ECF No. 26-1 ¶ 70 at PageID # 604 ("Starting in 2010, USDA and FCC abruptly and arbitrarily embarked on a targeted campaign to reduce services to native Hawaiians . . . .").  It also alleges disparate treatment that may have occurred much earlier—its allegation that "although [Sandwich Isles'] entire loan application had been approved, the USDA refused to fund any further loans long before the entire loan had been funded" (*id.* ¶ 80 at PageID # 609), refers to decisions made regarding the April 2, 2001 loan agreement.  *See* Hee Decl. ¶¶ 17-18, ECF No. 110-1 at PageID #1379-80 (explaining ¶ 80); ECF No. 1-3 (Apr. 2, 2001 loan contract).

The court agrees that, on its face, much of Count One is barred by the applicable statute of limitations under the ECOA (either two or five years).

---

[16] And a *two-year* period applies to ECOA claims—such as any claims that might be predicated on RUS loan decisions in 1997, 1999, or 2001—that accrued before July 21, 2010. *See, e.g.*, *Guy v. Mercantile Bank Mortg. Co*., 711 Fed. App'x, 250, 252 (6th Cir. Oct. 2, 2017) ("Claims brought under the ECOA that accrued prior to July 21, 2010 are subject to a two-year statute of limitations."); *id.* at n.3 (noting that "o[n] July 21, 2010, Congress passed the Dodd-Frank Act, which increased the limitations period for bringing an action under the ECOA from two years to five years.") (citing Pub. L. No. 111–203, § 1085(7), 124 Stat. 1376, 2085 (2010)).

Accordingly, based on a running of the statute of limitations, the Court

DISMISSES Count One of the counterclaim as to any discriminatory acts that

occurred prior to August 3, 2013. *See, e.g.*, *Von Saher v. Norton Simon Museum of*

*Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) ("A claim may be dismissed

under Rule 12(b)(6) on the ground that it is barred by the applicable statute of

limitations only when 'the running of the statute is apparent on the face of the

complaint.'") (quoting *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th

Cir. 2006)).[17]

---

[17] The United States measured the cutoff date on which actions would be time-barred from when the Counterclaim was filed—August 3, 2018—and Sandwich Isles did not contest that accrual date (although its opposition did contest the running of the limitation period by emphasizing that its ECOA counterclaim is based on acts beginning in 2010, not 1997, *see* ECF No. 123 at PageID #1580).

It is possible, however, that the applicable date for measuring timeliness would actually be when the United States' Complaint was filed—April 20, 2018—if the ECOA counterclaim was compulsory. *See, e.g.*, *MH Pillars Ltd. v. Realini*, 2018 WL 1184847, at *3-4 (N.D. Cal. Mar. 7, 2018) (concluding that "although the Ninth Circuit has not opined on the issue . . . the weight of authority [is] that the filing of a complaint tolls the statute of limitations for compulsory counterclaims, which relate back to the date the initial complaint was filed") (citations omitted); *Oahu Gas Serv. v. Pac. Res., Inc.*, 473 F. Supp. 1296, 1298-99 (D. Haw. 1979) (applying a relation back rule to a compulsory counterclaim, tolling the statute of limitations to when the initial complaint was filed).

But the parties have not briefed this issue, much less addressed whether Sandwich Isles' counterclaim is compulsory or permissive. Moreover, the issue makes little difference because even assuming that April 20, 2013 is the proper cutoff date, Sandwich Isles' ECOA counterclaim would still be time-barred (at least as currently pleaded). Although there might be a question about the timeliness of a claim based on the RUS's alleged failure to "offer a workout," the current allegations are unclear. The dismissal, however, is without prejudice and so, if necessary, the court can address accrual questions further if Count One is amended, and if there is a challenge to such an amendment.

