RUTH A. HARVEY
KIRK T. MANHARDT
SHANE HUANG
MINIARD CULPEPPER JR.
J. ZACHARY BALASKO
United States Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875
Telephone: (202) 514-7162
Email: john.z.balasko@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT
## DISTRICT OF HAWAII

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>        **Plaintiff,**<br><br>    v.<br><br>**SANDWICH ISLES COMMUNI-**<br>**CATIONS, INC.,** *et al.*,<br>        **Defendants.** | **Civ. No. 18-145 JMS RT** |

## UNITED STATES' REVISED PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with the *Stipulation of Procedures for Submission of Revised Proposed Findings of Fact and Conclusions of Law*, ECF No. 458, the United States respectfully submits the following revised proposed findings of fact and conclusions of law.

\*      \*      \*

The United States of America (the "United States"), on behalf of the Rural Utilities Service ("RUS"), filed this suit on April 20, 2018. ECF No. 1. Beginning on October 13, 2022, this Court conducted a non-jury trial on the following counts asserted by the United States against Albert S.N. Hee ("Mr. Hee"):

- Count Three (violations of the Federal Priority Statute, 31 U.S.C. § 3713, "for approving payment of claims of others before causing the claims of the United States to be paid");

- Count Four (violations of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304(a)(2), for "transfers made [to insiders] while [Sandwich Isles] was insolvent");

- Count Five (violations of the Federal Debt Collection Procedures Act, § 3304(a)(1), for "[Sandwich Isles'] transfers or obligations for which [Sandwich Isles] did not receive reasonably equivalent value"); and

- Count Six (breach of fiduciary duty).

For the reasons fully set forth below, judgment should be entered in the United States' favor on each of these counts.

## FINDINGS OF FACT

### I.  Sandwich Isles

1.  Sandwich Isles was formed in the mid-1990s to provide telecommunications services to native Hawaiians on Hawaiian Home Lands.[1] ECF No. 26-1 ¶ 29 at PageID #590. *See generally Nelson v. Hawaiian Homes Comm'n*,

---

[1] Trial Tr. 2-6:14–16, Oct. 14, 2022 (Kihune); .Trial Tr. 4-19:4–6, Oct. 19, 2022 (Hee).

127 Haw. 185, 187–89, 277 P.3d 279, 281–83 (2012) (explaining basic history of the Hawaiian Homes Commission Act); *Arakaki v. Lingle*, 477 F.3d 1048, 1054–55 (9th Cir. 2007) (also setting forth history, and explaining that the State of Hawaii Department of Hawaii Home Lands administers Hawaiian Home Lands for the benefit of "native Hawaiians," defined by the Hawaiian Homes Commission Act as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778"). Hawaiian Home Lands are primarily located in rural or more remote areas, and "[b]ecause of the remote and non-contiguous nature of the Home Lands, the cost to provide infrastructure to these areas is very high." ECF No. 26-1 ¶ 20 at PageID #587.

2.      Sandwich Isles is a wholly-owned subsidiary of Waimana Enterprises, Inc. ("Waimana"), which is a Hawaii corporation.[2] WD Ex. 73. Since December 2012, Mr. Hee owns 10% of Waimana, with the other 90% owned by trusts benefitting Mr. Hee's children. *Id*.

3.      Mr. Hee has held officer and director positions within Sandwich Isles, Waimana, and ClearCom, Inc. ("ClearCom") at times relevant in this case. With respect to Sandwich Isles, Mr. Hee was the President from before 2013 through August 2013, and was a director of Sandwich Isles from before 2013 through August

---

[2] Trial Tr. 2-58:14–18, Oct. 14, 2022 (Hee).

2015.[3] With respect to Waimana, Mr. Hee was President and a Director from before 2013 through June 2016.[4] With respect to Clearcom, Mr. Hee was President and a Director from before June 2013 through June 2016.[5] Waimana owned all outstanding stock of Sandwich Isles and Clearcom at all times between January 1, 2013 and the filing of the Complaint on April 20, 2018.[6]

## II.    The RUS Loans and Mortgages

4.    To partially finance construction and operation of Sandwich Isles' telecommunications services on Hawaiian Home Lands, Sandwich Isles and the United States entered into a series of loan agreements and corresponding promissory notes from September 1997 to April 2001. Plf. Exs. 3–5. The three sets of two loans each, totaling over $165 million, were made by the RUS and RTB pursuant to the Rural Electrification Act of 1936, as amended, 7 U.S.C. § 901 et seq.[7] *Id*. As of

---

[3] Plf. Ex. 37, at PageID #:7376, ¶¶ 6–7. (First Stipulation by the United States and Albert S.N. Hee).

[4] *Id.* ¶¶ 8–9.

[5] *Id.* at PageID # 7377, ¶¶ 11–12.

[6] *See id.* ¶ 14.

[7] RTB was an agency of the USDA, but was dissolved in 2006, and was succeeded by the RUS, which is also an agency of the USDA.

January 1, 2013, Sandwich Isles was required to make monthly installment payments to the RUS of approximately $1 million.[8]

### III. Sandwich Isles' Default

5.    In an April 25, 2013, letter from Mr. Hee to the Secretary of Agriculture, Sandwich Isles notified RUS that Sandwich Isles "is unable to continue making interest and principal payments on [its] RUS loans." Plf Ex. 1 at RUS-000001. Rather, Mr. Hee stated that "beginning in May 2013, Sandwich Isles will be reducing the amount of its debt payment made to RUS to match the amount the FCC has determined is reasonable and supportable." *Id*. at RUS-000003.

6.    On July 26, 2013, the RUS rejected a proposed restructuring plan from Sandwich Isles. Plf. Ex. 2 at RUS-000030. That letter indicated that, in order to cure the default, Sandwich Isles was required by August 26, 2013, to make payment in full of past due amounts. *Id*. at RUS-000031. The letter explained that if Sandwich Isles failed to make the payment on time, "on the following day (August 27, 2013), all unpaid principal and accrued interest on [Sandwich Isles'] loans [would] become due and payable immediately." *Id.*

---

[8] *See* Trial Tr. 1-86:6–7, Oct. 13, 2022 (Ho); Trial Tr. 2-70:7–9, Oct. 14, 2022 (Hee).

7.     Sandwich Isles did not make payment in full of past due amounts by August 26, 2013.[9] Instead, it continued to make periodic partial payments until February 2018, when it made its last payment. SIC Ex. YY.

