Albert S.N. Hee
1155 Akipola Street
Kailua, Hawaii  96734
808-599-4441
alhee@waimana.com
Pro Se

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
03 Feb. 2023 11:58 AM lrs
John A. Mannle, Clerk of Court

# UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 18-000145 |
| | ) | (JMT-RT) |
| SANDWICH ISLES COMMUNICATIONS | ) | |
| INC.; ALBERT S.N. HEE; ET AL | ) | Defendant Albert S.N. Hee |
| | ) | Proposed Findings of Fact and |
| | ) | Conclusions of Law |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANT ALBERT S.N. HEE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# Table of Contents

I.    INTRODUCTION

II.   PROPOSED FINDINGS OF FACT

    A.    FACTUAL AND PROCEDURAL BACKGROUND

    B.    FACTS RELEVANT TO THE CHALLENGED TRANSACTIONS

        1.    AUTHORITY AND ROLE OF AL HEE

        2.    THE CLEARCOM TRANSACTIONS

        3.    THE WAIMANA TRANSACTION

        4.    THE WARD RESEARCH PAYMENT

    C.    TRIAL

III.  CONCLUSIONS OF LAW

    A.    LEGAL STANDARDS AND CONCLUSIONS

        1.    FEDERAL PRIORITY STATUTE

        2.    THE FEDERAL DEBT COLLECTION PRACTICES ACT

            a.    PREFERENTIAL TRANSFERS TO AN INSIDER

            b.    CONSTRUCTIVELY FRAUDULENT TRANSFERS

        3.    INSOLVENCY IS A REQUIREMENT FOR ALL
            THE CLAIMS AND PLAINTIFF DID NOT MEET
            ITS BURDEN

        4.    PREFERENTIAL TRANSFER CLAIMS REQUIRE
            REASONABLE CAUSE TO BELIEVE THE DEBTOR WAS

INSOLVENT AND PLAINTIFF DID NOT MEET ITS BURDEN

5.    STATUTE OF LIMITATIONS FOR CLAIMS BASED ON PREFERENTIAL TRANSFERS

B.    CONCLUSIONS OF LAW REGARDING COUNTS

    1.    PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT III

        a.    CLEARCOM RETURNED THE FUNDS

        b.    NEW VALUE

        c.    PLAINTIFF HAS NOT ESTABLISHED THAT CLEARCOM WAS AN INSIDER

        d.    PLAINTIFF HAS NOT ESTABLISHED THAT AL HEE IS A REPRESENTATIVE OF THE DEBTOR WHO PAID A DEBT

    2.    PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT IV

    3.    PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT V.

    4.    PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT VI

    5.    PROMISSORY ESTOPPEL

## DEFENDANT ALBERT S.N. HEE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

I.   **INTRODUCTION**

1.      In 1900 all residents of Hawaii became United States Citizens. 8 USC § 1405.  In 1921, the Hawaiian Homes Commission Act ("HHCA") was enacted to rehabilitate native Hawaiians, who were now United States Citizens.  In 1934, the Communications Act established the Federal Communications Commission ("FCC"): "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible **to all the people of the United States** a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, …" Pub. L. 73-416 [emphasis added].

2.      The 1936 the Rural Electrification and Telephone Service Act as amended provided loans for the installation of telephone infrastructure to serve isolated rural areas. 7 USC § 901 et seq.

3.      Thereafter, universal communications service to all U.S. citizens living in uneconomical areas to serve was achieved by a company borrowing funds

---

[1] I obtained assistance from attorneys in preparation of this document.  These are very technical laws and I needed to make sure I understood them correctly.  I take personal responsibility for its contents.

from the Department of Agriculture to build infrastructure and the FCC providing subsidies to repay the loans to keep monthly charges reasonable. Without companies willing to take the risk[2] of "partnering" with the Department of Agriculture and FCC, "a rapid, efficient, nationwide and world-wide communications service at reasonable charges" would not be available to all US Citizens, only those living in economical areas to serve.

4.     Despite the successes, there were citizens living in areas extremely uneconomical to serve that had not benefited from the Communications Act.   The 1996 Telecommunications Act amended the 1934 Communications Act in part to insure universal telecommunications would be available to US citizens living in "rural, insular, and high cost areas" through "specific, predictable and sufficient" support funds to preserve and advance universal service regardless of "race, color, religion, national origin, or sex." 47 USC §151; 254 (b)(3), (5).  HHL is rural, insular and high cost.

5.     In 1996, those relatively few native Hawaiians living on Hawaiian Home Lands ("HHL") had poor or no telephone service.  The lack of adequate telephone service is a major impediment to full participation in US society.  It prevents the use of HHL for residential, educational, health and business purposes. Hawaiian Telephone refused to provide telephone service on HHL unless the

[2] TR 4-25

Department of Hawaiian Home Lands ("DHHL") paid for all of the infrastructure costs[3] and even then would only provide party line service in many areas.

6.      Defendant Albert S.N. Hee ("I, me, Al Hee, Mr. Hee") formed Sandwich Isles Communications, Inc. ("SIC") to take the risk of partnering with the Plaintiff to bring modern telecommunications to HHL at no cost to DHHL or the homesteaders.[4]  This complaint is a result of the Plaintiff's reliance on the FCC making "specific, predictable and sufficient" universal service funds available to repay their loans.  Plaintiff determined, prior to making the loans, over 90% of the revenues needed to repay their loans to Sandwich Isles Communications, Inc. ("SIC") would come from FCC administered support funds.  Plaintiff did not require any collateral or guarantees when they made the loans.

7.      The substantial potential consequences of borrowing hundreds of millions of dollars from a Federal agency and reliance on FCC administered support to repay the loans caused me to "trust but verify" that Plaintiff had the statutory authority to:  make the highly leveraged loans without requiring personal guarantees; Plaintiff's reliance for repayment of the loans on the FCC administered

---

[3] Hawaiian Telephone formed a subsidiary, Micronesian Telephone Company, to borrow $400M from the Department of Agriculture to build the infrastructure in Saipan to serve the US Citizens living there.

[4] Hawaiian Telephone required DHHL to pay for the infrastructure.  "Currently, the Department funds the initial infrastructure installation in all of its developments and issues licenses for the provision of the utility services." Ex. P-17 Exhibit A

support payments were both statutory and experienced based; and, the officials making the representations had the authority to do so.[5] TR 4-56:16-25; 4-57;4-58.

8.    Plaintiff assured me that Plaintiff would restructure the loans to prevent any default as long as SIC followed all of Plaintiff's rules.  SIC followed all of Plaintiff's rules.  Despite Plaintiff's assurances, when the FCC changed their rules and sufficient support funds were not available to repay their loans, Plaintiff foreclosed on the loans and initiated this complaint.

9.    The simple truth is that the Plaintiff is shifting the blame to me by any means necessary, regardless of the law, their promise or the effect on a group of US Citizens, all native Hawaiians, being denied the same opportunities Plaintiff has provided to other US Citizens.  Plaintiff's reliance on FCC administered support for repayment of its loans without guarantees or collateral was their decision.  Plaintiff's promise to me not to foreclose was also their decision.  When sufficient revenues to repay the loans were no longer available, Plaintiff had three choices; renegotiate the loans fulfilling their promise, initiate action against the FCC, or blame me.

10.    As this Court has seen by Plaintiff's Closing, Plaintiff will use any means necessary, including introducing new claims based on violations of

---

[5] Establishing that a government agency violated the plain language of a statue or made a mistake is almost impossible given the deference Courts are compelled to give federal agencies under the Chevron doctrine.

unalleged statutes to achieve its ultimate goal of SIC and I voluntarily filing for bankruptcy.  That will allow Plaintiff to use the bankruptcy code to further its purpose of shifting blame and effectively establish a personal guarantee after-the-fact.

## II.    PROPOSED FINDINGS OF FACT

### B.    FACTUAL AND PROCEDURAL BACKGROUND

11.    The Hawaiian Homes Commission issued License 372 to Waimana after speaking directly with Mr. Bob Peters, Undersecretary of United States Department of Agriculture Telephone programs expressing great interest in having Waimana apply for a loan and reviewing a letter from Bank of America committing to guaranteeing the Rural Electrification Administration now (Rural Utilities Service ("RUS")) loans. EX. P-17 exhibit A to July 26, 1994 item C1[6].

