IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>SANDWICH ISLES COMMUNICATIONS, INC.; ALBERT S.N. HEE; ET AL.,<br><br>             Defendants. | CIV. NO. 18-00145 JMS-RT<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO CLAIMS AGAINST ALBERT S.N. HEE |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO CLAIMS AGAINST ALBERT S.N. HEE**

## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 52(a), the court issues these Findings of Fact and Conclusions of Law ("FOFCOLs" or "Findings and Conclusions"), deciding remaining claims made by Plaintiff United States of America ("United States" or "the government") in a non-jury trial against pro se Defendant Albert S.N. Hee ("Defendant" or "Hee").

In these FOFCOLs, the court departs from the more traditional format usually consisting only of sections labeled "Findings of Fact" and "Conclusions of Law" with numbered Findings and Conclusions (although the court has reviewed

the proposed FOFCOLs from the parties in that format).  The resolution of this trial lends itself to a format more typically used for a dispositive order.  Nevertheless, the Findings and Conclusions will be apparent, and the court's resolution of relevant contested issues is controlling whether or not statements are labelled Findings or Conclusions.  *See, e.g.*, *In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so if they are in reality conclusions of law.") (citation omitted).[1]

For the reasons explained to follow, the court finds and concludes that the United States has not met its burden of proof as to an essential element— "insolvency"—of its claims under the Federal Priority Statute and the Federal Debt Collection Practices Act.  At the threshold, the United States tried its case utilizing an inappropriate test of "insolvency," proffering an expert witness who likewise opined as to the wrong legal standard.  And its claim under Hawaii law for breach of fiduciary duty under the Trust Fund Doctrine fails as a matter of law.  After the

---

[1]  Throughout, the court cites to evidence (testimony, declarations, and exhibits) for reference, but where facts are obvious or uncontested, the court sometimes omits such references.  The court cites to trial exhibits as either joint or by party, followed by a Bates number if available.  For example, "Pl.'s Exh. 20 at SIC0083388" is Plaintiff's exhibit 20 at Bates number SIC0083388.  Similarly, the court cites to the trial transcript ("Tr.") by date and page or page range.  For example, "Tr. 10/13/22 at 133" is page 133 of the transcript for October 13, 2022.

court resolves a remaining matter regarding foreclosure as to Count Two against

Defendant Sandwich Isles Communications, Inc. ("Sandwich Isles"), judgment

will issue in favor of Defendant Hee.

## II. **BACKGROUND**

These Findings and Conclusions resolve almost all remaining aspects

of this case, which originally encompassed several other related issues and claims.

The United States filed this civil action on April 20, 2018, for breach of contract

against Defendant Sandwich Isles, along with other claims against co-Defendants

affiliated with or related to Sandwich Isles—Defendants Hee; Randall Y.C. Ho;

Janeen-Ann Olds ("Olds"); ClearCom, Inc. ("ClearCom"); Hoʻopaʻa Insurance

Corp. ("Hoʻopaʻa"); Paniolo Cable Company, LLC ("Paniolo"); and Waimana

Enterprises, Inc. ("Waimana").  *See* ECF No. 1 at PageID.2.[2]  Aside from very

limited aspects of a foreclosure claim against Sandwich Isles, the only remaining

claims are against Hee.[3]  *See* ECF No. 446 (court minutes stating that the United

---

[2]  The Complaint also named additional Defendants Hawaii National Bank; Maui Electric Co., Ltd.; Hawaiian Electric Company, Inc.; Central Pacific Bank; Kekauluohi, Inc.; Dell Financial Services, LLC; and R.M. Towill Corporation as Defendants who might have an interest regarding Count Two for foreclosure.  ECF No. 1 at PageID.26.  Those additional Defendants disclaimed interests or otherwise did not oppose judgment as to their interests, *see* ECF Nos. 14, 16, 20, 31, and have been terminated.  Defendant Kehauluohi, Inc., was a Hawaii corporation that has been dissolved, and it has not appeared in this action.  ECF No. 1 at PageID.8.

[3]  Other related aspects of the action are set forth in many prior orders.  *See, e.g.*, *United States v. Sandwich Isles Commc'ns, Inc.*, 398 F. Supp. 3d 757 (D. Haw. 2019); *United States v. Sandwich Isles Commc'ns, Inc.*, 2019 WL 4017233 (D. Haw. Aug. 26, 2019); *United States v.*

(continued . . .)

States and Sandwich Isles agreed to bifurcate Counts Two and Seven regarding foreclosure and costs, from claims against Hee); ECF No. 451 at PageID.7397 (stipulation).

For the remaining claims, the court held a non-jury trial from October 13, 2022, to October 21, 2022, on the following counts asserted by the United States against Hee in the April 20, 2018 Complaint:

- Count Three—violations of the Federal Priority Statute, 31 U.S.C. § 3713, "for approving payment of claims of others before causing the claims of the United States to be paid";

- Count Four—violations of the Federal Debt Collection Practices Act ("FDCPA"), 28 U.S.C. § 3304(a)(2), for "transfers made [to insiders] while [Sandwich Isles] was insolvent";

- Count Five—violations of the FDCPA, 28 U.S.C. § 3304(a)(1), for "[Sandwich Isles'] transfers or obligations for which [Sandwich Isles] did not receive reasonably equivalent value"; and

- Count Six (breach of fiduciary duty under Hawaii law based on the "Trust Fund Doctrine").

After the October 2022 trial, Hee submitted additional deposition designations, ECF No. 481, to which the United States responded with no

---

(. . . continued)
*Sandwich Isles Commc'ns, Inc.*, 2020 WL 544692 (D. Haw. Feb. 3, 2020); *United States v. Sandwich Isles Commc'ns, Inc.*, 2020 WL 3504436 (D. Haw. June 29, 2020); *United States ex rel. Rural Utilities Serv. v. Sandwich Isles Commc'ns, Inc.*, 833 F. App'x 718 (9th Cir. 2021) (mem.).

additional designations, ECF No. 485.  The parties then submitted proposed

FOFCOLs in February 2023.  ECF Nos. 491and 492.

To understand the basic context for the remaining claims against Hee,

the court begins by reiterating much of the background of Sandwich Isles (and

Hee's role in it) as set forth in *United States v. Sandwich Isles Communications,*

*Inc.*, 398 F. Supp. 3d 757 (D. Haw. 2019) ("*Sandwich Isles I*"), which is the court's

July 22, 2019 order granting summary judgment in favor of the government on

Count One of the Complaint against Sandwich Isles.  *See also* ECF No. 161.  The

court later certified a partial judgment as final under Federal Rule of Civil

Procedure 54(b), and the Ninth Circuit affirmed that partial judgment in 2021.  *See*

*United States ex rel. Rural Utilities Serv. v. Sandwich Isles Commc'ns, Inc.*, 833 F.

App'x 718, 720 (9th Cir. 2021) (mem.).  The court quotes directly from that prior

order (with internal citations to the record omitted), supplemented with factual

details as established at trial.

## A.   Sandwich Isles and Related Companies

Sandwich Isles was formed in the mid-1990s to provide
telecommunications services to native Hawaiians on
Hawaiian home lands.  *See generally Nelson v. Hawaiian
Homes Comm'n*, 127 Haw. 185, 187-89, 277 P.3d 279,
281-83 (2012) (explaining basic history of the Hawaiian
Homes Commission Act); *Arakaki v. Lingle*, 477 F.3d
1048, 1054-55 (9th Cir. 2007) (also setting forth history,
and explaining that the State of Hawaii Department of
Hawaii[an] Home Lands administers Hawaiian home

5

lands for the benefit of "native Hawaiians," defined by
the Hawaiian Homes Commission Act as "any
descendant of not less than one-half part of the blood of
the races inhabiting the Hawaiian Islands previous to
1778").  Hawaiian home lands are primarily located in
rural or more remote areas, and "[b]ecause of the remote
and non-contiguous nature of the Home Lands, the cost
to provide infrastructure to these areas is very high."

According to the Complaint, "at times relevant,"
Defendant Albert S.N. Hee ("Hee") has been Sandwich
Isles' president and secretary, and one of its directors.
Hee was president "until a date in 2013 after August 30,
2013."  He remained secretary "until a date in 2013," and
a director until July 13, 2015.  Sandwich Isles' current
president and secretary is Defendant Janeen-Ann Olds
("Olds"), having become president "on a date in 2013
after August 30, 2013."

Sandwich Isles is a wholly-owned subsidiary of
Defendant Waimana Enterprises, Inc. ("Waimana"),
which is a Hawaii corporation.  Before December 2012,
Hee was the sole owner of Waimana.  After December
2012, Hee owned 10% of Waimana, with the other 90%
owned by trusts benefitting Hee's children.  The directors
of Waimana "at various times relevant" to this case, have
been Hee, his wife, and their children.  In addition to
Sandwich Isles, Waimana wholly owns as subsidiaries
Defendants ClearCom, Inc. and Ho'opa'a Insurance Corp.
Defendants Paniolo Cable Company, LLC and Pa
Makani LLC are owned indirectly by trusts benefitting
Hee's children.