Nevertheless, it may be possible for Sandwich Isles to identify some discriminatory RUS decision "refus[ing] to fund the rest of the loan," ECF No. 26-1 ¶ 81 at PageID #609, occurring after August 3, 2013 (or April 20, 2013) that would not be time-barred.  It is also unclear from the face of the Counterclaim whether claims based on the RUS's alleged failure "to offer a workout" to Sandwich Isles are timely (as it is, the record appears to indicate that the RUS formally rejected a proposed restructuring plan on July 26, 2013 (*see* ECF No. 48-21), which would be time barred if the cutoff is August 3, 2013).  Accordingly, the dismissal is *without* prejudice.  Sandwich Isles is granted leave to file an amended counterclaim, as to Count One only, to attempt to state an ECOA claim based on non-time-barred actions.

In deciding whether to amend, however, Sandwich Isles should bear in mind that alleged violations of the ECOA by the RUS that occurred *after* Sandwich Isles was no longer qualified for credit are not actionable.  *See, e.g.*, *Mays v. Buckeye Rural Elec. Co-op, Inc*., 277 F.3d 873, 877 (6th Cir. 2002) (reiterating that an element of an ECOA claim is that "Plaintiff was qualified for the credit") (citation omitted); *Lynch v. Fed. Nat'l Morg. Ass'n*, 2016 WL 6776283, at *7-8 (D. Haw. Nov. 15, 2016) (stating elements of an ECOA claim as including being "qualified for credit," and dismissing claim because plaintiff "fail[ed] to allege she was qualified to receive a modification or to allege any facts

from which the Court could infer she was qualified to receive any modification"). And, based on the court's findings addressed in Motion One, Sandwich Isles was in default at least as of August 27, 2013 when the RUS accelerated the remaining balance on the loans. *See* ECF No. 50 ¶ 45 at PageID #943.[18]

   *b.* *Count Two—Violation of Telecommunications Act*

   Incorporating factual allegations of the Counterclaim, Count Two alleges that the FCC and the RUS "violated the requirement to provide sufficient and predictable support to rural telecommunications in rural, insular and high cost areas." ECF No. 26-1 ¶ 111 at PageID #616. Specifically, it alleges that they violated a mandatory requirement to provide "sufficient support from the USF according to specific and predictable mechanisms." *Id.* (citing 47 U.S.C. § 254).[19]

---

[18] The court, however, does not dismiss the ECOA claims on this basis—it would require consideration of evidence, which the court cannot generally do when considering whether a pleading fails to state a claim under Rule 12(b)(6), without converting the motion into a Rule 56 summary judgment motion.

[19] Section 254, regarding "universal service," provides in part:

> (b) Universal service principles. The Joint Board and the [FCC] shall base policies for the preservation and advancement of universal service on the following principles:
> . . .
> (2) Access to advanced services
>
>  Access to advanced telecommunications and information services should be provided in all regions of the Nation.
>
> (3) Access in rural and high cost areas

(continued . . . )

Because the FCC previously (i.e., prior to issuance of the Transformation Order)

provided USF subsidies amounting to $14,000 per line, the Counterclaim alleges

that the FCC and the RUS admitted that this amount was appropriate and necessary

to support telecommunications to Hawaiian Homelands, implying that they

breached a mandatory duty by reducing that amount.  *Id.* ¶ 110 at PageID #615.

And the Counterclaim alleges that "[a]ll of the Counterclaim-Defendants, and each

of them, have for years deliberately violated the statutory mandate . . . [t]o provide

---

(. . . continued)

> Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.
>
> (4) Equitable and nondiscriminatory contributions
>
> All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.
>
> (5) Specific and predictable support mechanisms
>
> There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.
> . . . .
> (7) Additional principles
>
> Such other principles as the Joint Board and the [FCC] determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

specific and predictable support for rural telecommunications to native Hawaiians on Hawaiian Home Lands." *Id.* ¶ 114 at PageID #616.[20]

Read broadly, these allegations challenge the decisions:

(1) by the FCC in the Transformation Order that reduced Sandwich Isles' USF payments from $14,000 "per loop per year," ECF No. 26-1 ¶ 56 at PageID #599, by capping support at $250 "per line per month," *id.* ¶ 72 at PageID #605; and