8.     As the Court found in its opinion granting the United States' Motion for summary judgment as to Count One, ECF No. 161, as a result of the foregoing events, "Sandwich Isles has defaulted on its loan obligations with the RUS; Sandwich Isles has breached the loan contracts." ECF No. 161 at PageID # 2370.

### IV.   Sandwich Isles' Insolvency

9.     Between 2009 and 2014, Sandwich Isles primarily earned revenue from two sources: a pooling and cost recovery arrangement under the National Exchange Carrier Association ("NECA"), by which Sandwich Isles submitted its expenses to be pooled with other small telecommunications providers, for reimbursement (the "NECA Pooling Revenue"), and the Universal Service High Cost Loop Fund under which Sandwich Isles was reimbursed for certain capital and operational costs related to its telephone network (the "Universal Service High Cost Support

---

[9] *See* Trial Tr. 1-44:4–6, Oct. 13, 2022 (Lunking).

Revenue"). *See* Plf. Ex. 31, at SIC0149270. These two sources of revenue accounted for more than 90% of Sandwich Isles' total revenue.[10]

10.     The most significant of Sandwich Isles' expenses were its payments on the RUS loans, exceeding $12 million per year, and its lease payments owed to Paniolo Cable Company, LLC ("Paniolo"), exceeding $15 million as of December 31, 2012 and increasing each year past $26 million to be paid in 2017. Plf. Ex. 31, at SIC0149269.

11.     As of at least 2013, Sandwich Isles' annual audited financial statements noted that, due to a loss of nearly 50% of the NECA Pooling Revenue, there was substantial doubt regarding Sandwich Isles ability to continue as a going concern. Plf. Ex. 32, at SIC 0149281.

12.     In November 2011, the FCC issued an order (the "Transformation Order") modifying its rules regarding high cost support, which reduced Sandwich Isles' Universal Service High Cost Support Revenue by approximately $7 million per year. Plf. Ex. 32, at SIC0149296. Sandwich Isles applied to the FCC for a waiver of the Transformation Order in December 2011, but the waiver application was denied on May 10, 2013.

---

[10] *See* Trial Tr. 1-83:12–1-84:9, Oct. 13, 2022 (Ho); Trial Tr. 1-153:1–4, Oct. 13, 2022 (Ho); Trial Tr. 2-85:1–3, Oct. 14, 2022 (Hee); Trial Tr. 4-28:10–13, Oct. 19, 2022 (Hee).

13. By 2012, Sandwich Isles' current liabilities—i.e., liabilities to be settled in the next year—exceeded its current assets available to settle those obligations. Plf Ex. 35 at 8; Plf. Ex. 31 at SIC0149257–SIC0149258, SIC0149271; Plf Ex. 32 at SIC0149297; Plf. Ex. 33 at SIC0149323. On August 27, 2013, RUS accelerated the obligations due under the loans. Plf. Ex. 2 at RUS-000031.

14. The audited financial statement for the years ending in December 31, 2012 and December 31, 2011, noted that Sandwich Isles had been "unable to meet its obligations under the Paniolo lease" in 2012, and that Sandwich Isles had only paid $8,916,168 of the $18,337,940 due in 2012. Plf. Ex. 31 at SIC0149269.

15. Accordingly, Sandwich Isles was unable to pay its obligations as they came due, and was therefore cash flow (going concern)[11] insolvent, by the end of the 2012 fiscal year.[12] Plf Ex. 35 at 8.

16. Sandwich Isles' financial condition continued to worsen in 2013. On the revenue side, Sandwich Isles' application for a waiver from the Transformation Order was denied in May 2013.[13] With respect to expenses, Sandwich Isles ceased making full payments on the RUS Loans on May 1, 2013,[14] and the RUS Loans were

---

[11] Trial Tr. 3-17:3–14, Oct. 18, 2022 (Christiansen).

[12] Trial Tr. 3-29:13–25, Oct. 18, 2022 (Christiansen).

[13] Trial Tr. 1-95:8–19, Oct. 13, 2022 (Ho)

[14] Pl. Ex. 1 at RUS-0000003.

accelerated effective August 27, 2013.[15] Sandwich Isles was only able to pay $3,723,209 of the $19,616,796 due in 2013 on the Paniolo Lease. Pl. Ex. 32 at SIC0149295. The financial statement for the period ending December 31, 2013, showed Sandwich Isles' dire financial condition by the end of 2013: Liabilities of $148 million either past due or due within the year, with only $17 million of current assets available to pay those liabilities, even as Sandwich Isles continued to post an operating loss of over $17.8 million in 2013. *See* Pl. Ex. 32 at SIC0149283-84.

17.   By December 31, 2013, Sandwich Isles did not have a reasonable prospect of restoring the $17 million of lost annual revenue from the NECA Pooling Revenue and the Universal Service High Cost Support Revenue.[16]

18.   In addition, according to the valuations set forth in its annual audited Financial Statements, Sandwich Isles debts were therefore greater than all of its assets at a fair valuation by December 31, 2013. *See* Pl. Ex. 32 at SIC0149282-83.

### V.   The Waimana Bonus

19.   On August 4, 2014, Sandwich Isles transferred $1,350,000.00 to Waimana as a "bonus to owner." Plf. Ex. 20 at SIC 0083388; Plf. Ex. 21 at SIC 0083389–90 (the "Waimana Bonus").[17]

---

[15] Pl. Ex. 2 at RUS-00000031.

[16] Trial Tr. 1-96:3–1-104:14, Oct. 13, 2022 (Ho).

[17] Trial Tr. 1-111:8–16, Oct. 13, 2022 (Ho).

20.     Sandwich Isles did not have any written policy in place which would entitle Waimana, its corporate parent, to a bonus.[18] Rather, the Board of Directors of Sandwich Isles had once authorized a "Performance Based Bonus" of up to 10% of the company's net annual income in 2002 based upon audited financial statements payable to the president of Sandwich Isles, Albert Hee. Plf. Ex. 22 at SIC 0110095–96.