12.    I had been in discussions with Mr. Peters about loans to build telecommunications network on HHL throughout Hawaii.  I was assured by RUS personnel, including Mr. Peters, who had the authority to make and renegotiate loans that as long as SIC followed the rules, if SIC found itself in financial difficulties repaying the loans, RUS would renegotiate the loans. TR 4-56:16-25; Kuchno Dep. p. 114-5

---

[6] "In May 1994, staff spoke to Mr. Bob Peters ..."; "Mr. Hee provided copies of a letter from REA ... and also a letter from Bank of America ..."

13.    Waimana formed Sandwich Isles Communications, Inc. ("SIC")[7] to deliver telephone voice services and apply for the loans from RUS.

14.    "Sandwich Isles is a native Hawaiian owned company licensed by the Department of Hawaiian Home Lands to construct and operate a modern telecommunications network serving the Hawaiian Home Lands." H Ex. 6 p. 142 para II (A)(2).  *United States v. Sandwich Isles Communs., Inc.*, 398 F. Supp. 3d 757, 763 (D. Haw. 2019).

15.    "To partially finance construction and operation of Sandwich Isles' telecommunications services on Hawaiian home lands, Sandwich Isles and the United States entered into a series of loan agreements and corresponding promissory notes from September 1997 to April 2001. ECF No. 1 ¶ 57 at PageID #10.  The three loans, totaling over $165 million, were made by the RTB pursuant to the Rural Electrification Act of 1936, as amended, 7 U.S.C. § 901 et seq." *Id*. at 764.

16.    These loans from RUS and the Rural Telephone Bank ("RTB") were used to bring modern telecommunications service to the underserved residents of the Hawaiian Home Lands ("HHL").  HHL "are primarily located in rural or more

---

[7] By Partial Assignment of License dated January 15, 1996, Sandwich Isles holds "those certain rights, title and interest necessary to provide IntraLata and Intrastate telecommunication services in and to . . . License Agreement No. 372 dated May 9, 1995, between the Hawaiian Home Lands and [Waimana] . . . ."  EX. P-18.

remote areas, and '[b]ecause of the remote and non-contiguous nature of the Home Lands, the cost to provide infrastructure to these areas is very high.'  "  Id. at 763.

17.     All loans were made after the enactment of the 1996 Telecommunications Act which directed the implicit support authorized in the 1934 Communications Act be changed to explicit "specific, predictable and sufficient" funding support mechanisms.[8]

18.     RUS is a bank and its primary responsibility is to make loans that can be repaid.[9]

19.     Plaintiff had its financial analysts determine how much Universal Service Support a borrower should receive.  Support payments include the Universal Service Fund ("USF") and other support sources administered by the FCC through its contractors the National Exchange Carrier Association ("NECA") and the Universal Service Administrative Corporation ("USAC"). McLean Dep. p. 77, 78, 79.

---

[8] "I came to the agency [RUS] shortly after the Telecom Act in 1996 was enacted.  And so when I left the agency in 2000, the Telecom Program …had a perfect record of no defaults.  Universal service support, again, the FCC implemented the provisions of the Telcom Act of 1996.  …to essentially change out some of the implicit forms of support to make them explicit." McLean Dep. p.16

[9] "…the overarching principle of our program, … was loans are loans.  Loans are expected to be paid back. …And the third item, probably the most important particularly for new borrowers is is there reasonably adequate security for the loan. …if I don't have any way to be able to secure that repayment, we couldn't make the loan." McLean Dep. p. 26-7.

20.     Plaintiff made the loans after determining repayment of the loans to SIC would be over 90% reliant on FCC administered FCC administered support funds.  Kuchno Dep. p. 33.

21.     RUS is required under the Code of Federal Regulations to make a finding that the loans are feasible before making any loans.  SIC's loans each had a finding that SIC could repay them. Kuchno Dep. p. 20, 22.

22.     Plaintiff required SIC to qualify for the receipt of support funding from the FCC before approval of the loans. Kuchno Dep. p. 18.

23.     In February 1998, over GTE Hawaiian Tel's Opposition, the FCC granted SIC a waiver necessary to receive support funding.   AAD97-82, 13FCC Rcd 2407 (Acct. Aud. Div.) Feb. 3, 1998.  GTE Hawaiian Tel appealed.

24.     In 2005, the FCC reversed its 1998 Order to consider GTE-now Verizon Hawaiian Tel's appeal and once again approved sufficient USF for the SIC network as built in part with the RUS loans. TR 4-33:8-17

25.     In the FCC's 2005 Order:  "… Sandwich Isles states that it has been steadily investing large amounts of capital to construct state-of-the-art facilities to provide service on the Hawaiian home lands in reliance on the now-reversed Bureau order since 1998.  As a result of the combination of the $166 million in capital funding from the Rural Utilities (RUS) and cost recovery … Sandwich Isles

11

has been able to extend service to over 4,000 new lots and almost 1,200 access lines in 20 new communities …" EX H 6, C(11), p.146.

26.     As further stated in the FCC's 2005 Order:  "In this Order, we grant a request from [SIC] for waiver, *nunc pro tunc*, of the study area boundary … These waivers will permit Sandwich Isles to continue being treated as an incumbent LEC for purposes of receiving universal service support …" EX. H 6 para I.(1), p. 141-2.

27.     Plaintiff required SIC enter into a Management Agreement with Waimana Enterprises, Inc. ("Waimana") on terms satisfactory to the RUS.  The form of the Management Agreement was reviewed and expressly approved by the RUS before any fees were paid by SIC to Waimana. EX. WD-2; Kuchno Dep. p. 13.

28.     For over 20 years before the current controversy, SIC was audited regularly, not only by its independent auditors, but also by USAC, NECA, RUS, Congress and the FCC Inspector General.  TR 4-27: 19-25.  There were no negative findings in any of the audits.[10]  TR 4-28:1-4; Kihune Dec. p. 124-26, 131-33, 135-143, 162-163.  SIC followed Plaintiff's rules.

---

[10]In 2009, the IRS audited SIC.  After finding no significant issues the IRS then audited each of the Waimana companies.  After finding no significant issues with the other Waimana companies, the IRS audited me personally and decided to prosecute me without issuing a Notice of Proposed Adjustment so I could dispute or pay the taxes the IRS believed I owed.

29.    Defendant Clearcom Inc. ("Clearcom"), is a telecommunications company and, during the relevant timeframe, was a general contractor to SIC for special projects. TR 1-137:1-12

30.    In 2011, "the FCC 'comprehensively reformed' its existing regulatory system for telephone service." *In re FCC 11-161*, 753 F.3d 1015, 1035 (10th Cir. 2014).  "On February 9, 2011, the FCC issued a Notice of Proposed Rulemaking (NPRM) 'proposing to fundamentally modernize the FCC's Universal Service Fund (USF or Fund) and intercarrier compensation (ICC) system.'"  *Id*., at 1035-36 (citation and brackets omitted).  As a result, on November 18, 2011, the FCC issued a comprehensive . . . Report and Order (the "Transformation Order"), that, among other matters, reformed the manner and amount of USF payouts made to rural carriers.  *In re Connect America Fund*, 26 FCC Rcd 17663, 2011 WL 5844975 (Nov. 18, 2011), petitions for review denied, *In re FCC 11-161*, 753 F.3d at 1033; *In re FCC* 11-161, 753 F.3d at 1070 (analyzing changes to USF subsidies)."  *United States v. Sandwich Isles Communs., Inc.*, 398 F. Supp. 3d at 766.

31.    "The Transformation Order instituted a $250 per line per month [$3,000 per year] cap on USF support, effective July 2014. 47 C.F.R. § 54.302(a). This was a significant reduction from the $14,000 per line per year that Sandwich

Isles had been receiving.[11]”  *Id.* at 757.  “‘[T]he Transformation Order affected . . . all high-cost USF recipients by establishing, ‘for the first time,’ a ‘budget for the high-cost programs within USF’ to ‘protect consumers and businesses that ultimately pay for USF through fees on their communications bills.’”  *Id.*

32.    “The FCC recognized that its reforms could impact particular recipients differently, so the Transformation Order established a ‘waiver mechanism under which a carrier can seek relief from some or all of our reforms if the carrier can demonstrate that the reduction in existing high-cost support would put consumers at risk of losing voice service. . . .’”  *Id.* (quoting Transformation Order ¶¶ 32, 193, 539).  In re FCC 11-161, 753 F.3d at 1069 (explaining that “the Order made clear that if ‘any rate-of-return carrier can effectively demonstrate that it needs additional support to avoid constitutionally confiscatory rates, the FCC will consider a waiver request for additional support.’”) (citing Transformation Order ¶ 294).  Id.