*Sandwich Isles I*, 398 F. Supp. 3d at 763-64.

      Some of those details in *Sandwich Isles I* regarding Hee's interests in

Sandwich Isles, and the relationships between Sandwich Isles and the related

Defendants (e.g., Waimana, ClearCom, and Paniolo) were drawn directly from the allegations of the Complaint. As part of the trial proceedings, however, the parties stipulated to the following facts, which the court adopts and are controlling to the extent they are inconsistent with any details set forth in *Sandwich Isles I*:

Hee was President of Sandwich Isles from before 2013 through August 31, 2013. ECF No. 447 at PageID.7376 ¶ 6. Hee was a Director of Sandwich Isles from before 2013 through August 31, 2015. *Id.* ¶ 7. Hee was President of Waimana from before 2013 through June 30, 2016. *Id.* ¶ 8. Hee was a Director of Waimana from before 2013 through June 30, 2016. *Id.* ¶ 9. Wendy Hee, Adrianne Hee, Breanne Hee-Kahalewai, and Charlton Hee became directors of Waimana in 2014, and remained directors through the filing of the Complaint in this case on April 20, 2018.[4] ECF No. 447 at PageID.7376−77 ¶ 10.

Hee was President of ClearCom from before 2013 through June 30, 2016. ECF No. 447 at PageID.7377 ¶ 11. Hee was a Director of ClearCom from before 2013 through June 30, 2016. *Id.* ¶ 12. Wendy Hee was President and Treasurer of ClearCom from June 30, 2016, through the filing of the Complaint in this case on April 20, 2018. *Id.* ¶ 13. Waimana has owned all outstanding stock of Sandwich Isles and ClearCom at all times between January 1, 2013, and the filing

---

[4] Wendy Hee is Defendant Hee's wife; Adrianne Hee, Breanne Hee-Kahalewai, and Charlton Hee are Defendant Hee's children. *See* Tr. 10/14/23 at 57.

of the Complaint in this case on April 20, 2018. *Id.* ¶ 14.  Most, but not all

accounting services for each of Sandwich Isles, Waimana, and ClearCom were

performed by the same accounting department through agreements between

Sandwich Isles, Waimana, and ClearCom, at all times between January 1, 2013,

and April 20, 2018. Waimana and ClearCom also employed other accounting

services.  *Id.* ¶ 15.

**B.      Sandwich Isles' Loans from the Rural Telephone Bank ("RTB") and Funding from the Federal Communications Commission's ("FCC") Universal Service Fund ("USF")**

As the court established in *Sandwich Isles I*,

[t]o partially finance construction and operation of
Sandwich Isles' telecommunications services on
Hawaiian home lands, Sandwich Isles and the United
States entered into a series of loan agreements and
corresponding promissory notes from September 1997 to
April 2001.  The three loans, totaling over $165 million,
were made by the RTB pursuant to the Rural
Electrification Act of 1936, as amended, 7 U.S.C. § 901
et seq.  RTB was an agency of the [United States
Department of Agriculture ("USDA")], but was dissolved
in 2006, and was succeeded by the [Rural Utilities
Service ("RUS")], which is also an agency of the USDA.
As of January 1, 2013, Sandwich Isles was required to
make monthly installment payments to the RUS of
$1,086,758.01.

Meanwhile, Sandwich Isles was receiving subsidies from
the FCC as part of the FCC's Universal Service Fund
("USF").  Indeed, to qualify for certain loan advances,
the RUS required Sandwich Isles to provide "evidence
that it has received approval to participate in the

8

> Universal Service Fund" so that the RUS could
> "determine that the revenues derived by Sandwich Isles
> from said Fund, along with the revenues derived by
> Sandwich Isles from all other sources, will be sufficient
> to enable Sandwich Isles to maintain" a certain level of
> financial health.

398 F. Supp. 3d at 764–65 (some brackets removed).

> The USF is a funding stream the [FCC] uses to subsidize
> telecommunications and information services in rural and
> high-cost areas, as well as for schools, libraries, and low-
> income households.  47 U.S.C. § 254(b)(3), (h)(1)(B).
> The USF receives its funding from businesses in the
> telecommunications sector; some businesses are required
> by statute to contribute while others must contribute only
> when the [FCC] has, in its discretion, required them to do
> so.  Specifically, the Act mandates contributions from
> "[e]very telecommunications carrier that provides
> interstate telecommunications services."  *Id.* § 254(d).
> Moreover, under its permissive contribution authority,
> the [FCC] may demand USF contributions from "[a]ny
> other provider of interstate telecommunications . . . if the
> public interest so requires."  *Id.*

*Id.* at 765 (quoting *Vonage Holdings Corp. v. Fed. Commc'ns Comm'n*, 489 F.3d

1232, 1236 (D.C. Cir. 2007)).  "In 2005, Sandwich Isles was receiving USF high-

cost support in the amount of $14,000 per 'loop' (or line) per year."  *Id.*

Evidence at trial established that between 2009 and 2014, Sandwich

Isles primarily earned revenue from two sources: a pooling and cost recovery

arrangement under the National Exchange Carrier Association ("NECA"), by

which Sandwich Isles submitted its expenses to be pooled with other small

9

telecommunications providers, for reimbursement; and the Universal Service High

Cost Loop Fund (or "USF" discussed in *Sandwich Isles I*) under which Sandwich

Isles was reimbursed for certain capital and operational costs related to its

telephone network.  *See* Pl.'s Exh. 31 at SIC0149264; Tr. 10/13/22 at 82.  These

two sources of revenue accounted for more than 90% of Sandwich Isles' total

revenue.  *See, e.g.*, Tr. 10/13/22 at 83, 84, 153; Tr. 10/14/22 at 85; Tr. 10/19/22 at

28.

During this time frame, the most significant of Sandwich Isles'

expenses were its payments on the RUS loans, exceeding $12 million per year, and

lease payments (for an undersea cable network) owed to Paniolo, exceeding $15

million as of December 31, 2012, and increasing each year up to $26 million to be

paid in 2017.  *See* Pl.'s Exh. 31 at SIC 0149269.

## C.    The 2011 Transformation Order Reducing USF Support, and a 2013 Denial of a Waiver to Sandwich Isles

Sandwich Isles' finances changed fundamentally beginning in 2011.

As set forth in *Sandwich Isles I*,

> In 2011, "the FCC 'comprehensively reformed' its
> existing regulatory system for telephone service."  *In re*
> *FCC 11-161*, 753 F.3d 1015, 1035 (10th Cir. 2014).  "On
> February 9, 2011, the FCC issued a Notice of Proposed
> Rulemaking (NPRM) 'proposing to fundamentally
> modernize the FCC's Universal Service Fund (USF or
> Fund) and intercarrier compensation (ICC) system.'"  *Id.*
> at 1035-36 (citation and brackets omitted).  As a result,

on November 18, 2011, the FCC issued a comprehensive
975-page Report and Order (the "Transformation
Order"), that, among other matters, reformed the manner
and amount of USF payouts made to rural carriers.  *See
In re Connect America Fund*, 26 FCC Rcd. 17663, 2011
WL 5844975 (Nov. 18, 2011), *petitions for review
denied*, *In re FCC 11-161*, 753 F.3d at 1033; *see also In
re FCC 11-161*, 753 F.3d at 1070 (analyzing changes to
USF subsidies).

The Transformation Order instituted a $250 per line per
month cap on USF support, effective July 2014.  *See* 47
C.F.R. § 54.302(a).  This was a significant reduction
from the $14,000 per line per year that Sandwich Isles
had been receiving.  As summarized by the United States,
"[t]he Transformation Order affected . . . all high-cost
USF recipients by establishing, 'for the first time,' a
'budget for the high-cost programs within USF' to
'protect consumers and businesses that ultimately pay for
USF through fees on their communications bills.'"

398 F. Supp. 3d at 766.

Sandwich Isles sought a waiver from the Transformation
Order, and its $250 per line per month cap on USF
subsidies, but the FCC denied its request on May 10,
2013.  *See In re Connect America Fund*, 28 FCC Rcd.
6553, 2013 WL 1962345 (May 10, 2013).  The FCC's
denial concluded as follows:

> We conclude that Sandwich Isles has failed to
> show good cause for a waiver at this time.  In
> particular, Sandwich Isles seeks a waiver that
> would allow it to retain a number of significant
> and wasteful expenses, totaling many millions of
> dollars, including significant payments to a
> number of affiliated and closely-related
> companies.  Indeed, Sandwich Isles' corporate
> expenses are 623 percent greater than the average

11

> for companies of similar size with the highest
> corporate operations expenses. . . .  Sandwich Isles
> may file a new petition for waiver in the future,
> once it is able to restructure its operations in an
> appropriate manner that allows it to reduce
> unreasonable expenses.