(2) by the FCC in the May 10, 2013 FCC Order that denied Sandwich Isles' petition for a waiver from that price cap, *id.* ¶ 74 at PageID #606 (citing *In the Matter of Connect Am. Fund*, 28 F.C.C. Rcd. 6553, 6555 (May 10, 2013)).[21]

But, as mentioned above in rejecting Sandwich Isles' argument in attempting to defend the first Motion, this district court lacks subject-matter

---

[20] Under the Westfall Act, 28 U.S.C. § 2679, the United States substituted as the sole counter-Defendant as to Count Two of the Counterclaim, after the Attorney General certified that any acts taken by the individuals as to Count Two were done within the scope of their employment. *See* ECF No. 129 ("Notice of Substitution of the United States of America for Individual-Capacity Defendants Kenneth Johnson, Ajit Pai, Sharon Gillett, Carol Mattey, and Lisa Hone as to Count Two of SIC's Counterclaims.").

[21] As analyzed earlier with Count One, the Counterclaim also generally alleges actions (or inactions) by RUS in "refus[ing] to fund the rest of the loan [it] had approved," *id.* ¶ 81, ECF No. 26-1 at PageID #609; and in seeking to foreclose on the loans instead of "reneg[ing]" on an agreed-upon "workout agreement," *id.* ¶ 85, ECF No. 26-1 at PageID #610. Count Two (violations of the Telecommunications Act), however, cannot encompass these allegations because RUS cannot violate requirements that might exist under 47 U.S.C. § 254, or other sections of the Telecommunications Act. That Act concerns the FCC—not RUS, which is an agency of the USDA. RUS does not make USF subsidy payments to carriers, and loan decisions by RUS are not made under standards set forth in 47 U.S.C. § 254.

jurisdiction to address challenges to decisions of the FCC. *See, e.g.*, *Mais*, 768 F.3d at 1113 ("In the Hobbs Act, 28 U.S.C. § 2342, Congress unambiguously deprived the federal district courts of jurisdiction to invalidate FCC orders by giving exclusive power of review to the courts of appeals.") (citation omitted). *See also Pac. Bell Tel. Co. v. Cal. Pub. Utilities Comm'n*, 621 F.3d 836, 843 n.10 (9th Cir. 2010) ("Under the Hobbs Act, this court lacks jurisdiction to rule on a collateral attack of an FCC order.") (citations omitted).

And "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the [FCC's] order." *ITT World Commc'ns, Inc.*, 466 U.S. at 468 (citations omitted). "The exclusive jurisdiction of the courts of appeals cannot be evaded simply by labeling the proceeding as one other than a proceeding for judicial review." *Any & All Radio Station Transmission Equip.*, 207 F.3d at 463 (citation omitted). That is, "district courts lack jurisdiction to consider claims to the extent they depend on establishing that all or part of an FCC order subject to the Hobbs Act is 'wrong as a matter of law' or is 'otherwise invalid.'" *Mais*, 768 F.3d at 1120.

Accordingly, this court cannot address whether the FCC's Transformation Order's reduction in USF payments violated 47 U.S.C. § 254's principle to provide "specific, predictable and sufficient" support to rural and high cost carriers such as Sandwich Isles. It cannot consider any claims "to the extent

they depend on establishing that all or part of" the Transformation Order is "wrong as a matter of law" or "otherwise invalid." *Mais*, 768 F.3d at 1120. Likewise, this district court has no power to question the Tenth Circuit's decision in *In re FCC 11-161*, which affirmed the Transformation Order and specifically found the FCC's analysis to be "entirely consistent with the overarching universal service principles outlined in 47 U.S.C. § 254(b), including the principle that 'there should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.'" 753 F.3d at 1071 (quoting 47 U.S.C. § 254(b)(5)).