21.     Mr. Hee claims that Sandwich Isles followed this same policy of authorizing up to 10% of the company's net annual income as a bonus to be accrued, and paid the accrued bonus to Waimana (rather than the President) at irregular intervals,[19] but there is no evidence in the record showing that the board ever authorized another bonus to Mr. Hee under this policy.[20] Sandwich Isles' former CEO, retired Vice Admiral Robert Kihune ("VADM Kihune"), who was a director at all times relevant to the Waimana Bonus, testified that the board never authorized another bonus under this policy.[21]

---

[18] Trial Tr. 1-119:17–19, Oct. 13, 2022 (Ho); Trial Tr. 2-34:4–23, Oct. 14, 2022 (Kihune).

[19] *See* Trial Tr. 4-49:6 – 4-51:4, Oct. 19, 2022 (Hee).

[20] Trial Tr. 1-119:17 - 1-121:11, Oct. 13, 2022 (Ho); Trial Tr. 2-35:20–2-36:11, Oct. 14, 2022 (Kihune).

[21] Trial Tr. 2-34:4–2-36:6, Oct. 14, 2022 (Kihune).

22.    Plainly, the Waimana Bonus did not comply with Sandwich Isles' claimed bonus policy because it was paid to Waimana, which was not Sandwich Isles' president, and the amounts accrued each year were not limited to 10% of the net profits, and indeed continued to accrue in years in which Sandwich Isles posted losses, or negative profits, for the period from 2011 through 2014. Plf. Ex. 21 at SIC0152225; Plf. Ex. 35 at 9–10. Indeed, during his testimony, Sandwich Isles former Chief Financial Officer, Randy Ho ("Mr. Ho"), could not explain the chart Sandwich Isles allegedly prepared to explain the Waimana Bonus calculation.[22]

23.    As the sole shareholder and parent company of Sandwich Isles, Waimana was at all relevant times an insider of Sandwich Isles.

24.    The Waimana Bonus was effectively a dividend or distribution paid to Sandwich Isles' sole shareholder. Sandwich Isles had previously agreed to a covenant that it would only issue dividend payments or shareholder distributions while in strong financial health. Plf. Ex. 6, at RUS-0000202.

25.    Waimana had reasonable cause to believe that Sandwich Isles was insolvent. In addition to having the parent-subsidiary relationship with Sandwich Isles, Waimana shared key officers and directors and used the same accounting

---

[22] Trial Tr. 1-111:23–117:24, Oct. 13, 2022 (Ho).

staff.[23] Waimana, at least through Al Hee, its Director and President, therefore had access to Sandwich Isles' financial reports, and was aware of Sandwich Isles' inability to pay debts as they came due.[24]

26.    Sandwich Isles did not receive any value—let alone reasonably equivalent value—in exchange for the Waimana Bonus.[25]

27.    Mr. Hee exercised control over Sandwich Isles' payment of the Waimana Bonus. VADM Kihune and Mr. Ho testified that Sandwich Isles considered the funds to be owed to Mr. Hee, who directed Sandwich Isles to pay the funds to Waimana instead.[26] Mr. Hee remained a director of Sandwich Isles at the time of the Waimana Bonus.[27] In addition, Mr. Hee signed the invoice in his capacity as President of Waimana, Sandwich Isles' parent company.[28] Plf. Ex. 20 at

---

[23]  Plf. Ex. 37, at PageID #:7377, ¶ 15.

[24] *See id.* at PageID #:7376–77.

[25] Trial Tr. 3-33:7–14, Oct. 18, 2022 (Christiansen).

[26] Trial Tr. 1-111:1–16, Oct. 13, 2022 (Ho); Trial Tr. 4-51:2–4, Oct. 19, 2022 (Hee).

[27] Plf. Ex. 37 at PageID # 7373, ¶ 7.

[28] Trial Tr. 2-95:12–19, Oct. 14, 2022 (Hee).

SIC0083390. Mr. Hee exercised control over decisions of Sandwich Isles' employee compensation and bonuses.[29]

28.     At the time of Sandwich Isles' payment of the Waimana Bonus, Mr. Hee knew that Sandwich Isles was required to repay the RUS Loans, and caused Sandwich Isles to pay the Waimana Bonus before paying the amounts due to the United States.

## VI.    The ClearCom Transfers

29.     On December 31, 2014, Sandwich Isles transferred $3,000,000.00 to ClearCom as "Rent Prepayment." Plf. Ex. 23 at SIC0076100. On March 18, 2015, Sandwich Isles transferred $4,000,000.00 to ClearCom as "Prepaid Rent for Network Infrastructure." Plf. Ex. 26 at SIC0076225. On June 17, 2015, Sandwich Isles transferred $2,000,000.00 to ClearCom as "Prepaid Rent for Network Infrastructure." Plf. Ex. 27 at SIC0076232. Thus, collectively, Sandwich Isles transferred $9,000,000.00 to ClearCom between December 31, 2014 and June 17, 2015 (the "ClearCom Transfers"). Plf. Ex. 37 at PageID #7370-76, ¶¶ 1–5. Mr. Hee asserts that these payments were owed under an unsigned equipment lease (for equipment that was never purchased) and an unsigned building lease (for a building

---

[29] *See* Trial Tr. 2-33:21–23, Oct. 14, 2022 (Kihune); Trial Tr. 4-49:6–13, Oct. 19, 2022 (Hee).

that was never built), under a plan created by Mr. Hee.[30] Under Mr. Hee's plan, the amount of rent to be paid to ClearCom would be determined later, based on ClearCom's expenses in constructing the facilities on land already owned by Sandwich Isles.[31]

30.     On September 24, 2015, ClearCom returned $6,000,000.00 to Sandwich Isles as "Return of funds to [Sandwich Isles] originally remitted as Advanced Prepaid Rent to the Equipment Lease." Plf. Ex. 28 at CCI-000029–30; Plf. Ex. 37 at PageID #7376, ¶ 5.

31.     According to testimony from the United States' expert witness, Camille Christiansen, Sandwich Isles should have been entitled to interest in the amount of $127,800.00 arising from the period between when the prepayments were made to ClearCom and the return of funds on September 24, 2015.[32]

32.     Sandwich Isles was not under any obligation to "prepay" any lease obligations to ClearCom. Plf. Exs. 24–25; WD Exs. 18–19. The purported arrangement between Sandwich Isles and ClearCom, by which ClearCom was to construct a building on Sandwich Isles' land and purchase telecommunications

---

[30] *See* Trial Tr. 2-102:2–2-109:11, Oct. 14, 2022 (Hee).

[31] *See* Trial Tr. 2-103:16–19, Oct. 14, 2022 (Hee).