33.    SIC sought a waiver as soon as the Transformation Order became effective in November 2012.  Under the Transformation Order, the FCC was required to act on SIC’s waiver within 90 days.  The FCC denied its request on May 10, 2013, 18 months later.  *Id.* (citation omitted); Ex. H 7.

---

[11] The $14,000 per line was authorized by the FCC’s 2005 order.  Ex. H 6

34.     During the period SIC's waiver was being considered, I was asked to and agreed to give testimony before both the US Senate and US House of Representatives on the effects of the Transformation Order.  My testimony caused many conversations at the FCC and Plaintiff about SIC's loans. McLean Dep. p. 117

35.     RUS "accelerated" the loan in 2013, but took no action to collect.  In fact, RUS entered into negotiations with SIC to modify the loan just as it had told me it would.

36.     Representatives of RUS and SIC participated in negotiations for restructuring of the RUS Loans in 2013, 2014, 2015.  EX. WD 79 at ¶¶1-9.  In 2015, representatives of RUS and SIC reached an understanding on possible loan restructuring terms, but RUS refused to sign and enter into a binding agreement to restructure or modify the RUS Loans.  EX. WD 79 at ¶12.  Representatives of RUS and SIC continued to participate in negotiations for restructuring of the RUS Loans in 2016, 2017, and 2018.  EX. WD 79 at ¶¶ 13 through 15.

37.     While the restructuring negotiations were ongoing, SIC made reduced loan payments to the RUS as directed by Department of Justice ("DOJ"), which accepted the payments.  Ex. S-YY.  RUS, through DOJ, provided SIC with the wire instructions.  Ex. W 79: 46-48 ("Obviously, we're hoping for this and similar payments as we continue to attempt to work out this debt.  To help with this, I'm

forwarding wire instructions.") (8/4/15 email from Lloyd Randolph to SIC counsel).

38.     Plaintiff filed this lawsuit on April 20, 2018, against SIC and others, asserting among other things, claims under of the Federal Debt Collection Procedures Act, 28 U.S.C. §§ 301 et seq. making it impossible to attract and retain management. Kihune Dec. p. 159: 6-15

39.     I believed the loan restructuring negotiations between RUS and SIC would be successful.  TR 4-51: 5-25; 4-52:1-2.

40.     The only claims before the Court are Plaintiff's claims against Defendant Al Hee.

**B.     FACTS RELEVANT TO THE CHALLENGED TRANSACTIONS**

**1.     AUTHORITY AND ROLE OF AL HEE**

1.     Al Hee established Waimana, ClearCom and SIC and at various times held officer and/or director positions in all of the companies.

2.     SIC had weekly management meetings which Al Hee did not participate in. Kihune Dep. P. 153: 11-17; TR 2-42: 4; TR 1-137: 4-12, 15-22

3.     SIC's CEO(s), Admiral Kihune and Janeen Olds, headed the weekly meetings at which all SIC decisions were made. TR 4-41: 1-3; TR 5-39: 1-10;

4.      SIC's CEO's kept Al Hee apprised of the major issues however, he did not have veto power over their decisions.  SIC's CEO and CFO had veto power over any SIC payments. Kihune Dep. p. 70-71; TR 1-141 ln 22; 156

## 2.      THE CLEARCOM TRANSACTIONS

5.      SIC was planning to consolidate operations to a central network operations center in Mililani, Oahu.  TR 2-102:6-19. This centralization would result in efficiency and cost savings.  See Id.

6.      SIC already had the permits and other entitlements to build the new Network Operations Center ("NOC") on land it owned in Mililani.  TR 2-105:9-24; 106: 1-3.

7.      The equipment would include a centralized state-wide switch to replace the multiple regional switches located on the all islands.  TR 2-108; 109.

8.      To accomplish this plan, SIC and Clearcom entered into two agreements: a Building Lease (Ex. WD-19) and a Network Equipment Lease (Ex. WD-18).  TR 2-107:13-19.

9.      Pursuant to the Building Lease, Clearcom agreed to build and lease the NOC to SIC.  SIC agreed to prepay $3,000,000.00 in rent.  Ex. WD-19 at 1. The prepaid rent was to be used to "assemble the Building, construct leasehold improvements in the Building, and purchase any and all equipment or services[.]" *Id*. at 1-2.

17

10.     Clearcom received a $3,000,000.00 wire transfer from SIC on or around December 31, 2019.  Ex. P-24 at 3-4.  The Clearcom payment receipt states: "Additional Prepaid Rent pursuant to Building Lease[.]"  *Id*. at 4.

11.     The $3,000,000.00 was returned to SIC's designated payee in 2016. A "memo to accounting" explains:

> CCI will be redirecting the advance that SIC has provided to CCI to build a network operations center for SIC.  The network operations center project has been put on hold and the funds that SIC advanced to CCI will be redirected to Deutsche Bank (DB), until SIC is able to resolve its dispute with DB over lease payments. Ex. WD-5.

12.     SIC owed lease payments to Paniolo Cable Company, LLC ("Paniolo"), and Paniolo in turn owed loan payments to DB.  TR 3-129:19-24; 130:1-5.

13.     The return (redirection) of the money occurred in a series of wire transfers totaling around $3.3 million.  Ex. WD-6 through WD-13.  The accounting for the payments by SIC is shown on SIC's general ledger.  Ex. WD-20.

14.     Under the Equipment Lease, SIC agreed to pay Clearcom $6,000,000.00 in prepaid rent.  The prepaid rent was to be used "to cover the cost of acquiring and maintaining the Equipment and operating the Lessor's (SIC) business."  Ex. WD 18 at 2.

15.     $4,000,000.00 of the $6,000,000.00 of the Equipment Lease prepaid rent was made by SIC to Clearcom in March 2015.  Ex. P-26.  The receipt states

the funds were received as "Additional Prepaid Rent" under the "Equipment Lease between Clearcom and Sandwich Isles for the Network and Equipment." *Id.* at 7.

16.   The remaining $2,000,000.00 was received by Clearcom from SIC in June 2015.  Ex. P-27.  The receipt also states that it is for the "Equipment Lease between Clearcom and Sandwich Isles for the Network and Equipment." *Id*. at 5.

17.   These transactions were reversed at the request of SIC.  TR 4-46:17-25; Ex. WD 15; Ex. WD 5 (memo).

18.   The $6,000,000.00 prepaid rent under the Equipment Lease was returned by Clearcom to SIC on September 24, 2015.  Ex. P-28.  Clearcom processed a request to "Return funds to SIC originally remitted as Advanced Prepaid Rent to the Equipment Lease[.]"  Id. at 1.

19.   The $6,000,000.00 was transferred on September 24, 2015 from Clearcom's money market account at Bank of Hawaii to SIC.  Id*. at 2*

20.   The payments were authorized by SIC's CEO and there is no evidence that Clearcom or I benefited from any of these transactions.

### 3.   THE WAIMANA TRANSACTION

21.   In addition to a generous benefit package (TR 2-37-43), SIC had an employee bonus policy for SIC employees directed by its CEO not Al Hee. TR 1-140: 1-18; TR 2-33: 4-23

22.     SIC's executive management were employees of Waimana assigned to SIC.  TR 2-17: 4-8; 2-23: 21; 2-19: 21-2;

23.     A bonus program was authorized by SIC's Board of Directors during an April 24, 2003 board meeting.  Ex. P-22.

24.     Initially, the bonus was established as a performance-based bonus for the "President of [SIC]" up to 10% of SIC's net income.  *Id.*   At the time, Al Hee was the President of SIC.  It was later treated as a bonus to owner Waimana with checks made to Waimana.