> 2013 WL 1962345, at **1.  Sandwich Isles apparently
> did not appeal that denial.

398 F. Supp. 3d at 766.

## D.   Sandwich Isles Stops Making Full Payments on Its Loans, and Is Eventually Found in Default

Given its reduction in funding from the USF, Sandwich Isles sought to

mitigate or restructure its loan obligations.  Again, as explained in *Sandwich

Isles I*,

> in an April 25, 2013 letter from Hee to the Secretary of
> Agriculture, Sandwich Isles—given the FCC's adoption
> of the Transformation Order lowering USF payments
> (and apparently while its waiver petition was still
> pending)—notified the FCC that Sandwich Isles "is
> unable to continue making interest and principal
> payments on [its] RUS loans."  Rather, Hee stated that
> "beginning in May 2013, Sandwich Isles will be reducing
> the amount of its debt payment made to RUS to match
> the amount the FCC has determined is reasonable and
> supportable."

> On May 10, 2013, the RUS responded to the April 25,
> 2013 notification by declaring that Sandwich Isles'
> nonpayment of the full amounts owing was an "event of
> default," and that the RUS would be "accelerat[ing] the
> entire debt on the Loans" if full payment was not made.
> After apparent negotiations, by letter dated July 26, 2013,

12

> the USDA rejected a proposed restructuring plan from
> Sandwich Isles.  That letter indicated that, in order to
> cure the default, Sandwich Isles was required by August
> 26, 2013 to make payment in full of past due amounts.
>
> Sandwich Isles did not make payment in full.  Instead, it
> continued to make periodic partial payments until
> February 2018, when it made its last payment.
> Specifically, "[f]rom November 2013 through February
> 2018, [Sandwich Isles] has made payments on the RUS
> Loans ranging from approximately 4.6% to
> approximately 27.7% of the monthly installment
> payments that were due in 2013 prior to RUS's
> acceleration of the repayment of the RUS Loans."

398 F. Supp. 3d at 767.

After Sandwich Isles' failure to make any payments in February 2018, the United States filed this suit on April 20, 2018.  The Complaint contained six substantive counts:

- Count One (breach of contract against Sandwich Isles for failure to repay the RUS loans);

- Count Two (seeking foreclosure and sale of mortgaged property against Sandwich Isles);

- Count Three (violations of the Federal Priority Statute, 31 U.S.C. § 3713, against Hee, Olds, and Ho "for approving payment of claims of others before causing the claims of the United States to be paid");

- Count Four (violations of the FDCPA, 28 U.S.C. § 3304(a)(2), against Waimana, ClearCom, Hoʻopaʻa, Paniolo, Pa Makani LLC, Hee, Ho, and Olds, for "transfers made while [Sandwich Isles] was insolvent");

- Count Five (violations of the FDCPA, 28 U.S.C. § 3304(a)(1), against Waimana, ClearCom, Paniolo, Hee, Ho, and Olds, for "[Sandwich Isles'] transfers or obligations for which [Sandwich Isles] did not receive reasonably equivalent value"); and

- Count Six (breach of fiduciary duty, against Hee and Olds).

The claims against all Defendants other than Hee have been resolved (other than aspects of Count Two regarding a foreclosure matter against Sandwich Isles, as mentioned earlier), leaving Counts Three, Four, Five, and Six against Hee.[5]  As noted earlier, the court has found in favor of the government on Count One, establishing in 2019 that Sandwich Isles has defaulted on the government's loans. *See Sandwich Isles I*, 398 F. Supp. 3d at 773.

The October 2022 trial against Hee concerned financial transactions that occurred in 2014 and 2015, during the period after Sandwich Isles began making only partial payments in 2013 and before it stopped making any payments on the subject loans in 2018.  During trial, evidence was submitted regarding ongoing negotiations between Sandwich Isles and the United States regarding the loans.  In general, it is undisputed that there were attempts during this period (before 2018) by both sides to renegotiate or restructure the government loans based on Sandwich Isles' ability to pay as part of a workout process, given the

---

[5]  The claims under the Federal Priority Statute and the FDCPA against Ho, Olds, Waimana, ClearCom, Ho'opa'a, Paniolo, and Pa Makani were either dismissed or were settled. *See* ECF Nos. 89, 251, 420, 445.  Claims against Paniolo were subject to a bankruptcy stay. *See* ECF Nos. 74, 136.

14

severely limited stream of payments from USF.  *See, e.g.*, ECF No. 481-2 at

PageID.8441–8448 (excerpts of deposition of Kenneth Kuchno); ECF No. 422 at

PageID.6929 ("Representatives of RUS and [Sandwich Isles] engaged in loan

restructuring negotiations of the RUS Loans after August 27, 2013."); *id.* at

PageID.6930 ("Lloyd Randolph, acting as an attorney within the U.S. Department

of Justice, which represents RUS, attempted to negotiate a restructuring based on

ability to pay."); *id.* ("Lloyd Randolph expressed a possibility of agreement that

the RUS loans would be successfully restructured."); *id.* ("Representatives of RUS

and [Sandwich Isles] participated in negotiations for restructuring of the RUS

Loans in 2014 [and 2015].").[6]

Against this backdrop, the trial was limited to the following three

transactions or sets of transactions during the 2014 to 2015 period when Hee was

still a director or officer of Sandwich Isles:

(1) "The Waimana Bonus"—an August 4, 2014 transfer of $1,350,000

from Sandwich Isles to Waimana, purportedly as a "bonus to owner."  *See* Pl.'s

Exh. 20 at SIC0083388–SIC0083390.

---

[6] ECF No. 422 is a stipulation filed on September 27, 2022, between the United States and the Waimana Defendants, which Hee offered into evidence as "Exh. WD 79," referring to the Waimana Defendants' Exhibit 79.  *See* Hee's proposed FOFCOLs at 32, ECF No. 492 at PageID.8875.  That exhibit is properly in evidence.  *See* ECF No. 451 at PageID.7397 (Stipulation of Trial Procedures).

(2) "The ClearCom Transfers"—a remainder of $3,000,000 of "prepaid rent," representing the balance between (a) $9,000,000 transferred by Sandwich Isles to ClearCom between December 31, 2014, and June 17, 2015, and (b) $6,000,000, which ClearCom returned to Sandwich Isles on September 24, 2015.  *See* Pl.'s Exh. 23, 26, 27, 28.  Rather than paying the United States on its loans, Sandwich Isles credited the $3,000,000 remainder to Deutsche Bank in July of 2016, purportedly as a payment on amounts Sandwich Isles owed to Paniolo, which in turn owed loan payments to Deutsche Bank regarding construction of Paniolo's undersea cables.  *See, e.g.*, Pl.'s Exh. 29; Tr. 10/13/22 at 133, 147; Tr. 10/19/22 at 47, 48.  The United States also seeks interest of $127,800 on the $6,000,000 that was otherwise returned to Sandwich Isles from ClearCom.  Pl.'s Exh. 36 at 5, 8.

(3) "Fraudulent Jury Consultant Transfers"—$15,806.27 paid by Sandwich Isles between April 13, 2015, and May 11, 2015, for jury consulting services for use in a 2015 criminal trial then-pending against Hee personally (i.e., not against any Sandwich Isles-related entity) for tax-related charges.[7]  *See* Pl.'s Exh. 30.

---

[7]  The court takes judicial notice that, by judgment entered on January 7, 2016, Hee was sentenced in the U.S. District Court for the District of Hawaii for a conviction for various tax-related crimes, after a jury trial that started on June 23, 2015, and ended in a guilty verdict on July 13, 2015.  *See Sandwich Isles I*, 398 F. Supp. 3d at 764; *United States v. Hee*, Crim. No. 14-

(continued . . .)

The crux of these claims is based on a contention that Sandwich Isles—at a time when it was "insolvent"—made those payments totaling approximately $4.4 million to entities related to Sandwich Isles before satisfying loan obligations to the United States on the loans originally made to Sandwich Isles by RTB. That is, Sandwich Isles allegedly wrongfully paid (or "preferred") others before making loan payments to the United States, and Hee is allegedly personally liable for such payments under applicable laws.

Ultimately, however, the court need not address the particulars of these transactions because, as the court finds and concludes to follow, the United States has failed to prove that Sandwich Isles was "insolvent" at the time of the transfers, a threshold element of its claims in Counts Three, Four, and Five. Further, Count Six fails as a matter of law.

## III. DISCUSSION

### A. Count Three—The Federal Priority Statute

#### 1. The Essential Elements of the Claim

The Federal Priority Statute, concerning "priority of government claims," provides in part that:

---

(. . . continued)
00826 SOM (D. Haw.) (ECF Nos. 168, 189–196 in *Hee*). "[Courts] may take judicial notice of undisputed matters of public record . . . , including documents on file in federal or state courts." *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

> A claim of the United States Government shall be paid first when—
>
> (A)  a person indebted to the Government is insolvent and—
>
>> (i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
>>
>> (ii) property of the debtor, if absent, is attached; or
>>
>> (iii) an act of bankruptcy is committed; or
>
> (B)  the estate of a deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor.