Similarly, this court lacks jurisdiction to address whether the FCC's 2013 denial to Sandwich Isles of a *waiver* from the Transformation Order's reduction of USF payments violated the Telecommunications Act. If Sandwich Isles wanted to challenge that waiver denial, its remedy was to file a direct appeal of the FCC decision. *See Am. Bird Conservancy v. FCC*, 545 F.3d 1190, 1193 (9th Cir. 2008) (reiterating that 28 U.S.C. § 2342 "vests the courts of appeals with 'exclusive jurisdiction' to review 'all final orders of the Federal Communications Commission.'"). It apparently did not do so, and it is too late to challenge that May 20, 2013 decision now. *See* 47 U.S.C. § 402(c) (requiring "a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of").

In short, this court lacks subject matter jurisdiction over Count Two of the Counterclaim, and it is dismissed with prejudice.[22]

        *c.*    *Counts Three & Four (equal protection violations under* Bivens*)*

Counts Three and Four make *Bivens* claims against the official-capacity counter-Defendants for alleged equal protection violations. But a proper *Bivens* claim, by definition, seeks damages for constitutional violations against a federal official in their individual (not official) capacity.[23] *See, e.g.*, *Vaccaro v. Dobre*, 81 F.3d 854, 856 (9th Cir. 1996). "There is no such animal as a *Bivens* suit against a public official tortfeasor in his or her official capacity." *Solida v. McKelvey*, 820 F.3d 1090, 1094 (9th Cir. 2016) (quoting *Farmer v. Perrill*, 275

---

[22] The United States also argues that the Rural Capacity Counterclaimants, Patelesio and Cullen, lack standing to sue (assuming, in the first place, that they were properly joined as parties under Federal Rules of Civil Procedure 13(h) and 20). It argues that any injury to them (for example, in losing access to telecommunications services on Hawaiian Homelands) would not be "fairly traceable" to government action (for example, in reducing USF funds or foreclosing on Sandwich Isles loans) because any such injury would be attributable to acts of Sandwich Isles, not the FCC or the RUS. *See, e.g.*, *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (requiring injury to be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The court, however, need not reach this question as to Patelesio or Cullen because the Counterclaim otherwise fails to state a claim as to Sandwich Isles, which *does* have standing. *See, e.g.*, *Kostick v. Nago*, 960 F. Supp. 2d 1074, 1089-90 (D. Haw. 2013) ("It is enough, for justiciability purposes, that at least one party with standing is present.") (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999)).

[23] Motion Three addresses the *Bivens* claims against Johnson, Pai, Hone, Gillett, and Mattey in their individual capacities.

F.3d 958, 963 (10th Cir. 2001)).  Rather, "[a]n action against an officer, operating

in his or her official capacity as a United States agent, operates as a claim against

the United States."  *Id.* at 1095.  And thus, "by the logic of *Bivens* itself," there is

no cause of action under *Bivens* directly against a federal agency.  *F.D.I.C. v.*

*Meyer*, 510 U.S. 471, 486 (1994).  Accordingly, Counts Three and Four fail as a

matter of law to the extent they were asserted against the RUS or the FCC directly,

or against any counter-Defendant in their official capacity.[24]  In this regard, those

Counts are dismissed with prejudice.

## C.  Motion Three—The Individual Capacity Counter-Defendants' Motion to Strike or Dismiss, ECF No. 55

Counterclaim-Defendants (or Third-Party Counter-Defendants) Pai,

Gillett, Mattey, Hone and Johnson, in their individual capacities, move to strike or

dismiss the Counterclaim's *Bivens* claims for damages.  Count Three alleges that

these individuals violated "additional counterclaimants" (or "the Rural Consumer

Counterclaimants") Patelesio's and Cullen's rights to equal protection by

discriminating against them "on the basis of their race as native Hawaiians."  ECF

---

[24] Counsel for Sandwich Isles did not dispute this proposition at the April 29, 2019 hearing, and admitted that "we probably overpled."