[32] Trial Tr. 3-39:7–3-40:3, Oct. 18, 2022 (Christiansen); Plf. Ex. 36 at 5, 8.

equipment, using funds "prepaid" by Sandwich Isles, only to lease the building and equipment back to Sandwich Isles, was memorialized only with unsigned draft lease agreements.[33]

33.     Sandwich Isles, outside of its prior course of dealing or the reasonable course of dealing of any telecommunications company, elected to finance a new project to be owned by an affiliate, rather than conserving cash to meet its other, already defaulted obligations. Thus, plainly the prepayment of rent obligations to ClearCom was not in the ordinary course of business.

34.     The "prepaid rent" constituted a de facto interest free loan to ClearCom, despite Sandwich Isles not meeting the financial prerequisites in the Original Mortgage for extending credit to an affiliate. Plf. Ex. 6, at RUS-0000199.

35.     ClearCom is an insider of Sandwich Isles. ClearCom did not have its own employees, but relied instead on the employees and contractors of Sandwich Isles and Waimana.[34] ClearCom shared key officers and directors, as well as a shared accounting staff.[35] ClearCom's sole shareholder at all relevant times was Waimana, Sandwich Isles' parent company and sole shareholder. Plf. Ex. 37 at PageID #7377,

---

[33] *See* Trial Tr. 2-103:13–23, Oct. 14, 2022 (Hee); Def. Ex. WD18, WD19.

[34] Trial Tr. 1-107:3–17, Oct. 13, 2022 (Ho); Trial Tr. 2-22:3–19, Oct. 14, 2022 (Kihune); Trial Tr. 2-59:24–2-61:13, Oct. 14, 2022 (Hee).

[35] Plf. Ex. 37 at PageID #7376-77, ¶¶ 6–15; Trial Tr. 1-107:3–17, Oct. 13, 2022 (Ho).

¶ 14. ClearCom's business was effectively operated by Sandwich Isles.[36] Even if ClearCom's business were not effectively operated by Sandwich Isles, ClearCom and Sandwich Isles were under common control, and had access to inside information. ClearCom and Sandwich Isles plainly had a close relationship and negotiated at less than arm's length, functionally equivalent to the close relationships listed in 28 U.S.C. § 3301(5). *See In re The Village at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016).

36.     ClearCom had reasonable cause to believe that Sandwich Isles was insolvent at the time of each of the ClearCom Transfers. ClearCom shared officers and directors with Sandwich Isles, as well as a shared accounting staff, and those individuals' knowledge of Sandwich Isles' insolvency is imputed to ClearCom. *See supra* ¶ 35.

37.     Mr. Hee claims that ClearCom returned the funds to Sandwich Isles by making payments to Deutsche Bank on Sandwich Isles' behalf,[37] but Mr. Ho testified that Deutsche Bank was not a creditor of Sandwich Isles.[38] Even if the payments by ClearCom to Deutsche Bank could be construed as payments to Sandwich Isles'

---

[36] Supra note 35.

[37] Trial Tr. 4-73:15–4-78:23, Oct. 19, 2022 (Hee).

[38] Trial Tr. 1-129:23–25, Oct. 13, 2022 (Ho).

creditor Paniolo Cable Company, LLC ("Paniolo"), on behalf of Sandwich Isles, Paniolo was an insider of Sandwich Isles as well.[39] Mr. Hee testified that Paniolo did not have its own employees, and that the management of Sandwich Isles took control over Paniolo when Paniolo's original investors sought to exit their investment.[40]

38.    Mr. Hee has not demonstrated any new value received by Sandwich Isles from ClearCom following the dates of the ClearCom Transfers other than the September 24, 2015, partial return of funds. At most, ClearCom attempted to shift the benefit of an improper insider payment from itself to another of Sandwich Isles' insiders, rather than actually repaying Sandwich Isles, who would have been obligated under the Federal Priority Statute to use the funds to repay the United States, not Paniolo. Likewise, ClearCom has not demonstrated that Sandwich Isles received any value—let alone reasonably equivalent value—in exchange for the ClearCom Transfers, other than the September 24, 2015, partial return of funds.

---

[39] In the Complaint, the United States asserts claims against Mr. Hee for violations of the Federal Priority Statue arising from transfers not only to Waimana and ClearCom, but also to Paniolo. Compl. ¶ 182, ECF No. 1 at PageID #31.

[40] Trial Tr. 2-87:2–2-88:24, Oct. 14, 2022 (Hee).

## VII.   Ward Research Jury Consultant Payments

39.     Between April 13, 2015 and May 11, 2015, Sandwich Isles transferred $15,806.27 to Ward Research for jury consultant services (the "Jury Consultant Transfers"). Plf. Ex. 30.

40.     Mr. Hee was a constructive recipient of the Jury Consultant Transfers. The jury consultant services performed by Ward Research related to Mr. Hee's personal criminal trial for tax fraud, for actions taken by Mr. Hee relating to his personal income tax returns.[41]

41.     Sandwich Isles did not receive any benefit from the jury consultant services. Sandwich Isles was not a party to the criminal case, and Mr. Hee's criminal charges did not involve Sandwich Isles' taxes or relate to Mr. Hee's actions taken in any capacity as an officer or director of Sandwich Isles.[42]

42.     Mr. Hee was also a director of Sandwich Isles at the time of the Jury Consultant Transfers. *See supra* ¶ 3.

43.     At the time of the Waimana Bonus, the ClearCom Transfers, and the Jury Consultant Transfers, Mr. Hee had knowledge of Sandwich Isles' obligations

---

[41] Trial Tr. 4-40:22–4-42:2, Oct. 19, 2022 (Hee); Trial Tr. 4-67:12–18, Oct. 19, 2022 (Hee).

[42] Trial Tr. 4-41:12–4-43:8, Oct. 19, 2022 (Hee).

to the United States, and knew or had reason to know that Sandwich Isles was insolvent.

44.     Mr. Hee caused Sandwich Isles to pay the Jury Consultant Transfers ahead of paying the United States. Mr. Hee demonstrated knowledge of all other aspects of the jury consultant services, and his testimony that he did not know that Sandwich Isles paid for the jury consultant services was not credible.[43]

## CONCLUSIONS OF LAW

### I.     Jurisdiction and Venue

1.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Rural Electrification Act of 1936, as amended, 7 U.S.C. §§ 901-950bb-2, under 28 U.S.C. § 2410, under the Federal Debt Collection Procedure Act, 28 U.S.C. §§ 3001–3308, and under the Federal Priority Statute, 31 U.S.C. § 3713.