25.     Exhibit P. 21 contains the following summary which was provided to USAC during its audit and was attached as Exhibit Q to SIC's 2015 Audit:

| Year | Net Income | Authorized Bonus | Annual bonus accrued | Cumulative bonus accrued | Paid |
|---|---|---|---|---|---|
| 1997 & prior | $ (24,702) | $ - | $ - | $ - | $ - |
| 1998 | $ (608,340) | $ - | $ - | $ - | $ - |
| 1999 | $ (2,987,143) | $ - | $ - | $ - | $ - |
| 2000 | $ 1,308,018 | $ 130,802 | $ - | $ - | $ - |
| 2001 | $ (1,283,377) | $ - | $ - | $ - | $ - |
| 2002 | $ 1,641,916 | $ 164,192 | $ 100,000 | $ 100,000 | $ - |
| 2003 | $ 1,831,385 | $ 183,139 | $ 100,000 | $ 200,000 | $ - |
| 2004 | $ 2,197,359 | $ 219,736 | $ 100,000 | $ 300,000 | $ 300,000 |
| 2005 | $ 3,690,481 | $ 369,048 | $ 100,000 | $ 400,000 | $ - |
| 2006 | $ 2,466,969 | $ 246,697 | $ 100,000 | $ 500,000 | $ - |
| 2007 | $ 2,706,503 | $ 270,650 | $ 100,000 | $ 600,000 | $ - |
| 2008 | $ 5,360,027 | $ 536,003 | $ 200,000 | $ 800,000 | $ - |
| 2009 | $ 3,331,346 | $ 333,135 | $ 400,000 | $ 1,200,000 | $ 450,000 |
| 2010 | $ 3,002,114 | $ 300,211 | $ 400,000 | $ 1,600,000 | $ 300,000 |
| 2011 | $ (730,750) | $ - | $ 400,000 | $ 2,000,000 | $ - |
| 2012 | $ (6,276,118) | $ - | $ 400,000 | $ 2,400,000 | $ - |
| 2013 | $ (14,633,254) | $ - | $ - | $ 2,400,000 | $ - |
| 2014 | $ (13,499,313) | $ - | $ - | $ 2,400,000 | $ 1,350,000 |
| | $ (12,506,879) | $ 2,753,612 | $ 2,400,000 | | $ 2,400,000 |

26.     The chart, which was prepared years before litigation, shows that $300,000.00 was paid in 2004, $450,000.00 was paid in 2009, $300,000.00 was paid in 2010, and $1,350,000.00 was paid in 2014.  EX. P-21.

27.     There is no evidence that I received the amounts above.

### 4.     THE WARD RESEARCH PAYMENT

28.     By checks dated April 13, 2015, April 21, 2015, and May 11, 2015, SIC paid a total of $15,806.27 to Ward Research to pay invoices from Ward Research for Mock Jury services.   EX. P-30.

29.     Former SIC CEO Janeen Olds testified during her deposition that she authorized the payment in consultation with SIC's counsel because SIC had a duty to indemnify its officers and directors.  Olds Dep. p 114-5; TR 4-41: 4-11.

30.     There is no evidence I requested or knew about this payment being made.

### C.     TRIAL

31.     Trial was held on October 13, 14, 18, 19, and 21, 2022.

32.     Plaintiff's case was limited to Counts 3, 4, 5, and 6 against me.

33.     Counts 4 and 5 were limited to the Ward Research payments of around $15,000.  TR 5-27:19-25; 28:1-8; 31:15-17.

34.     Plaintiff did not dispute at trial that the $6,000,000 payment from SIC to Clearcom was reversed.  TR 5-43.  Plaintiff indicated in its opening (TR 1-17:1-

21

6) and confirmed in its closing statement that the $6,000,000.00 payment to

Clearcom was not being pursued.  TR 5-9.

35.     The trial was therefore limited to my alleged liability for the alleged

$3,000,000.00 payment to Clearcom, the $1.35 million Bonus Payment, and

approximately $15,000 in payments to Ward Research.

## III.    CONCLUSIONS OF LAW

### A.     LEGAL STANDARDS AND CONCLUSIONS

36.     The instant lawsuit involves claims under the Federal Priority Statute

(Count 3), Federal Debt Collection Procedures Act (Counts 4 and 5), and the

breach of fiduciary duty (Count 6).

37.     All of these claims require SIC to be insolvent.

38.     A summary of the law relating to these claims and legal conclusions

regarding insolvency are provided in the following sections.

39.     Conclusions of law based on the specific claims (i.e., Counts 3-6) will

follow these general conclusions of law.

#### 1.     FEDERAL PRIORITY STATUTE

40.     The Federal Priority Statute (the "FPA") provide that "(1) A claim of

the United States Government shall be paid first when—(A) a person indebted to

the Government is insolvent and—(i) the debtor without enough property to pay all

debts makes a voluntary assignment of property; (ii) property of the debtor, if

absent, is attached; or (iii) an act of bankruptcy is committed[.]"  31 U.S.C. §

3713(a).

41.    Plaintiff has only alleged "an act of bankruptcy" has been committed.

The issue is whether SIC committed an "act of bankruptcy" with respect to the

challenged payments.

42.    The FPA further provides that "[a] representative of a person or an

estate (except a trustee acting under title 11) paying any part of a debt of the person

or estate before paying a claim of the Government is liable to the extent of the

payment for unpaid claims of the Government."  31 U.S.C. § 3713(b).  Plaintiff

claims I am a representative within the meaning of this statute.

43.    An "act of bankruptcy" is not defined the Federal Priority Statute.

However, a preferential transfer may be an act of bankruptcy.  *See e.g., Lakeshore

Apartments, Inc. v. United States*, 351 F.2d 349, 353 (9th Cir. 1965) (case involved

the Federal Priority Statute, then codified a 31 U.S.C. § 191).

44.    A fraudulent transfer may also be an act of bankruptcy.  *See e.g., In re

Christian & Porter Aluminum Co.*, 316 F. Supp. 1340, 1342 (N.D. Cal. 1970)

(non-FPA cases).

45.    Plaintiff has asserted that preferential and fraudulent transfers under

the FDCPA are acts of bankruptcy.  *See* Dkt 418 at ¶59.

46.     Plaintiff's counsel further clarified: "In full transparency, the 33 -- the 3304 fraudulent transfer is also part of the federal debt -- I'm sorry, the federal priority statute claims in Count 3. It's -- it's the act of bankruptcy."  TR 10/21/22 at 31.

47.     When asked if "you have to go back to 3304 when you're looking at act of bankruptcy[,]" counsel for Plaintiff answered in the affirmative.  TR 10/21/22 at 31.

## 2.     THE FEDERAL DEBT COLLECTION PROCEDURES ACT

48.     The Federal Debt Collection Procedures Act, 28 U.S.C. §§ 3001 et seq. (the "Act" or "FDCPA") sets forth transfers that are deemed fraudulent as to the United States.  The Act is directly or indirectly involved in the claims against Al Hee.

49.     If the Plaintiff has not met its burden of proving the elements of the FDCPA, all claims against Al Hee must be dismissed.

50.     Section 3304 of the Act provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred" if certain conditions are met.  *See generally* 28 U.S.C. § 3304(a).

51.     The Act allows the government to recover "preferences" to insiders and any intentionally fraudulent and constructively fraudulent transfers.

52.     Plaintiff has only made claims for insider preferences and constructively fraudulent transfers.

### a.     PREFERENTIAL TRANSFERS TO AN INSIDER

53.     Under Section 3304(a)(2) of the Act, a transfer may be set aside if it was made to an "insider" for antecedent debt, **and** the insider had reason to believe the debtor was insolvent.  *See* 28 U.S.C. § 3304(a)(2).  An "insider" includes the following:

> (B)  if the debtor is a corporation--
>> (i)  a director of the debtor;
>>
>> (ii)  an officer of the debtor;
>>
>> (iii)  a person in control of the debtor;
>>
>> (iv)  a partnership in which the debtor is a general partner;
>>
>> (v)  a general partner in a partnership described in clause (iv); or
>>
>> (vi)  a relative of a general partner, director, officer, or person in control of the debtor;

28 U.S.C. § 3301(5)(B).

54.     Claims under Section 3304(a)(2) must be brought "within 2 years after the transfer was made or the obligation was incurred."  28 U.S.C. § 3306(b)(3).

### b.     CONSTRUCTIVELY FRAUDULENT TRANSFERS

55.     Section 3304(a)(1) of the Act provides as follows:

> **(a) Debt arising before transfer.** Except as provided in section 3307 [28 USCS § 3307], a transfer made or obligation incurred

by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if—

    **(1)**

        **(A)** the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; **and**

        **(B)** the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation….

28 U.S.C. § 3304(a)(1). [emphasis added]

### 3.    <u>INSOLVENCY IS A REQUIREMENT FOR ALL THE CLAIMS AND PLAINTIFF DID NOT MEET ITS BURDEN</u>

56.    In order to prevail on any of the claims Plaintiff must establish SIC's insolvency.  Plaintiff has not met its burden of establishing insolvency.