31 U.S.C. § 3713(a)(1).  The purpose of the Federal Priority Statute is to ensure adequate revenue to sustain public burdens and discharge public debts.  *United States v. Moore*, 423 U.S. 77, 81–83 (1975).

In this case, the United States seeks to demonstrate violations of 31 U.S.C. § 3713(a) by establishing the following elements:

> (1) the United States had a claim against the debtor (i.e., Sandwich Isles);
>
> (2) the debtor (Sandwich Isles) was "insolvent"; and
>
> (3) the debtor (Sandwich Isles) committed an "act of bankruptcy."

And if a violation of § 3713(a)(1) is established, 31 U.S.C. § 3713(b) provides as to liability:

> [a] representative of a person or an estate (except a
> trustee acting under title 11) paying any part of a debt of
> the person or estate before paying a claim of the
> Government is liable to the extent of the payment for
> unpaid claims of the Government.

Section 3713(b) "establishes personal liability for a representative of

the debtor who pays other claimants before paying the claims of the federal

government." *United States v. Cole*, 733 F.2d 651, 654 (9th Cir. 1984).  "The

representative liability provision, the provision at issue in this case, gives the

Priority Statute 'teeth' by making a representative who pays a non-federal debt on

behalf of a corporation before paying a federal claim personally liable for the

amount paid." *United States v. Renda*, 709 F.3d 472, 480 (5th Cir. 2013) (citations

omitted).  "Accordingly, a corporate officer is personally liable if, on behalf of the

corporation, he (1) pays a non-federal debt (2) before paying a claim of the United

States (3) at a time when the corporation was insolvent, (4) if he had knowledge or

notice of the claim." *Id.* at 480–81 (citing *United States v. Coppola*, 85 F.3d 1015,

1020 (2d Cir. 1996)).

Under this representative liability provision, the United States seeks to

prove that Hee—a corporate officer and/or director of Sandwich Isles at relevant

times—is personally liable for violations of the Priority Statute as a "representative

of a person" who pays "any part of a debt of the person . . . before paying a claim

19

of the Government" "to the extent of the payment for unpaid claims of the

Government."  31 U.S.C. § 3713(b).

### 2.    *"Insolvency" Under the Priority Statute*

#### a.    *The Balance Sheet Test of Insolvency*

And so, for the United States to succeed on its claims under the

Federal Priority Statute, it must prove at the threshold that Sandwich Isles was

"insolvent."  *See* 31 U.S.C. § 3713(a)(1)(A) (providing that "[a] claim of the

United States Government shall be paid first when—(A) a person indebted to the

Government is insolvent and . . . .").  The Priority Statute does not include its own

statutory definition of "insolvent."  Nevertheless, the Supreme Court and other

authorities have long-held that "insolvent" under the Priority Statute is measured

by a "balance sheet" test of insolvency, i.e., "if its liabilities exceed all its assets,"

as in the Bankruptcy Code.[8]  *See, e.g.*, *Bramwell v. United States Fidelity & Guar.

Co.*, 269 U.S. 483, 487 (1926) (looking to the insolvency definition found in the

---

[8]  The government's Internal Revenue Manual, states that "'insolvent' under 31 U.S.C. § 3713(a) refers to 'balance sheet' insolvency.  This occurs when the debtor's liabilities exceed the debtor's assets."  Internal Revenue Manual § 5.17.13.2.1 (July 9, 2012), available at *https://www.irs.gov/irm/part5/irm_05-017-013* (last accessed August 31, 2023).  Although "[t]he Internal Revenue Manual does not have the force of law," *Fargo v. C.I.R.*, 447 F.3d 706, 713 (9th Cir. 2006), it nevertheless is "the primary, official compilation of instructions to staff that relate to the administration and operation of the IRS."  Internal Revenue Manual § 1.11.2.2(1) (Aug. 12, 2021), available at *https://www.irs.gov/irm/part1/irm_01-011-002* (last accessed August 31, 2023).

Bankruptcy Act of 1898); 11 U.S.C. § 101(32)(A) (defining "insolvency" under the Bankruptcy Code for an "entity other than a partnership and a municipality" as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation" with certain inapplicable exceptions); *United States v. Oklahoma*, 261 U.S. 253, 261 (1923) ("[The Priority Statute] makes it apply only in cases where the debtor 'not having sufficient property to pay all his debts . . . .'"); *Lakeshore Apartments, Inc. v. United States*, 351 F.2d 349, 353 (9th Cir. 1965) ("[I]ts liabilities exceeded its assets."); *In re Gottheiner*, 3 B.R. 404, 408 (Bankr. N.D. Cal. 1980) ("A corporation is insolvent within the meaning of [the Priority Statute] when it is insolvent in the bankruptcy sense. Under this standard a debtor is insolvent whenever the aggregate of his assets is less than the aggregate of its liabilities.") (citing internally to *Oklahoma*, 261 U.S. at 261), *aff'd*, 703 F.2d 1136 (9th Cir. 1983); *Renda*, 709 F.3d at 479 n.6) ("An entity is 'insolvent,' within the meaning of the Priority Statute, if its liabilities exceed its assets.") (citing cases).[9]

---

[9] Some of these cases apply § 3713's predecessor priority statute, 31 U.S.C. § 191 (or Rev. Stat. § 3466), which was amended and recodified in 1982. *See, e.g.*, *Coppola*, 85 F.3d at 1019 n.3. Because "no substantive changes were adopted . . . [courts] rely on case law preceding the 1982 amendment in interpreting the current version of the [Priority] statute." *Id.*; *see also Cole*, 733 F.2d at 652 n.1 ("Section 3713(a) is a revision of section 3466 of the Revised Statutes, 31 U.S.C. § 191 (1976 ed.). The revision was part of a codification of laws relating to money and finance. The House Report on the codification law emphasizes that no substantive change was intended by changes in terminology and style in the codification law.") (citation omitted).

At trial, the United States presented evidence and argued that Sandwich Isles was "insolvent" under a "going concern" or "cash flow" test of insolvency—essentially, the inability to pay debts as they become due in the ordinary course of business.[10]  But that is the wrong test under the Federal Priority Statute.  *See, e.g.*, *Oklahoma*, 261 U.S. at 260–61 (reasoning that "[m]ere inability of the debtor to pay all his debts in ordinary course of business is not insolvency within the meaning of the [Priority Statute]," and rejecting a state law definition of insolvency of a bank—unable to pay its depositors in ordinary course of business and unable to continue as a going banking concern—as insufficient under the Priority Statute if the bank otherwise "has sufficient property to pay all its debts and is not insolvent within the meaning of [the Priority Statute] or the federal Bankruptcy Act"); *United States v. Gotwals*, 156 F.2d 692, 694 (10th Cir. 1946) ("The mere inability of a debtor to discharge his debts in the ordinary course of business does not constitute insolvency under the [Priority] statute.").[11]

---

[10]  The United States uses the terms "going concern" test and "cash flow" test interchangeably.  *See* ECF No. 491 at PageID.8812 (government positing that "Sandwich Isles was unable to pay its obligations as they came due, and was therefore cash flow (going concern) insolvent, by the end of the 2012 fiscal year"); *see also, e.g.*, Tr. 10/18/22 at 17.  The court will also use the terms interchangeably, but even if there are slight differences in terminology, neither test is a "balance sheet" test of insolvency.

[11]  Likewise, the Internal Revenue Manual states that "[t]he inability or failure to pay debts as they become due does not, by itself, constitute insolvency under 31 U.S.C. § 3713(a)." Internal Revenue Manual § 5.17.13.2.1(2) (July 9, 2012) (citing *United States v. Oklahoma*, 261

(continued . . .)

Although the government also argues that "[e]ither test is sufficient to prove insolvency," ECF No. 491 at PageID.8825, this argument is also incorrect.[12] The government cites *In re Lepe*, 470 B.R. 851, 861–62 (B.A.P. 9th Cir. 2012), for the proposition that "[e]ither test is sufficient," but *In re Lepe* has very little to do with the issue before the court.  Rather, *In re Lepe* concerned whether the debtor's bankruptcy plan was filed in good faith; any discussion of insolvency was collateral to that question.  470 B.R. at 855.  Indeed, *In re Lepe* confirms that a "balance sheet insolvency must be distinguished . . . from cash flow insolvency, where a debtor is unable to pay its debts when they come due."  *Id.* at 861 (citation omitted).  In short, the balance sheet test—whether the sum of an entity's debts is

---

(. . . continued)

U.S. 253 (1923)), available at *https://www.irs.gov/irm/part5/irm_05-017-013* (last accessed August 31, 2023).