No. 26-1 ¶ 120 at PageID #618.  Count Four makes a similar claim on behalf of

Sandwich Isles.  *Id.* ¶ 135 at PageID #622.[25]

   This motion challenges the Counterclaim on several alternative

grounds: (1) procedurally, as an improper use of Rule 13's joinder provisions, or

for insufficient service of process, and (2) more substantively, for failure to state a

claim, lack of personal jurisdiction, that the claims are time-barred, or that the

individual capacity counterclaim-Defendants have qualified immunity.  The court,

however, need not reach all these arguments because it agrees with the

counterclaim-Defendants' more fundamental argument that there is no basis in law

for a *Bivens* claim in the present context.[26]

---

[25] Count Two of the Counterclaim appears to have also made individual-capacity claims for violation of the Telecommunications Act.  *See* ECF No. 122 at Page ID #1533 n.1 ("Count II . . . is also asserted against the Individual Defendants, inasmuch as it . . . is asserted against the USDA and the FCC, both of which are defined as including the Individual Defendants.").  But, as noted above, under the Westfall Act, the United States subsequently substituted as the sole counter-Defendant as to Count Two of the Counterclaim, after the Attorney General certified that any acts taken by the individuals as to Count Two were done within the scope of their employment.  *See* ECF No. 129.

[26] The other grounds for dismissal could, at best, lead to dismissal without prejudice to perfecting the procedural defects, or could involve factual questions.  On the other hand, deciding at the threshold whether there even is a *Bivens* cause of action as a matter of law ultimately leads to dismissal with prejudice.

And the court may do this in this case despite unresolved questions regarding personal jurisdiction (and even if only Gillett has been personally served as required by Federal Rule of Civil Procedure 4(i)(3), *see* ECF No. 55-1 at PageID #1047).  In *Simpkins v. District of Columbia Government*, 108 F.3d 366 (D.C. Cir. 1997), the D.C. Circuit affirmed dismissal of *Bivens* claims on the merits with prejudice, even though the complaint was not served on the individuals (rendering the district court without personal jurisdiction) and such insufficiency of service would have warranted dismissal *without* prejudice.  *Id.* at 369.  *Simpkins* reasoned that

(continued . . . )

### 1. *Applicable Standards*—**Bivens** *is a Disfavored Remedy*

In 1971, *Bivens* authorized a potential remedy for damages against federal officers acting under color of law who violated the Fourth Amendment's prohibition against unreasonable searches and seizures. 403 U.S. at 397. Such a cause of action is analogous to a civil rights claim under 42 U.S.C. § 1983 against officials acting under color of state law, although § 1983 does not apply against federal officials. But, as explained in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Supreme Court has since authorized a "*Bivens* claim" in only two other instances: (1) for gender discrimination against a member of Congress, *see Davis v. Passman*, 442 U.S. 228 (1979); and (2) for inadequate medical treatment of a federal prisoner under the Eighth Amendment's cruel and unusual punishments clause, *see Carlson v. Green*, 446 U.S. 14 (1980). 137 S. Ct. at 1860. As *Abbasi* summarized, "[t]hese three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which

_____

(. . . continued)

dismissing invalid *Bivens* claims without prejudice for improper service, only to allow a plaintiff to re-file the same action again, "would be inconsistent with the duty of the lower federal courts to stop insubstantial *Bivens* actions in their tracks and get rid of them." *Id*. at 370 (citations omitted). "[D]elaying the inevitable [is not] in keeping with the Supreme Court's instruction to the lower federal courts 'to weed out' insubstantial *Bivens* suits 'expeditiously.'" *Id.* (quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)). "Dismissing a meritless *Bivens* suit for insufficiency of service of process . . . merely postpones the inevitable." *Id.*

Likewise, "[a] district court may decide that a complaint fails to state a claim even when it does not have personal jurisdiction." *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 990 n.6 (9th Cir. 2012) (citing *Wages v. I.R.S.*, 915 F.2d 1230, 1234-35 (9th Cir. 1990) (rejecting an argument that the district court erred in dismissing *Bivens* claims on the merits, despite also ruling that the court lacked personal jurisdiction for insufficient service of process)).

the [Supreme] Court has approved of an implied damages remedy under the Constitution itself." *Id.* at 1855.