2.     This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because the United States has commenced it.

3.     Jurisdiction is also proper under 28 U.S.C. § 3012.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b).

---

[43] *Id.*

## II.   Legal Standards

### a.   The Federal Priority Statute

5.    Under 31 U.S.C. § 3713(a)(1)(A), the United States' priority attaches when it has a claim against the debtor, the debtor is insolvent, and a triggering event occurs. Thus, to demonstrate liability under the Federal Priority Statute, the following elements must be established:

(1) the United States has a claim against the debtor;

(2) the debtor is insolvent; and

(3) either:

a. the debtor makes a voluntary assignment of property;

b. property of the debtor, if absent, is attached; or

c. the debtor commits an act of bankruptcy

6.    Because the Federal Priority Statute does not provide a statutory definition of "insolvent," Courts must look to federal common law for the definition of "insolvent." *See Bramwell v. U.S. Fidelity & Guaranty Co.*, 269 U.S. 483, 487 (1926) (looking to the insolvency definition found in the Bankruptcy Act of 1898). Under federal common law, a debtor is "insolvent" within the meaning of the Federal Priority Statute if its liabilities exceed its assets at fair value (balance sheet insolvency) or if it is unable to pay debts as they come due (cash flow insolvency). *See Bramwell*, 269 U.S. at 487 (applying the balance sheet definition of insolvency

from the Bankruptcy Act of 1898); *Wolkowitz v. Am. Res. Corp.* (*In re: Dak Indus., Inc.*), 170 F.3d 1197, 1199–1200 (9th Cir. 1999) (affirming a bankruptcy court's use of the balance sheet test for insolvency); *Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349, 353 (9th Cir. 1965) (noting that insolvency is established with a showing that liabilities exceed assets); *Newhouse v. Corcoran Irr. Dist.*, 114 F.2d 690, 690 (9th Cir. 1940) (applying the cash flow insolvency test to a municipal bankruptcy debtor). Either test is sufficient to prove insolvency. *Meyer v. Lepe* (*In re Lepe*), 470 B.R. 851, 861–62 (9th Cir. B.A.P. 2012) (holding that the balance sheet test was sufficient to show insolvency for a debtor who was arguably solvent under the cash flow test).

7. As used in the Federal Priority Statute, an "act of bankruptcy" that triggers the United States' priority includes the payment of a fraudulent transfer. *See United States v. Coppola*, 85 F.3d 1015, 1020 (2d Cir. 1996)

8. Once federal priority has been triggered under section 3713(a), "[a] representative of a person or an estate (except a trustee acting under title 11) paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government." 31 U.S.C. § 3713(b). Accordingly, a corporate representative is liable under § 3713(b) when the United States proves that the representative (1) pays a non-federal debt (2) before paying a claim of the United States (3) at a time when the corporation was insolvent,

(4) if the representative had knowledge or notice of the claim. *United States v. Renda*, 709 F.3d 472, 480–81 (5th Cir. 2013) (citing *United States v. Coppola*, 85 F.3d 1015, 1020 (2d Cir. 1996)).

9.      The purpose of the Federal Priority Statute is to ensure adequate revenue to sustain public burdens and discharge public debts. *United States v. Moore*, 423 U.S. 77, 81–82 (1975). "[A]s that policy has mainly a reference to the public good, there is no reason for giving [the statute] a strict and narrow interpretation." *Id*. (quoting *United States v. State Bank of North Carolina*, 31 U.S. 29, 35 (1832)).

10.     The Supreme Court has repeatedly emphasized that the Federal Priority Statute should be construed liberally in favor of the United States. *See, e.g.*, *United States v. Emory*, 314 U.S. 423, 426 (1941); *Bramwell v. United States Fidelity & Guaranty Co.*, 269 U.S. 483, 487 (1926); *Beaston v. Farmers' Bank of Delaware*, 37 U.S. 102, 134 (1838).

11.     In light of the statute's public purpose, "[t]he burden lies with those who argue that the government's priority does not apply to show that they are not within the provisions of section 3713." *United States v. Cole*, 733 F.2d 651, 654 (9th Cir. 1984) (citing *Bramwell*, 269 U.S. at 487).

### b.    Fraudulent Transfers

12.    As set forth above, to prove that the United States' priority was triggered under the Federal Priority Statute, the United States must prove that a "triggering event"—in this case an "act of bankruptcy"—occurred. In this case, the United States asserts that Sandwich Isles committed multiple "acts of bankruptcy" when it engaged in a series of fraudulent transfers.

13.    Likewise, the United States has asserted direct fraudulent transfer claims against Mr. Hee as the beneficial recipient of the Jury Consultant Transfers.

14.    Under the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304, certain fraudulent transfers are voidable by the United States. Transfers by a debtor are fraudulent as to the United States if an insolvent debtor does not receive reasonably equivalent value in exchange for the transfer (constructive fraud theory), *id.* § 3304(a)(1), or if the transfer was made on account of an antecedent debt to an insider who had reasonable cause to believe the debtor was insolvent (insider theory), *id.* § 3304(a)(2).

15.    The Federal Debt Collection Procedures Act provides a statutory definition of insolvency that follows the balance sheet insolvency test: "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 28 U.S.C. § 3302(a). The statute provides further that a debtor is presumed to be insolvent if it fails the cash flow insolvency test: "A debtor who is

generally not paying debts as they become due is presumed to be insolvent." 28 U.S.C. § 3302(b).

16.     Under the insider theory, to demonstrate the occurrence of a fraudulent transfer, the United States must prove (1) a pre-transfer debt to the United States, (2) a transfer of assets on account of an antecedent debt, (3) the recipient's insider status, (4) the debtor's insolvency at the time of the transfer, and (5) that the insider had reasonable cause to believe the debtor was insolvent. 28 U.S.C. § 3304(a)(2).