57.    Under the Federal Debt Collection Procedures Act, insolvency is defined as follows: "Except as provided in subsection (c) [relating to partnerships], a debtor is in solvent if the sum of the debtor's debts is greater than all of the debtor's assets **at a fair valuation**."  28 U.S.C. § 3302 (emphasis added).

58.    Plaintiff did not provide competent evidence of the fair value of assets SIC's assets during the relevant period.

59.    Camille Christiansen's expert report did not purport to provide a fair valuation of the sum of SIC's assets.  When asked by the Court how the fair value-based definition of insolvency contained in 28 U.S.C. § 3302 tied into her opinion,

she admitted that it is "a completely different insolvency test."  TR 10.18.22 at

119.

60.    The fair-value related test in 28 U.S.C. § 3303 is the test that the

statute refers to.  When asked if she provided an opinion under that test, she stated:

"I have not."  *Id.* at 120.

61.    Book value is not the same as fair value. *See e.g.*, *Imagine Fulfillment

Servs., LLC v. DC Media Capital, LLC (In re Imagine Fulfillment Servs., LLC)*,

489 B.R. 136, 145 (Bankr. C.D. Cal. 2013) ("the balance sheet book value of a

debtor's assets may not always equal the fair market value.") (citation omitted).

62.    Furthermore, "the 'fair valuation' of a transferor's assets depends on

(among other things) whether, at the time of the transfer, the transferor was a

'going concern or was on its deathbed.'"  *Field v. Trashmasters, LLC (In re

Rolloffs Haw., LLC)*, Nos. 16-01294, 18-90035, 2021 Bankr. LEXIS 2248, at *4

(Bankr. D. Haw. Aug. 18, 2021).  For companies the "many companies [that] are

neither doomed to failure nor assured of survival[,]" "fair valuation lies somewhere

between going concern and liquidation value depending on the probability of

success or failure." *Id.*, 2021 Bankr. LEXIS 2248, at *5.

63.    Going concern or liquidation value, or something in between, was not

addressed by the expert report.

64.     The Paniolo lease was an asset of SIC that should have been part of any valuation of SIC.  The lease was not addressed by the expert report.  SIC's assets include more than the assets that were built with RUS funds.  TR 2-136: 21-25; 2-137: 1-6.

65.     RUS had originally approved the loan for SIC building the interisland cable.  However, the Paniolo interisland network was built with funds from Deutsch Bank and leased in its entirety to SIC.  At the end of the lease, SIC would own the Paniolo interisland network. TR 2-88: 7-13; Kihune Dep. P. 157-8

66.     Plaintiff has not established insolvency using the legal standard required.

67.     Plaintiff cannot rely on the presumption of insolvency.  Even if the statutory presumption of insolvency from not paying debts applied (28 U.S.C. § 3302(b)), the presumption was rebutted when I introduced evidence of SIC's solvency and of SIC making regular payments in amounts acceptable to RUS.

68.     When asked by the Court if she opined on the presumption of insolvency, Ms. Christiansen testified it tied into her going concern test.  TR 10.18.22 at 120.

69.     The presumption of insolvency does not apply because the presumption was rebutted.

70.     For example, I produced evidence that SIC made 54 regular payments in significant amounts from the time of the notice of default through shortly before the filing of the lawsuit.  Ex. SIC-YY.

71.     The amount of evidence needed to rebut a presumption of insolvency has been described in the bankruptcy context as "some evidence." *In re Koubourlis*, 869 F.2d 1319, 1322 (9th Cir. 1989); 11 U.S.C. § 547(f) advisory committee's note ("This presumption is defined in Fed. R. Evid. 301 . . . .  This presumption requires the party against whom the presumption exists, here Akers, to come forward with some evidence to rebut the presumption, although the burden of proof remains on the party in whose favor the presumption exists.").

72.     Once a presumption is rebutted, the party with the burden of proof cannot rely on the presumption to establish the issue.  FRE Rule 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. **But this rule does not shift the burden of persuasion, which remains on the party who had it originally.**"[emphasis added]).

73.     Ms. Christiansen's "going concern test" fell far short of a cash-flow insolvency test.  Under bankruptcy law, there are generally three tests for insolvency: the balance sheet (at fair valuation) test, the adequate capital test, and the cash flow or equitable insolvency test.  *See Pac. Links U.S. Holdings, Inc. v.*

*Tianjin Dinghui Hongjun Equity Inv. P'ship (L.P.) (In re Pac. Links U.S. Holdings, Inc.)*, 644 B.R. 197, 208 (Bankr. D. Haw. 2022).

74.     The test used by Ms. Christiansen was based on current ratios.  This test is used by the United States Department of Agriculture under the Packers and Stockyards Act to enjoin packers and dealers from engaging in livestock purchasing operations while insolvent.  *See e.g., Bowman v. United States Dep't of Agric.*, 363 F.2d 81, 84 (5th Cir. 1966); *see also Blackfoot Livestock Com., Co. v. Dep't of Agric., Packers & Stockyards Admin.*, 810 F.2d 916, 921 (9th Cir. 1987). Ms. Christiansen seems to be using the same tool that the USDA regularly uses, but in a much different context.

75.     Ms. Christiansen was asked by the Court whether the current assets to current liabilities ratio is not considered by her or is just one factor.  She testified that the ratio by itself does not mean insolvency.  *See* TR 10.18.22 at 59:9-22 ("I consider it relative to a trend, but just because a current -- just because current liabilities are greater than current assets on its own does not mean that a company is insolvent.").

76.     This current ratio test is not a substitute for the required insolvency test.  When presented by the Court with the definition of insolvency provided in 28 U.S.C. § 3302, Ms. Christiansen testified that it is a completely different

insolvency test and that she cannot opine on it[12].  *See* TR 10.18.22 at 120:15-26; 120:1-3.

77.    Plaintiff was acting as a bank in making the loans to SIC.  Plaintiff determined over 90% of the loan repayment would be dependent on anticipated support revenues administered by the FCC before it made the loans.  Plaintiff did not require any guarantees or collateral even though I had obtained a letter from Bank of America guaranteeing the loan.  Plaintiff required annual audits and all audits showed SIC to be in compliance.  I ensured SIC did everything it was supposed to do.

### 4.  PREFERENTIAL TRANSFER CLAIMS REQUIRE THE INSIDER HAD REASONABLE CAUSE TO BELIEVE THE DEBTOR WAS INSOLVENT

78.    A claim of preferential transfer under the Federal Debt Collection Procedure Act requires more than insolvency.  In order to prevail on its Section 3304(a)(2) claims, the Plaintiff must establish that SIC was insolvent at the time of the transfer, and that "the insider had reasonable cause to believe that the debtor was insolvent."  28 U.S.C. § 3304(a)(2)(B).

79.    Plaintiff alleged I controlled Waimana and Clearcom because of my officer and director positions.  Under Plaintiff's claims, Plaintiff needed to

---

[12] The test employed by Ms. Christensen resulted in SIC being insolvent every year during the period 1997-2011 with the exception of 2010. WD Ex. H1 p. 2.  RUS could have invoked this complaint during any of those years.

establish that I had a reasonable cause to believe SIC was insolvent.[13]  Plaintiff did not succeed in making this showing.

80.    The evidence also showed that SIC and RUS were actively engaged in negotiations, that SIC made wire transfers during this period to RUS in amounts requested by RUS using forms provided by RUS, and that SIC and RUS appeared to have an agreement in 2015.  Ex. WD 79 (stipulation and appendix).

81.    I testified as to his state of mind during the relevant timeframe.  TR 10.19.22 at 51.  My testimony was that SIC had problems but they were being worked out.  That was my understanding.  TR 10.19.22 at 51:5-24.  Mr. McClean, stated in his deposition, that RUS would not negotiate if the situation were deemed doomed to fail.  McLean Dep. p. 102-3.  Plaintiff also had the authority to forgive the loan. Id p. 45, 50, 87.  Mr. McLean was only aware of one borrower impacted by the FCC's USF reforms that was foreclosed upon.  *Id*. at 127:10-24; 128:1-3.