[12]  The United States' proposed FOFCOLs specifically contend that because Sandwich Isles was cash flow insolvent in 2012, it was insolvent for purposes of its claim under the Priority Statute.  *See* ECF No. 491 at PageID.8831 (proffering that: "Sandwich Isles was unable to meet its obligations as they matured, and therefore was cash flow insolvent by the end of its 2012 fiscal year.  Accordingly, Sandwich Isles was 'insolvent' within the meaning of the Federal Priority Statute at all times after 2012.").  Moreover, as discussed in more detail later, this proposition is not always true for a balance sheet test.  Rather, the United States has a burden to prove insolvency "at the time of each contested transfer."  *In re Blair*, 594 F.R. 712, 753 (Bankr. D. Col. 2018) ("The balance sheet test for insolvency requires that the Court must determine 'the fair value' of the debtor's assets and the extent of its liabilities at the time of each contested transfer.") (citations and brackets omitted).

greater than all of such entity's property, at a fair valuation—is the applicable test under the Priority Statute.[13]

By its plain terms, a cash flow test (or "equity test") is inapplicable to a corporation under the Bankruptcy Code's definition in 11 U.S.C. § 101(32)(A), and thus is inapplicable under the Priority Statute.  Only for a municipality—not a corporation such as Sandwich Isles—is insolvency under the Bankruptcy Code determined by reference to an inability to pay debts as they become due, i.e., a cash flow test.  *See* 11 U.S.C. § 101(32)(C).[14]  The tests are decidedly not equivalent.  *See, e.g.*, *Kreps v. Commissioner of Internal Revenue*, 351 F.2d 1, 9 (2d Cir. 1965) (distinguishing between "[t]he equity test of insolvency [which] equates insolvency with a lack of liquid funds, or the inability to pay one's debts in the ordinary course

---

[13]  Whether a debtor fails a cash flow test might be relevant, although not dispositive, for determining "insolvency" under the *other* Counts of the Complaint under the FDCPA (Counts Four and Five of the Complaint).  *See* 28 U.S.C. § 3302(b) (providing that, for the FDCPA, "[a] debtor who is generally not paying debts as they become due is presumed to be insolvent," although the primary definition of insolvency under the FDCPA states in § 3302(a) that "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation").

[14]  Title 11 U.S.C. § 101(32)(C) defines insolvency "with reference to a municipality" as "financial condition such that the municipality is—(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due."  As for a partnership, § 101(32)(B) defines insolvency with a form of a balance sheet test, with particular provisions regarding the value of a general partner's nonpartnership property and debts.

In its proposed FOFCOLs, the government cites *Newhouse v. Corcoran Irrigation District*, 114 F.2d 690 (9th Cir. 1940), for the proposition that a cash flow test can apply with the Priority Statute.  *See* ECF No. 491 at PageID.8825.  But *Newhouse* concerned a municipal bankruptcy debtor, not a corporation like Sandwich Isles.  *Newhouse* is consistent with § 101(32)(C), but does not support application of a cash flow test here.

of business as the debts mature," on the one hand, and "[t]he bankruptcy test of insolvency [which] focuses on the balance sheet of a company at discreet intervals of time in order to determine whether the company's liabilities exceed its assets," on the other hand); *In re Dak Indus., Inc.*, 170 F.3d 1197, 1200 (9th Cir. 1999) (finding no error because "the bankruptcy court applied a balance sheet test rather than an equitable insolvency test"); *In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1990) ("A firm could be solvent in balance-sheet terms yet be in danger of imminent failure.  Bankruptcy law ignores these subtleties in the interest of having a clear rule: balance-sheet solvency determines whether the payments to creditors in the present case were voidable preferences.") (citations omitted).

At best for the United States, whether a debtor is a "going concern," on the one hand, or "on its deathbed," on the other hand, could affect how to determine the fair valuation of all of a debtor's total assets or property when analyzing insolvency under the balance sheet test.  *See In re Dak Indus.*, 170 F.3d at 1199–1200 ("[A] 'fair valuation' of a debtor's assets must begin with a determination of whether a debtor is 'a going concern' and end with the application of a balance sheet test to determine solvency.").[15]  But whether or not a debtor is a

---

[15] *In re Dak* addressed how to determine the "fair valuation" of all of a debtor's property for purposes of the Bankruptcy Code's balance sheet test of insolvency ("the sum of such entity's debts is greater than all of such entity's property, at a fair valuation").  The Ninth Circuit adopted the following analysis:

(continued . . .)

25

"going concern" does not, by itself, determine whether a debtor is insolvent under the Priority Statute.

           *b.*    *Expert Testimony*

Moreover, "[t]he plaintiff, in order to establish insolvency, must generally produce expert testimony[.]" *In re Prime Realty, Inc.*, 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007); *see also, e.g.*, *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) ("[A] finding of insolvency often depends upon the factual inferences and conclusions of expert witnesses . . . ."); *In re Roblin Indus., Inc.*, 78

---

(. . . continued)

> Although the Code does not define "fair valuation," courts have generally engaged in a two-step process of analysis. *See, e.g.*, *Matter of Taxman Clothing Co.*, 905 F.2d 166, 169–70 (7th Cir. 1990). First, the court must determine whether a debtor was a "going concern" or was "on its deathbed." Second, the court must value the debtor's assets, depending on the status determined in the first part of the inquiry, and apply a simple balance sheet test to determine whether the debtor was solvent.

170 F.3d at 1199. It further noted that:

> If the debtor was a going concern, the court will determine the fair market price of the debtor's assets as if they had been sold as a unit, in a prudent manner, and within a reasonable time. If the company was on its deathbed, i.e., only nominally extant, then the court will determine the liquidation value of the assets, such as a price expected at a foreclosure sale.

*Id.* at 1199 n.3. Even if the court were to accept the government's going concern analysis, the government did not address the "the fair market price of [Sandwich Isles'] assets" nor "the liquidation value of the assets," under either application of "fair valuation." Nor, for that matter, did it address whether Sandwich Isles was "on its deathbed," for purposes of an analysis under *In re Dak*.

F.3d 30, 38 (2d Cir. 1996) ("Whenever possible, a determination of insolvency should be based on seasonable appraisals or expert testimony."); *SE Prop. Holdings, LLC v. Center*, 2017 WL 242610, at *8 n.5 (S.D. Ala. Jan. 19, 2017) (citing numerous cases indicating that expert testimony is the standard means of showing insolvency); 5 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 548.05[3][a] at 548-82 (16th ed. 2020) ("The calculation of insolvency is often technical and will require expert testimony as to the value of the assets and the exposure on the liabilities.  Although accounting values are useful, they are not determinative . . . .").

Here, the United States presented reports and expert testimony of an accountant and auditor, Camille Christiansen, to opine on "insolvency" (and other topics).  *See* Pl.'s Exhs. 35, 36; Tr. 10/18/2022 at 3 to 121.  But Christiansen used a "going concern" or "cash flow" test for her opinions—the wrong test, at least for purposes of the Priority Statute.  *See, e.g.*, Tr. 10/18/22 at 18, 63, 65.[16]  In fact, the

---

[16]  At trial, Christiansen explained that (1) she conducted a "going concern insolvency analysis of Sandwich Isles for its fiscal years of 2012 through 2016," (2) a going concern test is "similar to a cash flow insolvency test," and (3) "[a] going concern insolvency test is looking at the information available in the financial statements along with considering the company's upcoming cash flow that will be generated to determine if they will have the cash flow available to meet those obligations."  Tr. 10/18/2022 at 17.

Christiansen's February 4, 2021 report opined that Sandwich Isles "was insolvent beginning in 2012 and continued through 2013 and 2014," based on a going concern analysis, focusing on its ability to meet obligations as they became due and based on "the assets available to settle those obligations."  Pl.'s Exh. 35 at 8.  At trial, she testified that, although she examined Sandwich Isles' balance sheets, she focused on "only the current assets because those are the

(continued . . .)

expert specifically *disclaimed* any opinion under a balance sheet test.  *See, e.g.*, Tr.

10/18/22 at 119 (testifying that "[the balance sheet test] is a completely different

insolvency test"); *id.* at 120 (stating that she "can't" and "ha[s] not" opined as to a

balance sheet test).[17]  Indeed, she opined that Sandwich Isles was *not* insolvent

when looking at its liabilities and "current assets," at least in 2011, *id.* at 59, and—

when considering a company's balance sheet as a factor in applying a going

concern test—would not necessarily consider a company insolvent (under a going

concern analysis) even if its current liabilities exceeded its current assets for ten

years, *id.* at 60.[18]

---

(. . . continued)

assets that are more liquid in nature that can be used to satisfy obligations in the next year."  Tr. 10/18/2022 at 21.  She explicitly did not consider "assets outside the ordinary course of business," and stated that "disposing of [Sandwich Isles'] property plant equipment to meet obligations would be outside the ordinary course of business."  *Id.*  That is, she did not consider "all of the assets" of Sandwich Isles, much less their "fair valuation."

[17]  At trial, the court asked Christiansen whether she could opine as to a balance sheet test, and she answered that "I can't because the key part . . . ."  Tr. 10/18/2022 at 119–120.  The court then asked her "You haven't?" and she answered "I have not.  I have not, no."  *Id.* at 120.