After reviewing "the notable change in [the Supreme] Court's approach to recognizing implied causes of action," *id.* at 1857, *Abbasi* emphasized that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* (citation omitted). It examined many instances where the Court refused to extend *Bivens* over the last 30 years—including a race-discrimination suit against military officers. *Id.* (citing *Chappell v. Wallace*, 462 U.S. 296 (1983)). It concluded that "a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action [to create a statutory remedy] by Congress.'" *Id.* (quoting *Carlson*, 446 U.S. at 18) (internal quotation marks omitted).

*Abbasi* "articulated a two-part test for determining whether *Bivens* remedies should be extended." *Lanuza v. Love*, 899 F.3d 1019, 1023 (9th Cir. 2018) (citing *Abbasi*, 137 S. Ct. at 1859-60). "First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context." *Id.* "If the answer to this question is 'no,' then no further analysis in required." *Id.* That is, there is a *Bivens* remedy if the context is not new. But "[i]f the answer is 'yes,' then the court must determine whether 'special factors counsel hesitation.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1860 (brackets omitted)).

"A case presents a new context if it 'is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court.'"  *Id.* (quoting *Abbasi*, 137 S. Ct. at 1859 (brackets omitted)).  And even "a modest extension" is an extension for the new context determination.  *Id.* at 1025 (quoting *Abbasi*, 137 S. Ct. at 1864).

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* (quoting *Abbasi*, 137 S. Ct. at 1860).

The "special factors" inquiry focuses on separation of powers.  *Id.* at 1028.  *Lanuza* summarizes the inquiry:

> *Abbasi*'s special factors include: the rank of the officer involved; whether *Bivens* is being used as a vehicle to alter an entity's policy; the burden on the government if such claims are recognized; whether litigation would reveal sensitive information; whether Congress has indicated that it does not wish to provide a remedy; whether there are alternate avenues of relief available; and whether there is adequate deterrence absent a damages remedy, among other factors.

*Id.* (citing *Abbasi*, 137 S. Ct. at 1857-63). "But the most important question . . . is 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Abbasi*, 137 S. Ct. at 1857-58). "If 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy . . . the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.'" *Id*. (quoting *Abbasi*, 137 S. Ct. at 1858).

And "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858. Such "'[a]lternative remedial structures' can take many forms, including administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018).

2.      ***The Counterclaim Presents a "New Context" and "Special Factors" Counsel Against Recognizing a* Bivens *Remedy for a Race-based Equal Protection Challenge to RUS-lending and FCC-funding Decisions***

Applying the *Abbasi* two-part test, the court easily concludes that the Counterclaim—alleging race-based discrimination in lending and funding decisions by RUS and FCC officials—fails to state a valid *Bivens* cause of action.

First, the Counterclaim presents a "new context."  No Supreme Court case has recognized a *Bivens* cause of action for a race-based equal protection violation.  That is, the Counterclaim "differs in a meaningful way" from previous Supreme Court precedent.  Although *Passman* recognized an equal protection-based *Bivens* cause of action grounded in the Fifth Amendment, 442 U.S. at 248-49, it involved gender discrimination against a Congressman for wrongfully firing a female secretary—meaningfully distinct from alleged race-based lending and funding decisions by high-level RUS and FCC officials.  *Cf. Vega*, 881 F.3d at 1153 (concluding that First Amendment access-to-courts and Fifth-Amendment due process claims presented a "new context"); *Schwarz v. Meinberg*, 761 F. App'x 732, 734 (9th Cir. Feb. 13, 2019) (mem.) ("Schwarz's [Fifth Amendment] due process claim is a new context because it alleges national origin discrimination.").  Moreover, the officers are different—the Supreme Court has never recognized a *Bivens* claim against individuals from the FCC or the RUS (much less from the Department of Agriculture).