17.     The Federal Debt Collection Procedures Act defines "insider" of a debtor to include expressly enumerated examples of insiders, or "statutory insiders," to include an "affiliate" that owns more than 20% of the voting securities of the debtor or a person whose business is operated by the debtor under a lease or other agreement. In addition, the statute's enumerated list of insiders is non-exclusive. As with the Bankruptcy Code's definition of "insider" at 11 U.S.C. § 101(31), which is functionally identical to the definition at 28 U.S.C. § 3301(5), other persons or entities can qualify as "non-statutory insiders" when "(1) the closeness of its relationship with the debtor is comparable to the enumerated insider classifications [in the statute], and (2) the relevant transaction is negotiated at less than arm's length." *U.S. Bank, N.A. v. Vill. at Lakeridge, LLC* (*In re Vill. at Lakeridge, LLC*), 814 F.3d 993, 1001 (9th Cir. 2016) (analyzing the nearly identical definition of "insider" in the Bankruptcy Code).

24

18.     To demonstrate the occurrence of a fraudulent transfer using constructive fraud theory, the United States must prove (1) a pre-transfer debt to the United States, (2) a transfer of assets, (3) lack of reasonably equivalent value in exchange for the transfer, and (4) debtor's insolvency at the time of the transfer. *U.S. Small Bus. Admin. v. Bensal*, 853 F.3d 992, 996–97 (9th Cir. 2017).

    *c.*    *Breach of Fiduciary Duty*

19.     When a corporation becomes insolvent, its directors owe a fiduciary duty to its creditors. As set forth by the Supreme Court for the Republic of Hawaii:

> When . . . a corporation is hopelessly insolvent and unable to carry out objects for which it is created, the directors must be regarded as trustees of the property for the benefit of the creditors and stockholders, and it is then their duty to wind up the affairs of the corporation for the benefit of all concerned[.]

*California Feed Co. v. Club Stables Co.*, 10 Haw. 209, 212 (Haw. Rep. 1896).

20.     Under federal common law, insolvency may be shown through either the balance sheet insolvency test or the cash flow insolvency test. *See, e.g.*, *Bramwell v. U.S. Fidelity & Guaranty Co.*, 269 U.S. 483, 487 (1926) (applying the balance sheet insolvency test); *Artesian Water Co. v. Comm'r of Internal Revenue*, 125 F.2d 17, 19 (9th Cir. 1942) (holding that despite a company's assets significantly exceeding its liabilities, it was nevertheless insolvent because it was not "able to meet its obligations as they matured, in the usual course of trade or business");

*Jeggle v. Mansur*, 17 F.2d 729 (9th Cir. 1927) (collecting cases applying the cash flow insolvency test under California law).

21.    The shifting of fiduciary duties from a corporation's stockholders to its creditors when a corporation becomes insolvent is known as the trust fund doctrine. *See, e.g.*, *Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944) ("An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors . . . . The fact which creates the trust is the insolvency." (citations omitted)); *Rapids Constr. Co. v. Malone*, 1998 WL 110151, at *4 (4th Cir.1998) ("[T]he trust fund doctrine gives creditors an equitable right of recovery against shareholders who take assets from a dissolving corporation."); *Geren v. Quantum Chem. Corp.*, 1995 WL 737512, at *3 (2d Cir. Dec. 13, 1995) ("[D]irectors of a corporation may become trustees of the creditors when the corporation is insolvent."); *Saracco Tank & Welding Co. v. Platz*, 65 Cal.App.2d 306, 150 P.2d 918, 923 (1944) ("When a corporation becomes insolvent its assets are held in trust for the benefit of the stockholders and creditors."); *Hinz v. Van Dusen*, 95 Wis. 503, 70 N.W. 657, 659 (Wis.1897) ("[W]hen a corporation ceases to be a going institution . . . its assets in the hands of such directors become, by equitable conversion, a trust fund for the benefit of its general creditors.").

22.     "Under the trust fund doctrine, [c]reditors may . . . look to the personal assets of the directors for breaching their fiduciary duty in improperly distributing the assets of the corporation." *Mansha Consulting LLC v. Alakai*, No CV 16-00582 ACK-RLP, 2017 WL 3659163, at *8 (D. Haw. Aug. 23, 2017) (internal quotes omitted). Thus, directors are liable for the amount of the improper distributions made to insiders by an insolvent corporation.

## III.   Discussion

23.     The United States asserts claims against Mr. Hee for violations of the Federal Priority Statute, fraudulent transfers, and breach of fiduciary duty. Each will be addressed in turn.

> a.     *Federal priority under 31 U.S.C. § 3713(a) was triggered when Sandwich Isles committed multiple acts of bankruptcy.*

24.     There is no dispute that Sandwich Isles owed an obligation to the United States under the RUS loans.

25.     As set forth above, Sandwich Isles was unable to meet its obligations as they matured, and therefore was cash flow insolvent by the end of its 2012 fiscal year. *See supra* ¶¶ 9–18. Accordingly, Sandwich Isles was "insolvent" within the meaning of the Federal Priority Statute at all times after 2012.[44]

---

[44] To the extent that the analysis of the Fraudulent Transfers requires a showing that Sandwich Isles' was "insolvent" under the statutory definition at 28 U.S.C. § 3302, Sandwich Isles' cash flow insolvency raises an unrebutted presumption of statutory

26.     After becoming insolvent, and after the RUS loans were accelerated, Sandwich Isles paid the Waimana Bonus, the ClearCom Transfers, and the Jury Consultant Transfers (collectively, the "Fraudulent Transfers"). *See supra* ¶¶ 19, 29, and 39.

27.     As detailed below, each of the Fraudulent Transfers constitutes an "act of bankruptcy" within the meaning of the Federal Priority Statute, triggering Sandwich Isles obligation to pay claims of the United States before paying other creditors under 31 U.S.C. § 3713(a). *See Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349, 353 (9th Cir. 1965) (holding that payments to creditors without due regard to the United States' priority triggered liability); *see also United States v. Golden Acres, Inc.*, 684 F. Supp. 96, 102 (D. Del. 1988) (holding that a fraudulent transfer is an act of bankruptcy triggering liability under the statute); *In re Gottheiner*, 3 B.R. 404, 408-09 (Bankr. N.D. Cal. 1980) (same).  Any of the three alleged Fraudulent Transfers, standing alone, constituted an act of bankruptcy that triggered the applicability of section 3713(a).

28.     At the time of each of the Fraudulent Transfers, Mr. Hee was an officer or director of Sandwich Isles. *See supra* ¶ 3.

---

insolvency. *See* 28 U.S.C. § 3302(b). In any event, the totality of the circumstances and unrebutted evidence as to the valuation of Sandwich Isles' assets in its audited financial statements shows that Sandwich Isles was clearly balance sheet insolvent by the end of 2013.