82.    I also provided deposition testimony of Kenneth Kuchno.  Mr. Kuchno testified that RUS figures out how to work it out.  Kuchno Dep. p.122.

83.    As described above, Representatives of RUS and SIC participated in negotiations for restructuring of the RUS Loans in 2013, 2014, 2015.   Ex. WD 79 at ¶¶ 1-9.  In 2015, representatives of RUS and SIC reached an understanding on

---

[13] "I didn't think we were insolvent.  That's why I kept signing the checks that I did until the end of April." Kihune Dep. pg. 155

possible loan restructuring terms, but at the 13th hour, RUS refused to sign and enter into a binding agreement to restructure or modify the RUS Loans.  Ex. WD 79 at ¶12.  Representatives of RUS and SIC continued to participate in negotiations for restructuring of the RUS Loans in 2016, 2017, and 2018.  Ex. WD 79 at ¶¶ 13 through 15.

84.     The evidence shows that I did not believe SIC was insolvent.  Plaintiff seeks to use my state of mind to establish that the alleged transfers to Waimana, Clearcom and the Mock Jury charges (for my benefit) were preferences.  I established that I did not believe that SIC was insolvent when the transactions took place.

## 5.   STATUTE OF LIMITATIONS FOR CLAIMS BASED ON PREFERENTIAL TRANSFERS

85.     Preference claims are subject to a two-year statute of limitations. Plaintiff's under Court III is based on an "act of bankruptcy," which includes alleged preferential transfer to Waimana and to Clearcom.  However, these claims are time barred.

86.     Under the Act, "[a] claim for relief with respect to a fraudulent transfer or obligation under this subchapter [28 U.S.C. §§ 3301 et seq.] is extinguished unless action is brought -- (3) under section 3304(a)(2) [28 U.S.C. § 3304(a)(2)] within 2 years after the transfer was made or the obligation was incurred."  28 U.S.C. § 3306(b)(3) (emphasis added).

87.     The transfers at issue occurred in 2014 and 2015.  Unless tolled, the complaint filed on April 20, 2018 was filed outside of the two-year limitations period.

88.     Although I citied this time requirement during trial, there are no tolling agreement(s) in evidence.

89.     The language used in the statute is similar to that found in a statute of repose.  If the provision is a statute of repose, then a tolling agreement would not preserve the claims.  "A statute of repose, like a jurisdictional prerequisite, extinguishes a cause of action after a fixed period of time . . . regardless of when the cause of action accrued and may not be waived."  *Weil v. Elliott*, 859 F.3d 812, 816 (9th Cir. 2017) (citations and internal quotation marks omitted).  "The FDCPA has no tolling provision similar to that in 28 U.S.C. § 2416(c)."  *United States v. Gelb*, 783 F. Supp. 748, 755 (E.D.N.Y. 1991).

B.     **CONCLUSIONS OF LAW REGARDING COUNTS**

1.     **PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT III**

90.     Count III is a claim against me under the Federal Priority Statute, 31 U.S.C. § 3713.

91.     As described above, threshold issues under the FPA are whether SIC is insolvent <u>and</u> an act of bankruptcy was committed.

92.     Plaintiff did not prove SIC was insolvent during the relevant time period.

93.     Plaintiff is seeking to prove an act of bankruptcy by establishing a preference or constructively fraudulent transfer under Section 3304 of the FDCPA.

94.     Plaintiff clarified that Count III is intertwined with the FDPCA claim asserted against Clearcom and Waimana: "although the Waimana defendants are no longer in the case, our Counts 4 and 5 against them asserted these theories.  So in a sense our Count 3 contains claims within a claim."  TR 5-8:7-10.

95.     Plaintiff claimed that "Each of the Preferential Transfers constitutes an 'act of bankruptcy' within the meaning of the Federal Priority Statute."  Dkt 418 at 31.

96.     The challenged transfers are not fraudulent or preferential as to Clearcom and Waimana.

97.     Plaintiff has not proven an act of bankruptcy was committed.

### a.     CLEARCOM RETURNED THE FUNDS

98.     As described above, the alleged fraudulent transfers to Clearcom were unwound.

99.     The FDPCA allows the government to seek, among other relief, the "avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States."  *See* 28 U.S.C. § 3306(a)(1).

100.   In general, "a creditor that succeeds in causing a fraudulent transfer to be avoided merely causes the property to be reconveyed to the transferor." *Sobel Bldg. Dev. Partners v. Broach (In re Sexton)*, 166 B.R. 421, 426 (Bankr. N.D. Cal. 1994).

101.   The transfers were avoided prior to the lawsuit and there is nothing more to avoid.

102.   Clearcom returned the funds that Plaintiff is now challenging and gave up possession of the funds without any benefit.

103.   $6,000,000.00 was returned to SIC directly.  The evidence in the record show that over $3,000,000.00 was returned to SIC indirectly, by sending the funds to SIC's designee.  Clearcom received no benefit from these transfers.

## b   NEW VALUE

104.   A transfer is also not voidable under 28 U.S.C. §3304(a)(2) "to the extent the insider gives new value to or for the benefit of the debtor after the transfer is made unless the new value is secured by a valid lien[.]" 28 U.S.C. § 3307(f).

105.   The $3,000,000.00 was returned to SIC through a series of payments by Clearcom as directed by SIC in writing. Ex. WD-6 through WD-13.  While not a direct transfer to SIC, the payment provided new value to SIC: it reduced SIC's lease rent obligations to Paniolo.  TR 3-132:1-10.

106.   The $3,000,000.00 and $6,000,000.00 transactions are not preferential transfers.

### c.   PLAINTIFF HAS NOT ESTABLISHED THAT CLEARCOM WAS AN INSIDER

107.   Plaintiff has the burden of proving all elements of its claims.  To the extent Plaintiff claims an act of bankruptcy occurred because of a preferential transfer under the FDCPA, the statute requires that Plaintiff show a payment made on an antecedent debt to an "insider."

108.   Clearcom clearly does fall into any of the categories of insider listed in 28 U.S.C. § 3301(5)(B).

109.   Clearcom was not "a person in control of the debtor[.]" None of the agreements in evidence make Clearcom in control of SIC.

110.   Clearcom was never a director or officer or "in control" of SIC.

111.   Clearcom also cannot be considered a "relative" of SIC as this provision relates to individuals, not companies.

112.   Although not mentioned in it its pretrial statement, trial brief, original proposed findings or during the evidentiary portion of trial, Plaintiff, relying on unspecified bankruptcy case law, argued at closing that the statutory list in 28 U.S.C. § 3301(5)(B) is not exhaustive.

113.   Whether or not Plaintiff is correct as to its new argument at closing, Plaintiff's ambush tactic does not allow Defendant to challenge the controlling

legal standard or any evidence at trial.  Plaintiff's argument that U.S.C § 3301 is

not exhaustive must be dismissed.

114.   Plaintiff has not proven that Clearcom is an insider of SIC under any

test.

115.   Clearcom is not an insider of SIC.

> **d.    PLAINTIFF HAS NOT ESTABLISHED THAT AL HEE IS A REPRESENTATIVE OF THE DEBTOR WHO PAID A DEBT**

116.   "Under Section 3713, 'a corporate officer is personally liable [for

unpaid claims of the Government] if, on behalf of the corporation, he (1) pays a

non-federal debt (2) before paying a claim of the United States (3) at a time when

the corporation was insolvent, (4) if he had knowledge or notice of the claim.'"

*See United States v. Sandwich Isles Commc'ns*, No. 18-00145 JMS-RT, 2021 U.S.

Dist. LEXIS 256767, at *9 (D. Haw. Aug. 16, 2021), citing *United States v. Renda*,

709 F.3d 472, 480-81 (5th Cir. 2013).

117.   "'The representative liability provision . . . gives the Priority Statute

'teeth' by making a representative who pays a non-federal debt on behalf of a

corporation before paying a federal claim personally liable for the amount paid."

*Id*. at 480 (citations omitted)." *Id*., citing *Renda* at 480.

118.   Plaintiff did not prove that I fit the statutory definition of a "representative who pays" Waimana or Clearcom before paying RUS.  I presented evidence that the provision does not apply to me.