[18]  When Christiansen was asked at trial how she considers current assets and current liabilities in her going concern analysis, she answered that "I consider it relative to a trend, but just because . . . current liabilities are greater than current assets on its own does not mean that a company is insolvent."  Tr. 10/18/2022 at 59.  According to Christiansen, a negative balance sheet is not enough to satisfy a going concern or cash flow test, one way or the other.  *Id.*  When applying a cash flow test, she was asked whether she "[w]ould consider a company insolvent if its current liabilities exceeded its current assets for ten years?" and she answered "[n]ot necessarily, no."  *Id.* at 60.  Thus, although she discussed Sandwich Isles' balance sheets, she was not addressing a balance sheet test of insolvency and appears not to have given much weight to whether all of its assets exceeded its liabilities for any particular year.

Christiansen was the only government expert witness regarding insolvency.  And so, the United States had *no* expert witness opining as to insolvency under a balance sheet test.  Moreover, even assuming the court could make a finding on insolvency under the balance sheet test without expert opinion, the United States has not proffered sufficient evidence of Sandwich Isles' finances—much less of the "fair valuation" of all of Sandwich Isles' assets—during the relevant periods to meet its burden of proof.

  c. *The Government's Proffered Evidence of Balance Sheet Insolvency*

The United States proffers an audited financial statement of Sandwich Isles for the years ending in 2012 and 2013, which lists Sandwich Isles' "Total Current Assets" for 2013 as "$17,307,135," and its "Total Current Liabilities" as "$148,557,147."  *See* Pl.'s Exh. 32 at SIC0149282–83.  Based on that, it argues that Sandwich Isles had "only $17 million of current assets available to pay [its] liabilities."  ECF No. 491 at PageID.8813.  It then leaps to concluding that "according to the valuations set forth in its annual audited Financial Statements, Sandwich Isles debts were therefore greater than all of its assets at a fair valuation by December 31, 2013."  *Id.*; *see also id.* at PageID.8831–8832 n.44 (arguing that "[i]n any event, the totality of the circumstances and unrebutted evidence as to the

valuation of Sandwich Isles' assets in its audited financial statements shows that Sandwich Isles was clearly balance sheet insolvent by the end of 2013").

But the United States does not explain that financial statement's figure of $292,285 of "Other Assets," nor account for the statement's listing of assets for "Property, Plant, and Equipment, net" of $159,744,951.  *See* Pl.'s Exh. 32 at SIC0149282.  It only considers Sandwich Isles' "current" or "liquid assets" that were available to pay ongoing debts—a valid consideration for a cash flow test, but the wrong (or incomplete) consideration for the balance sheet test.  In truth, the 2013 financial statement's listing of *all* Sandwich Isles' "assets" appears to be $177,344,371 (with a double-underline of that figure on the statement, presumably to indicate the *total* figure of assets), which (at face value) is *greater* than its listed total current liabilities of $148,557,147.[19]  *See id.*  Again, the relevant test is whether "the sum of such entity's debts is greater than *all* of such entity's property, at a fair valuation," 11 U.S.C. § 101(32)(A) (emphasis added).

---

[19]  The financial statement lists (1) total assets of $177,344,371 (the total of "Total Current Assets," "Other Assets," and "Property, Plant, and Equipment, net"), *see* Pl.'s Exh. 32 at SIC0149282, and (2) total liabilities of $176,853,883 (the total of "Total Current Liabilities" of $148,557,147 and "Total Noncurrent Liabilities" of $28,296,736, *see id.* at SIC0149283).  Thus, under the United States' evidence, it appears to the court that Sandwich Isles' total assets *exceeded* its total liabilities in 2013—apparently indicating Sandwich Isles was not balance sheet insolvent in 2013.  Again, however, there is no expert testimony on this question, much less evidence on the fair valuation of all of Sandwich Isles' assets.  In this context, for example, the meaning of "non-current liabilities" and "other assets" are accounting principles for which the court has no expertise.  With no expert testimony, the court can only speculate as to the valuation of all of Sandwich Isles' property.

The United States has offered no evidence at trial of the "fair valuation" of all of Sandwich Isles' assets—at best, it cites only to Christianson's report, which lists "current assets" in a table but *excludes* any figures for other assets such as "Property, Plant, and Equipment," *see* ECF No. 491 at PageID.8813 (citing the expert report).  It has no evidence and does not argue, for example, that the "fair valuation" of these other assets is lower than listed on the financial statement, or that the figures on the statement are wrong, or that those assets should otherwise be disregarded.  And in addressing balance sheet insolvency many courts have noted that "[n]eedless to say, a fair valuation may not be equivalent to the values assigned on a balance sheet."  *In re Haddox Contractor, Inc.*, 40 F.3d 118, 121 (5th Cir. 1994); *see also, e.g.*, *In re Roblin Indus., Inc.*, 78 F.3d 30, 36 (2d Cir. 1996) ("It is also true that book values are not ordinarily an accurate reflection of the market value of an asset.") (citing numerous cases); *In re Lingham Rawlings, LLC*, 2013 WL 1352320, at *17 (Bankr. E.D. Tenn. Apr. 3, 2013) ("As the statutory definition of insolvency makes clear, establishing solvency requires evidence of the value of Ames' assets and liabilities (and especially the former) *at a fair market value. . . .* Financial statements' showings as to assets and liabilities (and especially assets) are not necessarily (and rarely are) reflective of actual fair market value . . . ."); *cf. In re The Mortg. Store, Inc.*, 2015 WL 2195098, at *4 (Bankr. D. Haw. May 7, 2015) (denying summary judgment as

31

to insolvency reasoning that "[t]he book value of the assets, correctly reported in accordance with [generally accepted accounting principles], may or may not coincide with the fair valuation of the assets," and where the expert witness "acknowledged that he did not have an opinion about the 'fair valuation' of the assets") (applying the balance sheet test in HRS § 651C-2(a)).

Further, in its proposed FOFCOLs, the United States does not propose *any* findings about Sandwich Isles' insolvency as of the end of 2014 or 2015. It only proposes findings for the end of 2012 or 2013, which it presumably believes is sufficient for purposes of 2014 and 2015, when the transactions at issue occurred. *See* ECF No. 491 at PageID.8812–8813. But it is certainly possible that Sandwich Isles could be "insolvent" at the end of 2013 but solvent at the end of 2014 or 2015 (or vice versa). The United States has a burden to prove that Sandwich Isles was insolvent "at the time that the personal representative effects a transfer of assets." *United States v. McNicol*, 829 F.3d 77, 81 (1st Cir. 2016); *Renda*, 709 F.3d at 480–81. "The 'balance sheet test' requires a determination of whether the debtor was insolvent on the date of the transfer, which involves comparing of the fair value of the debtor's assets at the time of the transfer with the liabilities on the same date." *In re Tanglewood Farms, Inc., of Elizabeth City*, 515 B.R. 218, 223–24 (Bankr. E.D.N.C. 2014) (citations omitted); *see also In re Blair*, 594 B.R. at 753 (". . . at the time of each contested transfer"). The United States

32

has not met its burden to prove Sandwich Isles was insolvent under a balance sheet test for purposes of the Priority Act for *any* year, much less at the time of the contested transfers.[20]

The court therefore finds and concludes that the United States has failed to prove by a preponderance of the evidence, that Sandwich Isles was "insolvent" for purposes of its claims under the Priority Statute. It follows that the United States has failed to prove its claim under Count Three against Hee. And so (even if the Waimana Bonus payment was irregular, and even if the payment to

---

[20] The court has no obligation to scour the record in search of proof to support the government's case. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in [the record]." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). But the court is aware of Plaintiff's Exhibit 33, which includes an audited financial statement of Sandwich Isles with a balance sheet for 2014. *See* Pl.'s Exh. 33 at SIC0149307–SIC0149308. Exhibit 33 lists $174,944,180 of total assets for fiscal year 2014 for Sandwich Isles (including "current assets," "other assets," and "property, plant and equipment, net"), *see id.* at SIC0149307. Those total assets might be less than its total liabilities (if the court adds "total current liabilities" of $166,480,677 and "total noncurrent liabilities" of $21,472,328 to equal $187,953,005 of liabilities, *see id.* at SIC0149308).

But the government did not cite these figures in support of insolvency under a balance sheet test. Rather, the government only cited this exhibit in a string cite in its proposed FOFCOLs for the proposition that "[b]y 2012, Sandwich Isles' current liabilities—i.e., liabilities to be settled in the next year—exceeded its current assets available to settle those obligations." ECF No. 491 at PageID.8812. It thus cited Exhibit 33 in support of a cash flow insolvency analysis. And the court has no basis to consider Exhibit 33 as proof of insolvency under a balance sheet test for 2014. For example, as discussed earlier, the court has no evidence (e.g., appraisals or expert testimony) of the fair valuation of all of Sandwich Isles' assets, nor any knowledge of the accounting term "noncurrent liabilities." If the court excludes the $21,472,328 of "noncurrent liabilities" then the total of all assets for 2014 ($174,944,180) would *exceed* liabilities ($166,480,677). In short, even if the court considered Exhibit 33 under a balance sheet test—something the government did not ask the court to do—the government would still have failed to meet its burden of proof.