Next, "special factors"—most significantly, the availability of existing alternative remedies for alleged constitutional violations—counsel against recognizing a *Bivens* remedy in the present context.  As the individual counterclaim-Defendants point out, the RUS loan decisions were made pursuant to 7 U.S.C. § 902(a) "for the purpose of furnishing and improving . . . telephone

service in rural areas[.]" And the USF subsidy decisions were made pursuant to the FCC's requirement to provide "specific, predictable and sufficient support mechanisms" to advance "universal service," 47 U.S.C. § 254(b)(5), where "[a]ll providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service," 47 U.S.C. § 247(b)(4). But Congress did not provide for an individual cause of action for damages against officials who administer these programs, and "when Congress fails to provide a damages remedy . . . it is much more difficult to believe that 'congressional inaction' was 'inadvertent.'" *Abbasi*, 137 S. Ct. at 1862 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988)). Further, a *Bivens* claim could implicate another *Abbasi* special factor by "being used as a vehicle to alter" executive policy decisions. *Lanuza*, 899 F.3d at 1028.

   Although no one questions that invidious race discrimination by a government agency is unacceptable and repugnant, in fact Congress has provided a remedy for challenging agency action (including unconstitutional action) with the Administrative Procedures Act ("APA"). *See* 5 U.S.C. § 706(2) (allowing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (B) contrary to constitutional right, power, privilege, or immunity," among other reasons). *See Wilkie v. Robbins*, 551

U.S. 537, 553 (2007) (refusing to recognize a Fifth Amendment *Bivens* claim based on decisions of the Bureau of Land Management, reasoning in part that plaintiff "has an administrative, and ultimately a judicial, process for vindicating virtually all of his complaints [through the APA]"); *see also id*. at 552 ("Each time, the Bureau claimed that Robbins was at fault, and for each claim, administrative review was available, subject to ultimate judicial review under the APA."); *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("[T]he design of the APA raises the inference that Congress 'expected the Judiciary to stay its *Bivens* hand' and provides 'a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages[.]'") (quoting *Wilkie*, 551 U.S. at 550); *id*. (concluding that "the APA leaves no room for *Bivens* claims based on agency action or inaction").[27]

In short, Counts Three and Four of the Counterclaim, seeking relief under *Bivens* against individuals of the RUS and the FCC for alleged equal protection violations, fail to state claims. Applying *Abbasi*, the court cannot infer a *Bivens* remedy. Counts Three and Four of the Counterclaim are dismissed with prejudice as to the individual capacity counter-Defendants.

---

[27] And, as noted earlier, the ECOA, 15 U.S.C. § 1691 et seq., also appears to provide a remedy for certain discriminatory credit decisions, including by governmental agencies.

# IV.  CONCLUSION

The United States' Motion for Partial Summary Judgment, ECF No. 48, is GRANTED as to Count One of its Complaint.  Sandwich Isles has defaulted and has breached the loan contracts.

The United States' Motion to Dismiss Counterclaim, ECF No. 52, is GRANTED as to all official-capacity claims.  Counterclaimants are granted leave to file an amended counterclaim by August 19, 2019, as to Count One (violation of the Equal Credit Opportunity Act) of the counterclaim only.

The Individual Capacity Third-Party Defendants' Motion to Dismiss the Individual Capacity Claims, ECF No. 55, is GRANTED.  The Third-Party Claims based on *Bivens* are DISMISSED with prejudice.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, July 22, 2019.



 /s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*United States v. Sandwich Isles Commc'ns, Inc., et al.*, Civ. No. 18-00145 JMS-RT, Order (1) Granting in Part Plaintiff's Motion For Partial Summary Judgment, ECF No. 48; (2) Granting Plaintiff's Motion To Dismiss Counterclaim, ECF No. 52; and (3) Granting Third-Party Defendants' Motion to Dismiss Individual Capacity Claims, ECF No. 55