*i.      Fraudulent Transfers to Waimana*

29.     The United States asserts that the August 4, 2014 $1,350,000.00 Waimana Bonus was a fraudulent transfer under both the insider theory and the constructive fraud theory, and thus an "act of bankruptcy" under the Federal Priority Statute.

30.     It is undisputed that the Waimana Bonus was a transfer to Waimana on account of an antecedent debt. *See In re Futoran*, 76 F.3d 265, 267 (9th Cir. 1996).

31.     As set forth above, the Court finds and concludes that Waimana is a statutory insider of Sandwich Isles. *See supra* ¶ 2.

32.     As set forth above, the Court finds and concludes that Sandwich Isles was insolvent by the end of its 2012 fiscal year. *See supra* ¶¶ 9–18.

45.     Likewise, Waimana had reasonable cause to believe that Sandwich Isles was insolvent. In addition to having the parent-subsidiary relationship with Sandwich Isles, Waimana shared key officers and directors, used the same accounting staff, and shared office space with Sandwich Isles. Waimana had access to Sandwich Isles' financial reports, and was aware of Sandwich Isles' inability to pay debts as they came due. *See supra* ¶ 35.

46.     Mr. Hee did not demonstrate any value Waimana provided to Sandwich Isles in exchange for the Waimana Bonus. Likewise, Mr. Hee did not demonstrate

29

any new value Waimana provided to Sandwich Isles following the date of the Waimana bonus.

33.   Finally, there is no question that the Waimana Bonus was outside of the ordinary course of business or financial affairs between Waimana and Sandwich Isles. Nothing in the Waimana management agreement or the Sandwich Isles bonus policy provided for the Waimana Bonus. Waimana's argument that the Waimana Bonus represents an amount due to Mr. Hee under the Sandwich Isles bonus policy fails for two, independent reasons. First, the bonus was paid to Waimana, not Mr. Hee, and the ordinary course defense applies only to the course of dealing between the debtor and the insider receiving the transfer, in this case Waimana. 28 U.S.C. § 3307(f)(2). Second, even if the Waimana Bonus represents amounts due to Mr. Hee, the Waimana Bonus plainly fails to comply with Sandwich Isles established bonus policy—namely, that the amounts allegedly accrued were not limited to 10% of Sandwich Isles' annual net profit in any given year, or even limited to years in which Sandwich Isles earned a net profit. *See supra* ¶ 22.

34.   Accordingly, the Court concludes that the United States has demonstrated that the Waimana Bonus was a fraudulent transfer under both the insider theory and the constructive fraud theory, and thus constituted an "act of bankruptcy" triggering the United States' priority under the Federal Priority Statute.

ii.      *Fraudulent Transfers to ClearCom*

35.     The United States also asserts that the ClearCom Transfers between December 31, 2014 and June 17, 2015 were fraudulent transfers under both the insider theory and the constructive fraud theory in the amount of $3,127,800.00, and thus also "acts of bankruptcy" under the Federal Priority Statute.

36.     It is effectively undisputed that the ClearCom Transfers were transfers to ClearCom on account of antecedent debts. *See In re Futoran*, 76 F.3d 265, 267 (9th Cir. 1996).

37.     As set forth above, the Court finds and concludes that ClearCom is an insider of Sandwich Isles. *See supra* ¶ 35; *In re The Village at Lakeridge, LLC*, 814 F.3d 993, 1001 (9th Cir. 2016).

38.     Likewise, as set forth above, the Court finds and concludes that Sandwich Isles was insolvent by the end of its 2012 fiscal year. *See supra* ¶¶ 9–18.

39.     As set forth above, ClearCom had reasonable cause to believe that Sandwich Isles was insolvent at the time of each of the ClearCom Transfers. ClearCom shared officers and directors with Sandwich Isles, as well as a shared accounting staff, and those individuals' knowledge of Sandwich Isles' insolvency can be imputed to ClearCom. *See supra* ¶ 35.

40.     The ClearCom Transfers were on account of lease obligations that had not yet become due and payable—and, in the case of the equipment lease and

building lease, arose under leases that were never performed on or even signed. *See supra* ¶ 32. Accordingly, ClearCom did not provide Sandwich Isles reasonably equivalent value at the time of the ClearCom Transfers.

41.    Likewise, aside from the return of $6,000,000.00 to Sandwich Isles, ClearCom has not demonstrated that it provided any new value to Sandwich Isles following the dates of the ClearCom Transfers. *See supra* ¶ 38.

42.    Mr. Hee asserts that ClearCom's payment of $6 million to Deutsche Bank constituted new value to Sandwich Isles, but has failed to show a benefit to Sandwich Isles from those payments. Even if the Court were to accept Mr. Hee's explanation of the Deutsche Bank payments at face value, the payment was an ineffective attempt to retroactively launder a fraudulent transfer to ClearCom into a fraudulent transfer to Paniolo at a time that Sandwich Isles was legally required by the Federal Priority Statute to pay the United States ahead of all of its other creditors, including Paniolo.[45]

43.    It is undisputed that Sandwich Isles was not under an obligation to prepay its lease obligations to ClearCom, and there is no evidence demonstrating that in the ordinary course of business between ClearCom and Sandwich Isles,

---

[45] Importantly, the United States asserted claims against Mr. Hee for violations of the Federal Priority Statute for improper distributions to Paniolo in the Complaint in this action. *See* Complaint ¶ 182, ECF No. 1, at PageID #31.

Sandwich Isles regularly prepaid its unmatured lease obligations to ClearCom. *See supra* ¶ 33.

44.    Accordingly, the Court concludes that the United States has demonstrated that the ClearCom Transfers were fraudulent transfers under both the insider theory and the constructive fraud theory, and thus also constituted "acts of bankruptcy" triggering the United States' priority under the Federal Priority Statute.

*iii.    Fraudulent Jury Consultant Transfers*

45.    Finally, the United States asserts that the Jury Consultant Transfers between April 13, 2015 and May 11, 2015 were fraudulent transfers under the constructive fraud theory in the amount of $15,806.27, and thus another "act of bankruptcy" under the Federal Priority Statute.

46.    As set forth above, the Court finds and concludes that Sandwich Isles was insolvent by the end of its 2012 fiscal year. *See supra* ¶¶ 9–18.