119.   As described above, I was not part of the SIC management team that authorized the payments.

120.   There is no evidence that I caused SIC to pay Waimana the challenged payment of $1.35M.  Plaintiff's Exhibit 20 shows that I signed the invoice from Waimana, but it was Randal Ho that authorized SIC to make the payment.  Janeen Olds was the President of SIC when this payment was made.  Olds Dep. 82.

121.   Randall Ho testified that Mr. Kihune as the CEO was in charge of the daily operations of SIC.  TR 1-158.  Later, I testified Janeen Olds became the new CEO and later also President and she would handle the operational meetings.  TR 4-41.

122.   Mr. Ho testified that I did not attend the SIC weekly operations meetings.  TR 1-159.  These meetings were attended by Mr. Ho, Admiral Kihune, and others.

123.   There is no evidence that I caused SIC to pay Clearcom $3,000,000.00. Plaintiff's Exhibit 23 shows the $3M payment was authorized by Randall Ho.   I signed the payment receipt on behalf of Clearcom.

124.    There is no evidence that I caused SIC to make the Mock Jury Payments.  Plaintiff's Exhibit 30 shows the payments being authorized by Mr. Ho (and by Janeen Olds).

125.    Plaintiff did not show that I paid anything on behalf of SIC or caused SIC to pay the challenged payments.

126.    Furthermore, I introduced evidence and testimony that the $3,000,000 for the NOC building, like the $6,000,000 for the NOC equipment, was returned when Clearcom made a series of payments totaling $3.3M to SIC's designee, Deutsche Bank.  While the return of the $3M was indirect, it was functionally the same as if Clearcom returned the funds to SIC and it used the same funds to pay Paniolo through the lockbox at DB.  The effect was the same: Clearcom no longer had the $3M and SIC had the benefit of the $3M.

127.    Plaintiff indicated that Paniolo might have been liable if the payments had been structured differently.  Paniolo has been in bankruptcy since the involuntary petition was filed against it on November 13, 2018.  *See* Case 18-01319, United States Bankruptcy Court, District of Hawaii.  There was no evidence at trial that Paniolo was an insider, and Plaintiff did not develop a case against Paniolo at trial.  Plaintiff has filed numerous documents supporting Paniolo's plan including subordinating Plaintiff's interests in bankruptcy court.

128.   Any imputed interest that Plaintiff claims Clearcom was liable for by temporarily holding the funds was effectively discharged when Clearcom redirected $3.3M instead of just $3M.

129.   Ms. Christiansen's testimony (TR 3-37) regarding the $3,000,000 and reasonably equivalent value and ordinary course is not entitled to any weight.  She did not provide any analysis of how the NOC building and equipment would result in efficiencies and costs savings.

130.   Ms. Christiansen also incorrectly believed that only $3M (and not $3.3M) was redirected, and claimed that an additional $282,491 in imputed interest had accrued.  TR 3-85.  However, she acknowledged that if there was an additional payment in the amount of the imputed interest, it would "zero it out."  *Id*. at 85:16-22. The redirected payments were in fact over $3M, specifically $3.3M.  Ex WD6-WD13.  My expert, Garret Hoe, confirmed this during his testimony.   TR 3-129:14-16.

131.   Similarly, Ms. Christiansen's testimony regarding the $6,000,000 in payments for the NOC was conclusory and superficial.  However, she stated she was aware that the funds were returned.  TR 3-39:16-19.  She stated that the return stopped her interest calculations.  *Id*. at 39:20-25.

132.   My expert, Garrett Hoe, testified that consolidating multiple switching locations to a single location would lower operating costs.  TR 3-126.  Mr. Hoe

also testified that SIC received reasonable value for the $3,000,000 it paid to Clearcom because there was an intention to build a network facility, and SIC even maintained an asset on its books for $3,000,000.  *Id*. at 130:9-25.

### 2.   PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT IV

133.   During closing, Plaintiff represented that Count IV was limited to the Ward Research Payments.  See TR 10.21.22 at 27.

134.   Count IV is based on Section 3304(a)(2) of the Act which describes transfers that are deemed fraudulent as to the United States.  Section 3304 of the Act provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred" if certain conditions are met.

135.   Under Section 3304(a)(2) of the Act, a transfer may be fraudulent if it was to an "insider" for antecedent debt, **and** the insider had "reason to believe the debtor was insolvent."  *See* 28 U.S.C. § 3304(a)(2).  An "insider" includes the following:

(B)  if the debtor is a corporation--

(i)  a director of the debtor;

(ii)  an officer of the debtor;

(iii)  a person in control of the debtor;

(iv)  a partnership in which the debtor is a general partner;

42

(v)  a general partner in a partnership described in clause (iv); or

(vi)  a relative of a general partner, director, officer, or person in control of the debtor;

28 U.S.C. § 3301(5)(B).

136.   Claims under Section 3304(a)(2) must be brought "within 2 years after the transfer was made or the obligation was incurred."  28 U.S.C. § 3306(b)(3).

137.   Ward Research is not an insider.

138.   The Ward Research Payments were not made to me, they were made to Ward Research.  The argument that I "constructively" received payments to Ward Research was not pled and is not supported by the statute, which allows avoidance of transfers made *to* third parties, not *for the benefit* of third parties.

139.   Plaintiff cannot seek to avoid the transfer made to Ward Research.

140.   Plaintiff has not proved SIC was insolvent.

141.   The payments were not made for antecedent debt

142.   The claim is without merit.

**3.    PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT V.**

143.   During closing, Plaintiff represented that Count V was limited to the Ward Research Payments.  TR 5-28.

144.   The claims in Count V are based on 28 U.S.C. § 3304(a)(1), which

provides as follows:

> **(a) Debt arising before transfer.** Except as provided in section
> 3307 [28 USCS § 3307], a transfer made or obligation incurred
> by a debtor is fraudulent as to a debt to the United States which
> arises before the transfer is made or the obligation is incurred
> if—
>
>> **(1)**
>>> **(A)** the debtor makes the transfer or incurs the obligation
>>> without receiving a reasonably equivalent value in
>>> exchange for the transfer or obligation; **and**
>>> **(B)** the debtor is insolvent at that time or the debtor
>>> becomes insolvent as a result of the transfer or
>>> obligation….

28 U.S.C.S. § 3304(a)(1) [emphasis added].

145.   28 U.S.C. § 3304(b) is the statute authorizing a monetary judgment

against a transferee:

> Except as provided in subsection (d), to the extent a transfer is
> voidable in an action or proceeding by the United States under
> section 3306(a)(1) [28 USCS § 3306(a)(1)], the United States
> may recover judgment for the value of the asset transferred, but
> not to exceed the judgment on a debt. The judgment may be
> entered against—
>
> **(1)** the first transferee of the asset or the person for whose
> benefit the transfer was made; or
>
> **(2)** any subsequent transferee, other than a good faith transferee
> who took for value or any subsequent transferee of such good-
> faith transferee.

28 U.S.C. § 3307(b) (emphasis added).

146.   As with Count IV, the Ward Research Payments were not made to me, they were made to Ward Research.

147.   Plaintiff cannot seeking to avoid the transfer made to Ward Research.

### 4.   PLAINTIFF HAS NOT MET ITS BURDEN ON COUNT VI

148.   Count VI is a claim for breach of fiduciary duty based on the alleged "trust fund doctrine" under state law.

149.   "Very few cases in Hawaii have involved the trust fund doctrine and most of these cases are over a hundred years old. See, e.g., Hemenway v. Honolulu Clay Co., 18 Haw. 187 (Haw. Terr. 1907); Troy Laundry Mach. Co. v. Sanitary Steam Laundry Co., 18 Haw. 388 (Haw. Terr. 1907); California Feed Co. v. Club Stables Co., 10 Haw. 209 (Haw. Rep. 1896)." Mansha Consulting LLC v. Alakai, No. 16-00582 ACK-RLP, 2017 U.S. Dist. LEXIS 135407, at *23-25 (D. Haw. Aug. 23, 2017) (footnote omitted).

> The Supreme Court of the Republic of Hawaii recognized this doctrine, noting that:
>
>> when . . . a corporation is hopelessly insolvent and unable to carry out objects for which it is created, the directors must be regarded as trustees of the property for the benefit of the creditors and stockholders, and it is then their duty to wind up the affairs of the corporation for the benefit of all concerned[.]
>
> California Feed Co., 10 Haw. at 212; see also Hemenway, 18 Haw. at 189 (stating that the "trust fund theory" "is that the capital stock of a corporation, and especially its unpaid portion, is a trust fund for the benefit of creditors").