Deutsche Bank could have been used to reduce government debt), the court need not address other elements of a Priority Claim such as whether Sandwich Isles committed an "act of bankruptcy," whether its payments were in the ordinary course of business, or whether Hee had "knowledge or notice" of the claim.

## B.   Counts Four and Five—The FDCPA

Under 28 U.S.C. § 3304(a), certain fraudulent transfers are voidable by the United States.[21]  Transfers by a debtor are fraudulent as to the United States if an insolvent debtor does not receive reasonably equivalent value in exchange for the transfer (a "constructive fraud theory"), *id.* § 3304(a)(1), or if the transfer was made on account of an antecedent debt to an insider who had reasonable cause to believe the debtor was insolvent (an "insider theory"), *id.* § 3304(a)(2).

---

[21]  Section 3304(a) provides:

(a) Debt Arising Before Transfer.—Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if—

(1)(A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
(B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation; or

(2)(A) the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time; and
(B) the insider had reasonable cause to believe that the debtor was insolvent.

As to Counts Four and Five, the United States sought to prove at trial under 28 U.S.C. § 3304(a)(1) or § 3304(a)(2) that Sandwich Isles made fraudulent transfers—i.e., made improper payments to "insiders" or "without receiving a reasonably equivalent value" at a time when Sandwich Isles was "insolvent"— instead of satisfying debts owed to the United States.  If transfers were fraudulent, the United States would be entitled to avoid the transfers under 28 U.S.C. § 3306(a)(1)[22] and, if the transfers were made for the benefit of Hee, would be able to recover the amount from Hee under 28 U.S.C. § 3307(b)(1).[23]  *See, e.g.*, *United States v. Schippers*, 982 F. Supp. 2d 948, 973 (S.D. Iowa 2013) (discussing

---

[22] Section 3306 provides in relevant part:

> (a) In General.—In an action or proceeding under this subchapter for relief against a transfer or obligation, the United States, subject to section 3307 and to applicable principles of equity and in accordance with the Federal Rules of Civil Procedure, may obtain—
>
>> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;
>> (2) a remedy under this chapter against the asset transferred or other property of the transferee; or
>> (3) any other relief the circumstances may require.

[23] Section 3307 provides in relevant part:

> (b) Limitation.—Except as provided in subsection (d), to the extent a transfer is voidable in an action or proceeding by the United States under section 3306(a)(1), the United States may recover judgment for the value of the asset transferred, but not to exceed the judgment on a debt. The judgment may be entered against—
>
>> (1) the first transferee of the asset or the person for whose benefit the transfer was made . . . .

35

remedies available to the government for a fraudulent transfer under the FDCPA, including under § 3307(b)).  Both of these Counts are directed solely to the $15,806.27 that was paid by Sandwich Isles to Ward Research, Inc., for jury consulting services for 2015 Hee's criminal tax trial.  Additionally, proving either Count would, under the government's theory, also constitute an "act of bankruptcy" for its Federal Priority Claim asserted in Count Three.

But, similarly to the court's ruling as to Count Three, the court finds and concludes that the United States has not met its burden to prove "insolvency" of Sandwich Isles for purposes of Counts Four and Five.

The FDCPA provides its own definition of "insolvency."  As noted above, "insolvency" for purposes of the FDCPA—but not for the Federal Priority Statute—is defined in 28 U.S.C. § 3302.  Section 3302(a) provides:  "Except [for a partnership] as provided in subsection (c), a debtor is insolvent if the sum of the debtor's debts is greater that all of the debtor's assets at a fair valuation."  This is the traditional balance sheet test of insolvency, and is the same definition as in the Bankruptcy Act for a corporation.  *See* 11 U.S.C. § 101(32)(A) (defining "insolvent" for "an entity other than a partnership and a municipality" as "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . .").

36

Section 3302(b) does, however, create a "presumption" that "[a] debtor who is generally not paying debts as they become due is presumed to be insolvent." That is, a debtor that fails a cash flow test of insolvency is presumed to be balance sheet insolvent under § 3302(a)'s general definition. The definition in § 3302—both the general definition in § 3302(a) and the presumption in § 3302(b)—is "identical in substance" with the definition of insolvency set forth in the Hawaii Uniform Fraudulent Transfers Act, Haw. Rev. Stat. ("HRS") ch. 651C. *In re: Rolloffs Hawaii, LLC*, 2021 WL 4943463, at *2 (Bankr. D. Haw. Oct. 21, 2021). Nevertheless, under both statutes, "[t]he presumption is rebuttable." *Id.* at *3.[24]

---

[24] In assessing whether a debtor is presumed insolvent under HRS § 651C-2(b) and the identically-worded 28 U.S.C. § 3302(b), *In re: Rolloffs Hawaii, LLC* also pointed to commentary from the Uniform Fraudulent Transfer Act (from which HRS ch. 651 is derived):

> In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness. The court should also take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments. The court's determination may be affected by a consideration of the debtor's payment practices prior to the period of alleged nonpayment and the payment practices of the trade or industry in which the debtor is engaged.

2021 WL 4943463, at *3 (quoting Unif. Fraudulent Transfer Act § cmt. 2). The court has not weighed these factors in assessing whether the United States has proven insolvency of Sandwich Isles under a going concern test. Indeed, because it is the wrong test under the Priority Statute,

(continued . . .)

In addressing this presumption, the court applies Federal Rule of

Evidence 301, which governs as to "presumptions in civil cases generally:"

> In a civil case, unless a federal statute or these rules
> provide otherwise, the party against whom a presumption
> is directed has the burden of producing evidence to rebut
> the presumption.  But this rule does not shift the burden
> of persuasion, which remains on the party who had it
> originally.

Nothing in § 3302 "provides otherwise" to indicate that the burden of *proving*

solvency (or disproving insolvency) would shift permanently once the presumption

has been established.

Thus, even if the government has established a presumption of

insolvency under § 3302(b) for purposes of the FDCPA, that presumption can be

rebutted with evidence.  Once rebutted, the burden of proof remains on the

government—which the government could satisfy by proving insolvency under a

balance sheet test as set forth in § 3302(a).

For example, a presumption of insolvency can be rebutted with

evidence of solvency under the general balance sheet test set forth in the

Bankruptcy Code.  *See In re Pembroke Dev. Corp.*, 122 B.R. 610, 612 (Bankr.

S.D. Fla. 1991) (rebutting the presumption of insolvency in 11 U.S.C. § 547(f) by

---

(. . . continued)
the court need not make any ultimate finding of insolvency under a going concern or cash flow
test.

introducing bankruptcy petition schedules listing the value of a debtor's property

that exceeds its listed liabilities, "thereby rendering the debtor solvent"). If the

presumption is rebutted, the burden remains with the proponent to prove

insolvency under the balance sheet test. In *In re Pembroke*, after the presumption

was rebutted by evidence of solvency under the balance sheet test, the party

seeking to prove the debtor was insolvent—like the United States here in seeking

to prove Sandwich Isles was insolvent—then argued that the property values under

the balance sheet test were not accurate because the values did not take current

market conditions into account. *See* 122 B.R. at 612 ("[T]he debtor asserted that

the actual values of the properties were substantially less than [the] sum of the

liabilities listed on the schedules, and the debtor was therefore insolvent."). *In re

Pembroke* found, however, that the proponent failed to meet its ultimate burden of

proof because it "failed to introduce any evidence, such as appraisals or opinion

testimony, to indicate to the Court the actual values of the real properties." *Id. See

also, e.g.*, *Maples, Tr. for Priceville Partners, LLC v. Klein*, 2020 WL 1659748, at

*6 (N.D. Ala. Mar. 27, 2020) (granting summary judgment as to a lack of

insolvency "[b]ecause [the trustee] has presented no evidence to contradict the

Defendants' evidence [rebutting a presumption of insolvency] showing that [the

debtor] was not insolvent"); *In re Lingham Rawlings, LLC*, 2013 WL 1352320, at

*16 ("[T]he presumption of insolvency may be rebutted by the introduction of

'some evidence to show that the debtor was solvent *at the time of the transfer[.]*'
'If the creditor introduces such evidence, then the trustee must satisfy its burden of
proof of insolvency by a preponderance of the evidence.'") (emphasis in original)
(citations omitted).

      Applying § 3304 here, the government at trial has failed to prove
insolvency under § 3304(a) for the same reason it failed to prove insolvency under
the Priority Statute.  It has failed to submit any evidence of the fair valuation of all
of Sandwich Isles' assets for 2013 (or 2014 or 2015 for that matter), much less
expert testimony as to valuation applying a balance sheet test.  Again, as discussed
in detail earlier, the government's expert opined on insolvency under a cash flow
test (and she specifically disclaimed any opinion as to insolvency under a balance
sheet test).  *See* Tr. 10/18/22 at 119.