47.    Because the Jury Consultant Payments were on account of jury consulting services relating solely to Mr. Hee's personal criminal trial, not claims against Sandwich Isles, the Court concludes that Sandwich Isles received no value in exchange for the Jury Consultant Payments.

48.    Accordingly, the Court concludes that the United States has demonstrated that the Jury Consultant Transfers were fraudulent transfers under the

constructive fraud theory, and thus also constituted "acts of bankruptcy" triggering the United States' priority under the Federal Priority Statute.

> b.   *Mr. Hee is personally liable for the Fraudulent Transfers under 31 U.S.C. § 3713(b).*

49.   Once federal priority was triggered under section 3713(a), Sandwich Isles was obligated to pay claims of the United States before paying any other creditor.  31 U.S.C. § 3713(a).

50.   Despite this obligation, under Mr. Hee's control, Sandwich Isles paid each of the Fraudulent Transfers to other creditors before paying its claim to the United States for the accelerated RUS Loans.

51.   As set forth above Sandwich Isles was insolvent at the time of the Fraudulent Transfers. *See supra* ¶¶ 9–18.

52.   Mr. Hee had full knowledge of Sandwich Isles Claim to the United States at the times Sandwich Isles committed the Fraudulent Transfers. *See supra* ¶ 43.

53.   Accordingly, under Count III, Mr. Hee is liable to the United States for the $4,493,606.27, paid to other creditors that, under 31 U.S.C. 3713(a), was required to be paid instead to the United States.

       c.     *Mr. Hee is directly liable to the United States as the recipient of the fraudulently-transferred Jury Consultant Payments.*

54.    As set forth above, the Jury Consultant Payments were constructively fraudulent transfers under 28 U.S.C. § 3304(a)(1).

55.    Because the Jury Consultant Payments related solely to Mr. Hee's personal criminal trial, and not to Sandwich Isles, Mr. Hee personally received all of the benefit of Sandwich Isles' transfer of $15,806.27 to Ward Research. Sandwich Isles, by contrast, received no benefit in exchange for this transfer.

56.    Accordingly, Mr. Hee is the beneficial recipient of the $15,806.27 Jury Consultant Transfers.

57.    It is undisputed that Mr. Hee is in an insider of Sandwich Isles. *See supra* ¶ 3. In addition, Mr. Hee knew or had reasonable cause to believe that Sandwich Isles was insolvent. *See supra* ¶ 43.

58.    Thus, as to Mr. Hee's receipt of the benefit of the $15,806.27 Jury Consultant Transfers, these transfers were also fraudulent insider transfers under 28 U.S.C. § 3304(a)(2).

59.    Under 28 U.S.C. § 3306(a)(1), the United States is entitled to avoidance of the $15,806.27 Jury Consultant Transfers, thus Mr. Hee is liable to the United States for $15,806.27 under Counts IV and V.

d.     *Breach of Fiduciary Duty*

60.     Once Sandwich Isles became insolvent, its directors—including Mr. Hee—owed a fiduciary duty to Sandwich Isles' creditors, including the United States, to preserve the value of the company so that the remaining assets of the company can be wound up and distributed fairly to creditors.

61.     By transferring the Fraudulent Transfers to other creditors—including insiders Waimana and ClearCom—Sandwich Isles and its directors breached their fiduciary duties to the United States by improperly distributing the limited assets of company to and for the benefit of insiders ahead of Sandwich Isles' secured creditor, the United States.

62.     The United States is entitled to judgment against Mr. Hee personally in the amount of these improper distributions. *Mansha Consulting LLC v. Alakai*, No CV 16-00582 ACK-RLP, 2017 WL 3659163, at *8 (D. Haw. Aug. 23, 2017).

63.     Accordingly, the United States has demonstrated that the Sandwich Isles violated its fiduciary duties to the United States by engaging in the Fraudulent Transfers when it was insolvent, and thus Mr. Hee is liable to the United States under Count VI, as an officer and director of Sandwich Isles at the time of the Fraudulent Transfers, in the amount of $4,493,606.27.

### <u>CONCLUSION</u>[46]

In view of the Court's findings and conclusions, the Court finds that judgment should be entered in the United States' favor against Mr. Hee in the amount of $4,493,606.27. A separate judgment shall be entered contemporaneously herewith in accordance with Federal Rule of Civil Procedure 58.

The United States has also asserted Counts for foreclosure and for "Interest, Processing, Handling and Administrative Costs, Penalties and Attorneys' Fees," *see* Compl. ¶¶ 276–79, and Foreclosure, *see* Compl. ¶¶ 162–73. The Court will hold these Counts in abeyance, and the United States shall be entitled to proceed with these Counts at an appropriate time following any judicial sale in accordance with this Order and the *Stipulation Regarding Trial Procedures* entered at ECF No. 451.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, February __, 2023.

_____
J. Michael Seabright
Chief United States District Judge

Date: February 3, 2023

---

[46] Mr. Hee additionally asserts that the government should be estopped from proceeding with its claims against him. Mr. Hee's assertions, however, plainly do not state a claim for promissory estoppel. Moreover, Mr. Hee does not explain how his claim for promissory estoppel could operate as a defense to the United States' claims under the Federal Priority Statute and breach of fiduciary duty. Thus, the Court holds that the United States is not estopped from proceeding with its claims against Mr. Hee.

Prepared By:

BRIAN BOYNTON
Principal Deputy Assistant Attorney General

RACHEL S. MORIYAMA #3802
Civil Chief, District of Hawaii
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515

/s/J. Zachary Balasko
RUTH A. HARVEY
KIRK T. MANHARDT
SHANE HUANG
(Illinois Bar 6317316)
MINIARD CULPEPPER JR.
(MA BBO No. 693851)
J. ZACHARY BALASKO
(W. Va. State Bar No. 12954)
Civil Division
United States Department of Justice
P.O. Box 875, Ben Franklin Station
Washington, DC 20044-0875
Telephone: (202) 514-7162
Email: john.z.balasko@usdoj.gov

Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 3rd day of February, 2023, a copy of the

foregoing **UNITED STATES' REVISED PROPOSED FINDINGS OF FACT**

**AND CONCLUSIONS OF LAW** was served by the ECF system on all parties

who have consented to service in that manner, and by first class U.S. mail on:

    Albert S.N. Hee
    1155 Akipola Street
    Kailua, HI 96734

    Pro Se

                             /s/ J. Zachary Balasko
                             J. ZACHARY BALASKO