150.   SIC was created to provide telephone service to HHL.  It continues to do so today.  SIC's inability to pay its debts is a result of FCC action in opposition to clearly stated law.  Likewise, FCC corrective action can resolve SIC's debt service issues.  In the alternative, Plaintiff could renegotiate or forgive the debt.

151.   Plaintiff plans to sell SIC's assets on the condition that the buyer continue to provide service.  Plaintiff could sell the assets to SIC and resolve the debt issues.  SIC is not "hopelessly insolvent."

152.   "The trust fund doctrine imposes certain fiduciary duties on a corporation's directors when the corporation becomes insolvent.  The theory underlying the doctrine is that when this occurs the assets of a corporation 'exist for the benefit of all of its creditors and that thereafter no liens or rights can be created either voluntarily or by operation of law whereby one creditor is given an advantage over others.' 15A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 7369 (rev. vol. 2009)."  *Mansha Consulting LLC v. Alakai*, No. 16-00582 ACK-RLP, 2017 U.S. Dist. LEXIS 135407, at *22-23 (D. Haw. Aug. 23, 2017).

153.   Plaintiff has not established SIC is insolvent.  Plaintiff has not met the legal definition of insolvency required for the other Counts.  Nor has Plaintiff produced any evidence that the "trust fund doctrine" uses a different legal definition of insolvency.

154.    "The trust fund doctrine in Hawaii has only been applied to conduct

involving self-dealing.  *Troy Laundry Mach. Co. v. Sanitary Steam Laundry Co.*,

18 Haw. 388 (Haw. Terr. 1907) involved allegations that a corporation's director

engaged in self-dealing and discussed cases in other jurisdictions involving similar

conduct.  *Hemenway v. Honolulu Clay Co*., 18 Haw. 187 (Haw. Terr.

1907) examined the trust fund doctrine where stockholders of an insolvent

corporation allegedly received shares in excess of what they paid. See 18 Haw. at

188." Mansha Consulting LLC v. Alakai, No. 16-00582 ACK-RLP, 2017 U.S.

Dist. LEXIS 135407, at *25-26 (D. Haw. Aug. 23, 2017).

155.    There was no evidence of self- dealing by me.  There is no allegation

or assertion that I received any of the payments to Clearcom.  There is no evidence

that I personally received any of the bonus payments paid to Waimana totaling

$1.35M and the Ward Research payment was not directed by or made to me.   SIC

Bonus payments were to its owner, Waimana not me. TR 5-40-42.  Plaintiff was

well aware of the IRS audit of my personal finances and so could have had a

record of any of these payments. TR 4-67:12-18

156.   Count VI asserted that "[d]ue to the benefits received by Hee,

members of his family, or Olds from the Preferential Payments during or after May

2013, Hee's, and Olds's approving or failing to prevent these payments when SIC

was insolvent violated the fiduciary duties of Hee and Olds to SIC's other creditors, including the United States."  Dkt 1 at ¶274.

157.  Plaintiff did not establish SIC was insolvent.

158.  Plaintiff did not identify or assert any "benefits received by members of his [Hee's] family" or provide evidence to support any assertions.  Plaintiff settled with Olds prior to trial.

159.  The $3,000,000 payment was made by SIC to Clearcom for construction of the NOC.  Again, there is no allegation or evidence that I received any of this money.  The evidence further shows that Clearcom returned the money through a series of wire transfers pursuant to instruction.

160.   The $1,350,000 Bonus was paid to Waimana, and, again, Plaintiff provided no evidence that Waimana transferred the funds to me.  The payment was made to Waimana, not me, and the funds went into Waimana's general funds to pay expenses.  *Id.* at 50-51.  When asked by the Court, I testified that I would have remembered if Waimana had paid me the bonus, even if it were around $800,000.  TR 2-97.  Plaintiff did not produce any documentary or testimonial evidence that I received any portion of the $1,350,000 Bonus to Waimana.

161.  SIC had the bonus accrued on its books and the SIC auditor stated it needed to be cleared.  TR 5-42.  I testified I generated the invoice for Waimana that was needed to clear the bonus.  TR 4-50.

162.   The total of $15,806.27 for Mock Trial was paid directly to Ward Research.  Even if I was the intended beneficiary, there is no evidence that I ordered the payment.  Rather, the evidence shows that it was approved by SIC's CEO after consultation with counsel.

163.   Multiple witnesses testified that I was not involved in weekly management meetings and this testimony was not controverted.

164.   Witnesses testified that the CFO and CEO had veto power over any payments.

165.   I did not breach his fiduciary duty.

### 5.   <u>PROMISSORY ESTOPPEL</u>

166.   The claims against me are Promissory Estopped under Hawaii law. <u>See</u> <u>Gonsalves v. Nissan Motor Corp.  Hawaii, Ltd.</u>, 100 Haw. 149, 164-65, 58 P.3d 1196, 1211-12 (2002).

167.   The Government has engaged in Bad faith dealing by assuring me that as long as SIC followed Plaintiff's rules, the loan would be restructured to prevent a default then refusing sign a renegotiated loan they agreed to after years of renegotiation.

168.    I was dealing with Mr. Bob Peters[14] the person responsible for approving the loan and making the repayment certification required by law.  Mr. Peters had the authority to renegotiate loans and/or forgive loans.    "[A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947). TR 4-20:7-25; 4-21:1-9

169.    Plaintiff's multi-year negotiation of a new loan confirmed their intention to fulfill their promise and renegotiation was not unusual.  Both Plaintiff and SIC had a common purpose of providing telephone service to HHL.  "[P]arties have a duty of good faith and fair dealing in performing contractual obligations; such good faith 'emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'"  Mizukami v. Am. Home Mortg. Servicing Inc., No. 13-00586 SOM/RLP, 2014 U.S. Dist. LEXIS 5683, at *12 (D. Haw. Jan. 16, 2014), citing Hawaii Leasing v. Klein, 5 Haw. App 450, 456, 698 P.2d 309, 313 (App. 1985).

---

[14] In May 1994, [DHHL] staff spoke to Mr. Bob Peters, Under Secretary of Agriculture in charge of the REA telephone program.  Mr. Peters expressed great interest in having Waimana apply for an REA telephone loan…" Ex. P-17 (exhibit A item C-2).

170.    This complaint is a result of Plaintiff's decision not to fulfill their promise to renegotiate the loans and DOJ's overzealous use of the law to fashion a personal guarantee that was not required by Plaintiff.

171.    Plaintiff is seeking unjust enrichment through this complaint by seeking funds directly from me alleging I owe money for actions I allegedly took while Sandwich Isles was allegedly insolvent.  Plaintiff did not require me to guarantee the loans.  Bank of America was willing to guarantee the loans[15]. Sandwich Isles alleged insolvency was caused by Plaintiff reliance on the receipt of sufficient support payments administered the FCC.

172.    Plaintiff did not pursue its rights to the assets built with RUS funds that the Paniolo Trustee sold to Hawaiian Telcom.  Those assets constituted a large amount of the RUS loans.

173.     The Paniolo interisland cable terminated on each island at the SIC central offices which were built with RUS funds.  The Paniolo interisland cable was useless without the SIC central offices which RUS held the first mortgage on. TR 1-155: 16-25, 1-156: 1-3.

174.    Plaintiff did not pursue its rights under the mortgage to the SIC lease of the Paniolo Network.  Although not built with RUS funds, Plaintiff's RUS

---

[15] "To supplement his proposal, Mr. Hee provided copies of a letter from REA on this matter and also a letter from Bank of America committing to guaranteeing the REA loan." Ex P-17 (exhibit A item C-2).

witness testified Plaintiff had a right to all SIC leases in its mortgage. TR 2-136-7. The Paniolo asset surpassed the RUS loans.  Even a partial settlement

175.   Plaintiff has caused the alleged insolvency to collect funds from Defendant while it has forgone its legitimate claims against the Paniolo Trustee when it sold the Paniolo network and SIC's central offices to Hawaiian Telcom in the Paniolo Bankruptcy[16].

---

[16] The Paniolo Trustee sale to Hawaiian Telcom is currently on appeal before Judge Otake.  Plaintiff has not asserted its rights to these assets.