      Even assuming that the United States, through its expert's opinion,
has established that Sandwich Isles was cash flow insolvent for 2013 (thus entitling
it to a presumption of insolvency under § 3304(b)), that presumption has been
rebutted by the 2013 financial statement itself.  Under the same reasoning
discussed when examining the Federal Priority Statute—with no explanation or
expert testimony as to valuation—the sum of *all* of Sandwich Isles assets,
including its plant, property and equipment, *exceeds* its liabilities.  *See* Ex. 32 at

SIC0149282.  That is, as discussed earlier, Sandwich Isles may actually have been

solvent in 2013 under a balance sheet test when looking at the figures at face value.

Even if Hee did not actually prove at trial that Sandwich Isles was in

fact *solvent* under a balance sheet test, it was not his burden to prove solvency; it

was still the government's burden to prove *insolvency* once a presumption of

insolvency under § 3304(b) was rebutted.  *See* Fed. R. Evid. 301.  As with *In re*

*Pembroke*, the United States has "failed to introduce any evidence, such as

appraisals or opinion testimony, to indicate to the Court the actual values" of all of

Sandwich Isles' assets.  122 B.R. at 612.  *See also In Re: Alpha Protective Servs.,*

*Inc.*, 570 B.R. 914, 921 (Bankr. M.D. Ga. 2017) (concluding that "the Trustee has

not carried his burden . . . on the issue of the Debtor's insolvency" under § 3302(a)

where "[t]he record does not show that the sum of the Debtor's debts was greater

than all of the Debtor's assets at fair value at the time of the insider-preferential

transfers").

It follows that (although the Jury Consultant Transfer payments in

2015 of $15,806.27 from Sandwich Isles to Ward Research, Inc., for use in Hee's

criminal trial appear to have been irregular) the court need not reach whether

Sandwich Isles made the transfers without receiving "a reasonably equivalent

value," whether these payments were fraudulent transfers under § 3304(a), nor

whether Hee was "the person for whose benefit the transfer was made" under 28

U.S.C. § 3307(b)(1).  The failure to prove insolvency under § 3304 is enough for the government's FDCPA claims to fail.[25]

## C.      Count Six—Breach of Fiduciary Duty Under the Trust Fund Doctrine

Finally, the court finds and concludes that the United States has failed to prove liability for its claim under Count Six.

The United States bases this claim on Hawaii state law—a common law claim under the "Trust Fund Doctrine," which "imposes certain fiduciary duties on a corporation's directors when the corporation becomes insolvent." *Mansha Consulting LLC v. Alakai*, 2017 WL 3659163, at *9 (D. Haw. Aug. 23, 2017).  "The theory underlying the doctrine is that when [insolvency] occurs the assets of a corporation 'exist for the benefit of all of its creditors and that thereafter no liens or rights can be created either voluntarily or by operation of law whereby one creditor is given an advantage over others.'"  *Id.* (quoting 15A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 7369 (rev. vol.

---

[25]  Hee also argued (both in his opening statement and in his proposed FOFCOLs) that the FDCPA claim in Count Four, 28 U.S.C. § 3304(a)(2)(A), is time-barred because such a claim must be brought "within two years after the transfer was made of the obligation was incurred." 28 U.S.C. § 3306(b)(3).  *See* Tr. 10/13/2023 at 29; ECF No. 492 at PageID.8886.  Hee further argues that § 3306(b)(3) is a statute of repose which is not subject to tolling.  *See* Tr. 10/13/2023 at 29.  The United States did not specifically respond to these arguments at trial.  Nevertheless, even if Count Four were time-barred, the government could still proceed with Count Five under § 3304(a)(1)—which has a *six-year* period to bring a claim, *see* § 3306(b)(2).  Counts Four and Five are duplicative to the extent they both seek recovery of the Fraudulent Jury Consultant Transfers.  But because the government has failed to prove insolvency for purposes of the FDCPA, the court need not resolve whether a claim in Count Four under § 3304(a)(2) would otherwise be time-barred.

2009) ("*Fletcher*")).  Under this doctrine, "creditors may look to the personal assets of the directors for breaching their fiduciary duties in improperly distributing the assets of a corporation."  *Id.* (quoting *Fletcher*) (internal editorial marks omitted).

In comprehensively reviewing Hawaii law, *Mansha Consulting* recognized that "[v]ery few cases in Hawaii have involved the trust fund doctrine and most of these cases are over a hundred years old."  *Id.* (citations omitted).  And most important for present purposes, *Mansha Consulting* also determined under Hawaii law that "the trust fund doctrine [does] not apply unless the corporation determines to discontinue the prosecution of business."  *Id.* at *12.  It applied the following statement of the law:  "*[W]hen a corporation becomes insolvent and intends not to prosecute it business, or does not expect to make further effort to accomplish the objects of its creation*, its managing officers or directors come under a duty to distribute its property or its proceeds ratably among all creditors, having regard of course to valid liens or charges previously placed upon it."  *Id.* (emphasis in original) (quoting *Sutton Mfg. Co. v. Hutchinson*, 63 F. 496, 500–03 (7th Cir. 1894)).[26]

---

[26] *Sutton* had been followed by the Hawaii Territorial Supreme Court in *Troy Laundry Mach. Co. v. Sanitary Steam Laundry Co.*, 18 Haw. 388 (Haw. Terr. 1907), which applied the trust fund doctrine.

*Mansha Consulting* had applied the same rule in an earlier decision in the case, and refused to reconsider its prior ruling. *See id.* (finding "no reason to depart from the law of the case as to this issue") (referring to a prior order at *Mansha Consulting LLC v. Alakai*, 236 F. Supp. 3d 1267, 1279 n.4 (D. Haw. 2017)). In that prior order dismissing the breach of fiduciary duty claim with leave to amend, the court recognized that the trust fund doctrine "has created . . . much confusion" and "has been widely criticized." 236 F. Supp. 3d at 1278 (quoting *Fletcher*). *Mansha Consulting* also reasoned that "other jurisdictions have found that the trust fund doctrine does not apply when a corporation is insolvent but still operating." 2017 WL 3659163, at *12 (citing cases).[27] The doctrine essentially has a narrow view of the "insolvency" necessary to trigger fiduciary duties in that context. And this court agrees with *Mansha Consulting*'s view of Hawaii law. Thus, under Hawaii law, if an "insolvent" debtor has not been dissolved and intends to stay in business—like here with Sandwich Isles—then the Trust Fund doctrine does not apply.

And so, the government cannot prevail on Count Six. Even assuming that Sandwich Isles was "insolvent" in 2013 (or 2014) under a cash flow or "going

---

[27] *See In re Kallmeyer*, 242 B.R. 492, 497 (B.A.P. 9th Cir. 1999) (concluding that "[w]hen a corporation becomes insolvent *and ceases doing business*, Oregon law requires the directors to hold the corporation's assets in trust for the benefit of the corporate creditors," and affirming the use of a balance sheet test of insolvency) (emphasis added).

44

concern" test (and assuming that test is sufficient under Hawaii law), there is no evidence that Sandwich Isles had been dissolved, much less that it intended to stop operating.  At best, there was credible testimony that Sandwich Isles considered filing for bankruptcy in 2013, *e.g.*, Tr. 10/14/23 at 28, but the evidence—stipulated by the government—is that Sandwich Isles intended to stay in business and had hopes or expectations that the RUS loans would be re-negotiated or debt would be restructured.  *See, e.g.*, Exh. WD 79; ECF No. 422 at PageID.6929, 6930. Although the government accelerated Sandwich Isles' debt in April 2013, Sandwich Isles continued to operate and make partial payments on the loans.  It was not until April 2018 that it filed this suit, after Sandwich Isles stopped making any payments in February 2018.  *See Sandwich Isles I*, 398 F. Supp. 3d at 767. Indeed, Sandwich Isles remained in operation (even with clear financial difficulties) well past 2016, and was operating in some form even at the time of trial in October 2022.  *See, e.g.*, Tr. 10/18/2022 at 65, 66.

In short, the Trust Fund Doctrine—the basis for Count Six—does not apply in this case under Hawaii law.  The government at trial failed to prove that Hee is liable for breaching fiduciary duties under the Trust Fund Doctrine for the transactions at issue in this trial.  Count Six fails.

## IV.  **CONCLUSION**

For the foregoing reasons, Plaintiff United States of America has failed to prove liability against Defendant Albert S. Hee under Counts Three through Six.  Judgment will issue in favor of Defendant Hee after the court resolves the remaining issue regarding foreclosure as to Sandwich Isles.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 31, 2023.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*United States v. Sandwich Isles Communications, et al.*, Civ. No. 18-00145 JMS-RT, Findings of Fact and Conclusions of Law as to Claims Against Albert S.N. Hee